**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 15-24067-CV-ALTONAGA/O'Sullivan**

ROTHSCHILD CONNECTED                )
DEVICES INNOVATIONS, LLC,            )
                                     )
                 Plaintiff,          )
                                     )
v.                                   )
                                     )
THE COCA-COLA COMPANY,               )
                                     )
                 Defendant.          )
                                     )
_____       )

<u>**DEFENDANT THE COCA-COLA COMPANY'S**</u>
<u>**OPENING CLAIM CONSTRUCTION BRIEF**</u>

## TABLE OF CONTENTS

I.     INTRODUCTION .......................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

III.   LEGAL STANDARD .................................................................................... 3
       A.    The Patent and Its Claims ................................................................ 3
       B.    The Law of Claim Construction ...................................................... 3

IV.    ARGUMENT ................................................................................................. 5
       A.    "element" ........................................................................................... 5
       B.    "valve" ................................................................................................ 6
       C.    "coupling" .......................................................................................... 8
       D.    "dispensing section" ........................................................................ 8
       E.    "mixing chamber for mixing the beverage" ................................ 10
       F.    "user interface module" ................................................................ 11
       G.    "actuate" .......................................................................................... 13
       H.    "server" ............................................................................................ 14
       I.    "communication module" .............................................................. 16
       J.    "configured to actuate the at least one valve to control an amount of
             the element to be dispensed … based on the user gene[r]ated beverage
             product preferences" ...................................................................... 18
       K.    "configured … to actuate the mixing chamber based on the user
             gene[r]ated beverage product preferences" ................................ 20

V.     CONCLUSION ............................................................................................ 20

## TABLE OF AUTHORITIES

**CASES**                                                   **PAGE(S)**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003)............................................................11, 12

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
55 F.3d 615 (Fed. Cir. 1995).........................................................................3

*Boston Sci. Scimed, Inc. v. Cordis Corp.*,
554 F.3d 982 (Fed. Cir. 2009)....................................................................4, 5

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002).......................................................................3

*CIAS, Inc. v. All. Gaming Corp.*,
504 F.3d 1356 (Fed. Cir. 2007)....................................................................11

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997)......................................................................11

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ........................3

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)..........................................................3, 4, 5, 8

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).....................................................................4

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012).....................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)...............................................................3, 4, 8

# I.   INTRODUCTION

Pursuant to the Court's December 15, 2015 Order Setting Trial and Pre-Trial Schedule, Requiring Mediation, and Referring Certain Matters to Magistrate Judge, The Coca-Cola Company ("Coca-Cola") hereby submits its Opening Claim Construction Brief in connection with U.S. Patent No. 8,417,377 ("the '377 Patent"). In this action, Plaintiff Rothschild Connected Devices Innovations, LLC ("RCDI") alleges that Coca-Cola has infringed certain claims of the '377 Patent. The '377 Patent is entitled "System and Method for Creating a Personalized Consumer Product" and was issued to Leigh Rothschild on April 9, 2013.[1]

Coca-Cola's proposed constructions are consistent with the use of the terms in the claims, specification, and file history of the '377 Patent (i.e., the intrinsic record).[2] Despite Coca-Cola's repeated requests, RCDI has steadfastly refused to discuss which claim terms require construction, which constructions it may propose, or even which patent claims are being asserted against Coca-Cola. Accordingly, it is unknown to Coca-Cola at this point whether Coca-Cola's proposed constructions are even disputed by RCDI.[3] Coca-Cola respectfully requests that the Court adopt the constructions proposed herein.

---

[1] RCDI also asserted U.S. Patent No. 8,788,090 against Coca-Cola in this action, but has since indicated its intent to withdraw its infringement allegations pertaining to that patent. Based on RCDI's stated intent to withdraw that patent from this action, Coca-Cola has not requested the construction of any terms unique to that patent's claims.

[2] Coca-Cola seeks constructions from the Court only for terms in Claim 11 of the '377 Patent, because that is the only claim that RCDI has identified as allegedly infringed. Though Coca-Cola proposed constructions for additional terms found in Claim 1 of the '377 Patent, including "housing," "product to be consumed by a user," "final product," "communicate to the controller the specific valve settings for the at least one valve," "communicate to the controller … the specific time and duration for actuating the mixing device based on the received product preferences of the user," "mixing device," and "exit port," RCDI has since withdrawn is infringement allegation pertaining to Claim 1 of the 377 Patent. Accordingly, Coca-Cola does not seek construction of these terms at this time.

[3] On the evening before this opening claim construction brief was due to the Court, RCDI filed a Motion for Leave to File Amended Complaint alleging for the first time that Coca-Cola has infringed Claims 12, 13, 15, 17, 19, and 21-25 of the '377 Patent. In the event the Court grants RCDI's leave to amend its complaint, Coca-Cola will later supplement this brief to address any constructions made necessary by RCDI's proposed amendment.

## II.     BACKGROUND

The '377 Patent describes a system and method for creating a personalized consumer product.  This system and method purports to enable a consumer to customize products allow a server to communicate over a global network to provide the preferences of a user to a beverage dispenser which in turn creates the customized product.

The Inventor plainly states in the Abstract:

> The method for creating a product according to a user's preferences over a network includes the steps [of] identifying a product to a server over the network; identifying a user to the server over the network; retrieving the user's product preferences from a database at the server based on the product's identity and user's identity; transmitting the user's product preferences to the product over the network; and mixing at least one element contained within the product based on the user's product preferences.

('377 Patent at 1:57-62).

According to the '377 Patent, a "need exists for a system and method to enable a user to customize a consumable product wherein the user's product preferences may be stored and retrieved at a later time when the user purchases the product." ('377 Patent at 1:47-51).  Thus, the '377 Patent describes a solution in which a computer communicates via the internet in order to store a user's preferences and instruct a device on the proper elements required to create such a product.

The '377 Patent claims priority to a parent patent, U.S. Patent No. 7,899,713, which Mr. Rothschild filed on June 20, 2006, entitled "System and Method for Creating a Personalized Consumer Product" (the '713 Patent).  The '377 Patent incorporates the contents of the 713 Patent and its application, U.S. Application Ser. No. 11/471,323, in their entirety.

2

### III.     LEGAL STANDARD

#### A.     The Patent and Its Claims

A patent includes two basic parts: (i) a written description of the invention, which is referred to as the "specification" of the patent, and (ii) the patent claims.  The specification typically contains a short abstract describing the invention, a recitation of the background and summary of the invention, a set of drawings depicting the invention, and a description of the drawings and preferred embodiment of the invention.  The patent claims define the boundaries of the invention and provide notice to the public of those boundaries.  *See Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude") (internal quotations omitted); *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention.").  The text of the claims list in separate paragraphs the elements of the invention – referred to as "limitations" because they define the technical boundaries of the invention.  Thus, when a product or service is accused of infringing a patent, it is the claims that must be compared to the accused product or service to determine whether or not there is infringement. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc*., 289 F.3d 801, 812 (Fed. Cir. 2002).

#### B.     The Law of Claim Construction

In a patent lawsuit, a court first determines, as a matter of law, the proper definition of the terms of the patent claims, thus establishing the scope and boundaries of the subject matter of the patent.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995).  In order to ascertain the meaning of an asserted claim, a court must first look to "intrinsic" evidence, *i.e.*, the language of the claim, the patent specification, and the file history.

3

*Phillips,* 415 F.3d at 1315 (citing *Vitronics,* 90 F.3d at 1582-83 ("Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.")).

It is well established that "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.  Further, the specification is not only "always highly relevant to the claim construction analysis," but "[u]sually it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  Thus, the claims of the patent should be read in view of the specification.  *Id.* The specification becomes especially important when the patentee acts as his own lexicographer, creating his own definitions of claim terms.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Vitronics*, 90 F.3d at 1580.  In this situation, the specification acts as a dictionary for the Court to use in construing the claim terms.  *Phillips*, 415 F.3d at 1321.

In addition to the specification, the file history of the patent-in-suit should be considered in interpreting the claims.  *See id.* at 1317.  Like the specification, the prosecution history provides evidence of how the Patent Office and the inventor interpreted the invention disclosed in a patent.  *Id.*  "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent."  *Id.*  The prosecution history is particularly relevant when "the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.*

Although in most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, *Vitronics*, 90 F.3d  at 1582, extrinsic evidence, such as a dictionary definition, can be considered "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Boston Sci. Scimed,*

*Inc. v. Cordis Corp.*, 554 F.3d 982, 987 (Fed. Cir. 2009) (holding that the district court did not err in relying on a dictionary definition to inform the meaning of the claim term because "the court's definition accords with the specification, prosecution history, and the dictionary definition of a related term") (quoting *Phillips*, 415 F.3d at 1322–23).

## IV.    ARGUMENT

Coca-Cola seeks construction of eleven terms that are critical to determining the scope of the asserted claim of the '377 Patent.

### A.    "element"

Coca-Cola proposes that the term "**element**" be construed as "**one of several components of a consumable final product.**"  This construction is consistent with the stated purpose of the invention and the use of the term in the specification.

As stated above, the purpose of the invention of the '377 Patent is to enable a user to customize products so that the product is "specifically tailored for them." ('377 Patent at 1:39-40).  The invention of the '377 Patent purportedly accomplishes this purpose by creating a system which, once the server identifies the product preferences for that specific user, identifies and combines several different components to create a final product according to these preferences.  The components which combine to make this final product are referred to as "elements" consistently throughout the specification. *See, e.g.*, ('377 Patent at 3:1-3) ("the terminal will access the server to enable a user to enter product preferences for a specific product which will be store[d] in database for future use.  The server will formulate the proper mix of *elements*, e.g., ingredients, for the product according to the user's product preferences"); *see also* ('377 Patent at 5:41-44) ("Once the questionnaire is completed, the server will use a software algorithm and standard computer processing power to determine the user's product preferences,

e. g., the proper mix of *elements*"); ('377 Patent at 4:13-19) ("Initially, in step 302, the user purchases and/or acquires the product … the product includes one or more sealed compartments … These compartments will contain the *elements*, e.g., fluids and/or solids, to be mixed to produce the final product.") (emphasis added).

Coca-Cola's proposed construction is reinforced by disclosures made in the specification. One preferred embodiment discloses a beverage dispenser – a term used in the preamble of Claim 11 – and specifically describes "elements" as ingredients for making a beverage. This embodiment discloses a compartment for "storing the *elements* of the beverages, for instance, soda syrup, additional flavorings such as lemon or lime, additional sweeteners for the beverage, etc.," which are then mixed together and poured into a receptacle from which to be consumed. ('377 Patent at 6:35-42) (emphasis added).  As such, the purpose of the invention, when read in light of the specification, supports Coca-Cola's position that an element is one of several components required to make a consumable final product.  Accordingly, the Court should adopt Coca-Cola's proposed construction.

### B. "valve"

Coca-Cola proposes that the term "**valve**" be construed as "**a device for controlling the flow of a liquid or other material through a passage**."  The term "valve" is used twice in Claim 11 and multiple times throughout the specification.  Each use makes clear that Coca-Cola's construction, which requires that a "valve" control the flow of liquid or other material through a passage, is correct.  In fact, many of the uses in the specification explicitly state that the valve's function is to "control" the flow of liquids or materials.  *See, e.g.*, ('377 Patent at 4:21-24) ("[e]ach tube will include a valve, e.g., a microvalve, that will *control* the amount of fluid and/or solid that is dispensed into the mixing chamber"); ('377 Patent at 6:48-

53) ("the mixing chamber may include a valve *controlling* the flow of the beverage to the dispensing section.  All of the valves will be coupled to a *controller*, e.g., a microprocessor, which will actuate each valve independently to *control* the amount of each element or ingredient to be added to the mixture") (emphasis added).

Coca-Cola's proposed construction is also consistent with the stated purpose of the '377 patent, which is to "enable a user to customize products containing solids and fluids." ('377 patent at 1:56-57.  Creating a user's preferred product requires specific amounts of each ingredient, and the valves, through instructions from the controller, allow only those specific amounts to be released.  *See, e.g.,* ('377 patent at 4:38-42) ("[t]he communication module will communicate to the controller the specific valve settings for each valve based on the user's product preferences"); ('377 Patent at 4:44-47) ("[a]s instructed by the controller, the microvalves will release fluids and/or solids from the separate compartments into the central waterproof and gas proof chamber"); ('377 Patent at 5:63-67) ("[t]he controller will then instruct the microvalves in the container as to the specific amount of fluids and/or solids that should be released into the mixing chamber (step 318). The valves will then open to release the fluids and/or solids into the mixing chamber"); ('377 Patent at 8:36-47) ("[o]nce the dispenser has the user's beverage product preferences (BPP), the controller of the dispenser will tell the valves that are part of the dispenser how much of each of the separate stored elements (e.g., flavors, carbonation, etc.) to release into the mixing chamber or dispensing section (step 520).").

According to the specification and claimed invention, in order to create a beverage according to a user's preferences, a valve must control the flow of liquid or other material through a passage.  Thus, Coca-Cola's proposed construction embraces the proposed function and purpose of the claim term, valve.

7

### C.      "coupling"

Coca-Cola proposes that the term "**coupling**" be construed as "**connecting two items**." The claim language is clear and supports Coca-Cola's position.  Indeed, the term "coupling" appears in each of the independent claims of the '377 Patent to show that two items are connected.  For example, Claim 11 describes a "valve coupling" that is connecting a compartment to the dispensing section. ('377 Patent at 9:46-47) ("at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage").

Further, the term "coupling" is used only once in the specification and describes a communication module "for coupling the dispenser to the global computer network" to enable communications between the dispenser and the server via the internet. ('377 Patent at 6:57-60). Thus, there can be no dispute that the construction of the term "coupling" connects two items, as outlined by Coca-Cola's construction.

Moreover, although in most situations an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, *Vitronics Corp.*, 90 F.3d at 1582, extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean […]" *Phillips*, 415 F.3d at 1319.

 In this case, and consistent with the intrinsic evidence, the dictionary definition of "coupling" also supports Coca-Cola's construction, the definition being "a device that connects two parts or things" (Ex. C (Merriam-Webster Online Dictionary) – "coupling").  As such, the intrinsic evidence along with the extrinsic evidence dictates Coca-Cola's construction.

### D.      "dispensing section"

Coca-Cola proposes that the term "**dispensing section**" be construed as "**a component for directing the flow of a mixed beverage released from the mixing chamber**."  As an initial

matter, the claim language is clear that the function of the dispensing section is to "dispense the beverage." ('377 Patent at 9:47).  The specification provides further support for Coca-Cola's construction, consistently describing a beverage dispenser in which the elements required to make a customized beverage are blended together in a mixing chamber, then dispensed to the user through a dispensing section.  *See, e.g.*, ('377 Patent at 6:42-44) ("The dispensing section 409 will mix the various elements and direct the mixture into a receptacle 411, e.g., a cup, bottle, can, etc.  Alternatively, the tubing will le[a]d to a mixing chamber to mix the various elements before allowing the mixture to flow to the dispensing section.").

Similarly, Figure 4 displays a dispensing section (409), which is attached to, but not part of, the mixing chamber (410), and dispenses the beverage into a receptacle (411).



FIG. 4

('377 Patent at Fig. 4).

This is consistent with other embodiments described in the specification, which require that the beverage contained in the mixing chamber be dispensed to the user through a component

that directs the flow of the beverage.  *See, e.g.*, ('377 Patent at 4:57-62) (requiring that the mixing chamber "include an exit port" which "will allow the user to dispense the contents of the mixing chamber).  Accordingly, the '377 Patent discloses a component of a beverage dispenser which directs the flow of the mixed beverage from the mixing chamber, and Coca-Cola's construction should be adopted.

> **E.**    **"mixing chamber for mixing the beverage"**

Coca-Cola proposes that the terms "**mixing chamber for mixing the beverage**" be construed as "**a component for holding and mechanically blending all of the elements required to produce the beverage, when actuated by the controller**."  The function captured by Coca-Cola's proposed construction is clearly supported by the specification, which consistently shows that the mixing chamber is the point at which all of the elements are transferred from separate compartments to be combined.  *See, e.g.*, ('377 Patent at 4:44-47) ("As instructed by the controller, the microvalves will release fluids and/or solids from the separate compartments into the central waterproof and gas proof chamber (MC)"); ('377 Patent at 6:42-45) ("the tubing will le[a]d to a mixing chamber to mix the various elements before allowing the mixture to flow to the dispensing section").  For example:

> The communication module on the product will receive this information and send the information to the controller. The controller will then instruct the microvalves in the container as to the specific amount of fluids and/or solids that should be released into the mixing chamber (step 318). The valves will then open to release the fluids and/or solids into the mixing chamber.

('377 Patent at 5:61-6:4).

After the fluids/solids are mixed in the mixing chamber, "the user may [] use the customized product."  ('377 Patent at 5:61-6:4); *see also* ('377 Patent at 4:13-23, 4:44-62, 5:61-6:4, 8:36-47).

Further, Claim 11 discloses a controller, which "actuate[s] the mixing chamber."  ('377 Patent at 9:59-62).  As discussed in detail below, as used in the '377 Patent, actuate means to cause a device to operate.  Thus, by disclosing a controller that actuates the mixing chamber, the Patentee requires that the controller cause the ingredients within the mixing chamber to be mechanically blended.

Indeed, the specification describes an embodiment in which the mixing chamber:

> will contain an actuator or mixing device. … the actuator or mixing device will be coupled to the controller and will receive instruction from the communication module.  The communication module will tell the controller when and for how long to activate the actuator or mixing device.  Upon activation of the actuator, the contents of the sealed chamber will be mixed.

('377 Patent at 4:48-57)

Thus the intrinsic evidence clearly and unmistakably shows that all of the elements are combined in the mixing chamber and mechanically blended when actuated by the controller.

F.     **"user interface module"**

Coca-Cola proposes that the term "**user interface module**" be construed as "**a component of the beverage dispenser for receiving input from the user and for displaying to the user information from the beverage dispenser**."  As an initial matter, the claim language makes clear that the user interface module is a component of the claimed beverage dispenser.  Claim 11 of the '377 Patent explicitly covers "[a] beverage dispenser comprising: … a user interface module configured to receive and identity [sic] of a user and identifier of the beverage." ('377 Patent at 9:43-52).  "Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc*., 314 F.3d 1313, 1344-45 (Fed. Cir. 2003).  Furthermore, the claim term "comprising" is synonymous with other words, less often used, such as "'including,' 'having,' 'containing,' and even 'wherein.'"

11

Robert A. Faber, Landis on Mechanics of Patent Claim Drafting § 2:5, 2–15 (5th ed. 2006); *see also CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1361 (Fed. Cir. 2007). Here, the '377 Patent uses the term "comprising" after "beverage dispenser" in the preamble, and in doing so, clearly describes the invention as a beverage dispenser containing each of the disclosed elements, including a "user interface module." *See, e.g.*, *Amgen*, 314 F.3d at 1344-45 (construing the term glycoprotein "compris[ing] the mature erythropoietin amino acid sequence of Fig. 6...." to mean a glycoprotein that must include the 166 amino acid sequence disclosed in Fig. 6) (*citing Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)).

Moreover, the specification supports Coca-Cola's position that the user interface module is intended to be a component of the beverage dispenser. For example, it states that "[t]he dispenser will also include a user interface module (UIM) for enabling a user to input information to the dispenser and to receive information from the dispenser." ('377 Patent at 6:61-7:14); *see also* ('377 Patent at 7:39-43) ("[o]nce the user is ready to dispense a beverage, the user will locate a beverage dispenser that is coupled to the communications network. The user will then communicate the user's identity to the subject dispenser via the dispenser's user interface module"). Similarly, Figure 4 depicts a beverage dispenser in which the user interface module is enclosed within the housing of the beverage dispenser. *See* ('377 Patent at Fig. 4).

Further, the user interface module is intended to both receive information *from* the user to be input into the beverage dispenser, and also to display information *to* the user from the beverage dispenser. This is clearly stated in the claim language. *See, e.g.*, ('377 Patent at 9:50-51) ("a user interface module is configured to receive and identity of a user and an identifier of a beverage [sic]"); ('377 Patent at 10:18-23) ("the user interface module further comprises a display for displaying the product preferences to the user"); *see also* ('377 Patent, Claims 12-22).

12

And the specification further clarifies that the purpose of the user interface module is to both "enable communications between the user and dispenser" by "allow[ing] the user to identify themselves and/or input information" ***and***, via a display screen," "relay messages from the controller and/or from a server" back to the user.  ('377 Patent at 6:64-7:6).  Indeed, the specification is replete with examples of the user interface module being used to receive input from the user and also display information back to the user.  *See e.g.,* ('377 Patent at 6:61-7:14) ("[t]he dispenser will also include a user interface module (UIM) for enabling a user to input information to the dispenser and to receive information from the dispenser"); ('377 Patent at 7:41-43) ("The user will then communicate the user's identity to the subject dispenser via the dispenser's user interface module"); ('377 Patent at 8:8-10) ("In one embodiment of the present disclosure, the user could be asked to complete a questionnaire while at the beverage dispenser via the user interface module"); ('377 Patent at 8:32-36) ("This beverage product preferences (BPP) information may appear on the display of the dispenser and the user could in one embodiment of this disclosure confirm the beverage product preferences (BPP) using the dispensers [sic] user interface module").  As such, Coca-Cola's construction should be adopted.

### G.  "actuate"

Coca-Cola proposes that the term "**actuate**" be construed as "**to cause a device to operate.**"  The claim language in Claim 11 of the '377 Patent is clear and supports this position. The term appears twice in Claim 11 of the '377 Patent, and each time the term is used to show a device is being caused to operate.  First, Claim 11 discloses a controller which is "configured to actuate the at least one valve to control an amount of the element to be dispensed."  ('377 Patent at 9:59-61).  As discussed above, the function of the valves in the invention of the '377 Patent is to control the flow of fluid.  Therefore it follows that, by actuating the valve and causing it to

13

control the flow of the elements, the controller is causing the valve to operate.  Similarly, Claim 11 discloses that the controller "actuate the mixing chamber based on the user gene[r]ated beverage product preferences." ('377 Patent at 9:61-63).  As discussed above and in the text of the claim, the function of the mixing chamber is to blend the elements which make up the final beverage.  As such, by actuating the mixing chamber, and causing it to mix the elements, the controller is causing the mixing chamber to operate.   The '377 Patent clearly links the meanings of the terms "actuate," "valve," and "mixing chamber."  Thus, Coca-Cola's proposed construction of "actuate" is consistent with and incorporates its constructions of both "valve" and "mixing chamber."

Moreover, again the extrinsic evidence, which is properly relied on when it is in accord with the intrinsic evidence is consistent with the intrinsic evidence and Coca-Cola's definition, as the Merriam-Webster Online Dictionary defines "actuate" as "to make (a machine or electrical device) move or operate" (Ex. D (Merriam-Webster Online Dictionary) – "actuate").

**H.     "server"**

Coca-Cola proposes that the term "**server**" be construed as "**a computerized database on which the user's product preferences are stored and that is in electronic communication with the communication module.**"  Again, the oft-cited intention of the invention of the '377 Patent is to "enable[] a user, e.g., a consumer, to customize products containing solids and fluids by allowing a server communicating over the global computer network, e.g., the Internet, to provide product preferences of a user to a product." ('377 Patent at 2:22-26).  Coca-Cola's construction is completely in line with this intention and is completely supported by the claim language and the specification.

14

The term "server" appears twice in Claim 11 of the '377 Patent.  The first use establishes that the communication module is "configured to transmit the identity of the user and the identifier of the beverage ***to a server over a network***…" ('377 Patent at 9:52-54).  Thus, the claim language plainly states that the server is electronically connected to the communication module.  The second use of "server" discloses that the communication module receives "user generated beverage product preferences" from the server.  ('377 Patent at 9:52-56).  Clearly it follows that, in order for the communication module to receive such information from the server, the information must be stored on the server.  Thus, the plain language of the claims requires that the "server" store a user's product preferences and be connected to the communication module.

Coca-Cola's proposed construction finds further support in the specification.  In fact, the specification specifically states on numerous occasions that the user's product preferences are stored on the server, which is connected to the communication module.  *See, e.g.*, ('377 Patent at 2:39-51) ("[t]he computer server [which is "coupled" to the communication module] also stores the specific customer's product preferences…"); ('377 Patent at 7:56-66) ("The beverage will now use its communication module to communicate with the server. … These beverage product preferences (BPP) will be stored in the database and cross-referenced by the user's identity …") ('377 Patent at 5:23-33) ("Next, in step 306, the user will transmit their identity to the server. … These preferences will be stored in the server database cross-referenced by the user's identity"); ('377 Patent at 5:44-51) ("Once the user's product preferences are determined, the server will store this information...Optionally, the server will issue an identity code, e.g., an alphanumeric code, to the user to facilitate retrieval of the user's product preferences for a subsequent purchase"); ('377 Patent at 6:14-20) ("alternatively, the dispenser communicates the user's identity information to a server on the global computer network (e.g., the Internet).  The server

15

then identifies the user of the dispenser and directs the dispenser to mix the beverage for the user exactly the way the user has predetermined that they like to drink the beverage"); ('377 Patent at 7:25-29) ("[o]nce the user's beverage product preferences (BPP) is determined, the server will store this information …cross-referenced to the user's identity information").

Finally, to distinguish the invention of the '377 Patent over known prior art, the patentee amended the as-issued Claim 11 to read "a communication module <u>configured to transmit the identity of the user to a server over a network, receive user generated beverage product preferences based on the identity of the user from the server and</u> ~~for communicating~~ <u>communicate the</u> user generated beverage product preferences to ~~the at least one valve and the mixing chamber~~ <u>a controller</u>."  In response to a rejection, Patentee asserted that the cited prior art "merely discloses a user interface for entering personal information." (Ex. E, '377 Patent File History, Am. 1/7/2013 at 4).  To distinguish his asserted invention, Patentee argued, that the prior art did not disclose or suggest "a communication module for ***transmitting the identity of the user to a server over a network, receiving user generated beverage product preferences based on the identity of the user from the server***…" (Ex. E, '377 Patent File History, Am. 1/7/2013 at 10) (emphasis in original).  Thus, the patentee necessarily and knowingly amended his claims to require that the server be able to transmit user generated beverage product preferences, by retaining a user's product preferences.

**I.     "communication module"**

Coca-Cola proposes that the term "**communication module**" be construed as "**a component of the beverage dispenser for receiving the user's product preferences from the server and for transmitting such user product preference information to the controller.**"

16

The claim language is clear.  In fact, Claim 11 explicitly details the function of the communication module, which is to:

> "transmit the identity of the user and the identifier of the beverage to a server over a network, receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server and communication[sic] the user generated product preferences to the controller.

('377 Patent at 9:52-58).

The specification further supports Coca-Cola's proposed constructions.  One embodiment describes a dispenser which "include[s] a communication module (CM) … for enabling communications between the dispenser and a server residing on the Internet." ('377 Patent at 6:57-61).  Figure 4 also shows the communication module as being enclosed in the housing of the beverage dispenser, exemplifying that the communication module is a component of the beverage dispenser.  *See* ('377 Patent at Fig. 4).

Further, the specification consistently and unambiguously describes the process of the communication module receiving the user product preferences from the server and transmitting them to the controller.  *See, e.g.*,  ('377 Patent at 4:38-55) ("the communication module is "coupled to the controller" and "will communicate to the controller the specific valve settings for each valve based on the user's product preferences" by "tell[ing] the controller when and for how long to activate the actuator or mixing device"); ('377 Patent at 5:52-66) ("[t]he communication module on the product will receive this [user product preference] information and send the information to the controller.  The controller will then instruct the microvalves in the container as to the specific amount of fluids and/or solids that should be released into the mixing chamber"); ('377 Patent at 8:29-31) ("[t]he server will now transmit via the communications network to the communication module of the dispenser the user's beverage product preferences.")

17

Finally, during prosecution of the '377 Patent, the patentee overcame a rejection based on prior art which disclosed a user interface for entering personal information.  The patentee argued that, unlike the invention of the '377 Patent, the cited prior art "does not suggest a communication module for transmitting the identity of the user to a server over a network, receive user generated beverage product preferences based on the identity of the user from the server and communicate the user generated beverage product preferences to a controller." (Ex. E, '377 Patent File History, Am. 1/7/2013 at 10).  The patentee clearly intended for the communication module to not only receive user product preferences, but also to transmit such preferences to a controller.

> **J.**     **"configured to actuate the at least one valve to control an amount of the element to be dispensed … based on the user gene[r]ated beverage product preferences"**

Coca-Cola proposes that the term "**configured to actuate the at least one valve to control an amount of the element to be dispensed … based on the user gene[r]ated beverage product preferences**" be construed as "**able to cause the valve to dispense the amount of each element specified by the user to be included in the final product."**  This term is used in Claim 11, which requires that the controller be "configured to actuate the at least one valve to control an amount of the element to be dispensed."  Coca-Cola's proposed construction clarifies that the valves are being caused to dispense elements in the amounts specified by the user's product preferences in order to make their final customized product, which is in line with the claim language and amply supported in the specification.

> For example:

> Once the dispenser has the user's beverage product preferences (BPP), the controller of the dispenser will tell the valves that are part of the dispenser how much of each of the separate stored elements (e.g., flavors, carbonation, etc.) to release into the mixing chamber or dispensing section.  For instance, one specific beverage product preferences

(BPP) may cause the dispenser to mix a certain amount of lemon flavoring into a cola beverage.  In another case, a user's beverage product preferences (BPP) could cause the dispenser to release additional sugar into the beverage.  The dispenser may now dispense the customized beverage.

('377 Patent at 8:36-47).

Indeed, as discussed in detail in Section B above, the function of the valves is to control the flow of the liquid or elements.  The specification makes clear that the controller is configured to cause the valves to operate[4] by controlling the flow of liquid to allow the specific amount of each element to be dispensed that is required for the user's customized final product.  *See, e.g*., ('377 Patent at 4:39-46) ("[t]he communication module will communicate to the controller the specific valve settings for each valve based on the user's product preferences.  As instructed by the controller, the microvalves will release fluids and/or solids from the separate compartments" into the mixing chamber); ('377 Patent at 6:50-53) ("[a]ll of the valves will be coupled to a controller, e.g., a microprocessor, which will actuate each valve independently to control the amount of each element or ingredient to be added to the mixture"); ('377 Patent at 5:61-6:4) ("[t]he communication module on the product will receive [the user's product preferences] and send the information to the controller.  The controller will then instruct the microvalves in the container as to the specific amount of fluids and/or solids that should be released into the mixing chamber.  The valves will then open to release the fluids and/or solids into the mixing chamber. … The user may now use the customized product").  Thus, the claims and specification indicate that the controller must cause the valves to operate based on the user's product preferences, to satisfy the claim requirement that the valves release elements into the mixing chamber.

---

[4] As discussed in Section G, "actuate" is properly construed as "to cause a device to operate."

**K.**     **"configured … to actuate the mixing chamber based on the user gene[r]ated beverage product preferences"**

Coca-Cola proposes that the term "**configured … to actuate the mixing chamber based on the user gene[r]ated beverage product preferences**" be construed as "**able to cause the mixing chamber to hold and mix the elements of the final product for an amount of time determined by the user, and starting at a time determined by the user**."  Coca-Cola's proposed construction is directly aligned with the specification of the '377 Patent.

As discussed in detail in Section E above, the invention of the '377 Patent discloses a mixing chamber which holds and mechanically blends all of the elements required to produce a final beverage according to a user's preferences.  The specification makes clear that the controller is configured to cause the mixing chamber to operate[5] by holding and mixing, at a specific starting time and for a specific amount of time, all of the required elements of the final product.   The communication module receives information regarding the user's product preferences.  Next "[t]he communication module will tell the controller when and for how long to activate the actuator or mixing device.  Upon activation of the actuator, the contents of the [mixing chamber] will be mixed." ('377 Patent at 4:53-57).  The final beverage is then dispensed to the user.  ('377 Patent at 4:57-62).  It follows that, in order for the final beverage to be dispensed, the mixing chamber, as described above, must be actuated to combine the elements.

**V.     CONCLUSION**

For these reasons, Coca-Cola respectfully requests that the Court enter a claim construction order in accordance with Coca-Cola's proposed constructions.

---

[5] As discussed in Section G, "actuate" is properly construed as "to cause a device to operate."

Respectfully submitted this 18 March 2016.

 *s/ Jeremy T. Elman*

Jeremy T. Elman
Florida Bar Number: 37448
DLA PIPER LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 423-8514
Facsimile: (305) 503-7551
Email: jeremy.elman@dlapiper.com

A. Shane Nichols
Admitted *Pro Hac Vice*
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-4540
Facsimile: (404) 881-7777
Email: shane.nichols@alston.com

*Attorneys for The Coca-Cola Company*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2016, I electronically filed the foregoing OPENING CLAIM CONSTRUCTION BRIEF with the clerk of the United States District Court for the Southern District of Florida, using the electronic case filing system, which will automatically send e-mail notification of such filing to the attorneys of record.

 s/ *Jeremy T. Elman*
Jeremy T. Elman