IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| ROTHSCHILD CONNECTED DEVICES INNOVATIONS, LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>THE COCA-COLA COMPANY,<br><br>     Defendant. | Civil Action No. 1:16-cv-01241-TWT |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT THE COCA-COLA COMPANY'S MOTION FOR SUMMARY JUDGMENT

I. **PARTIES**

 **A. Rothschild Connective Devices Innovations, LLC**

1. Plaintiff Rothschild Connected Devices Innovations, LLC ("RCDI") is a Texas limited liability company with its standard place of business at 1400 Preston Rd., Suite 400, Plano TX 75093 (Texas Office of the Comptroller Franchise Tax Account Status for Rothschild Connected Devices Innovations, LLC (Ex. 1 at RCDI000711)).

2. RCDI was formed on December 18, 2014 (*id.*) and as of January 25th, 2017, became the exclusive licensee of U.S. Patent No. 8,417,377 ("the '377 Patent") (Assignment of Patent Rights between Leigh M. Rothschild and Rothschild Connected Devices Innovations, LLC (Ex. 2 at RCDI000765-768)).

3. Mr. Leigh Rothschild is the manager of RCDI and he resides in Miami-Dade County, Florida (D.I. 1 at ¶1; Officers and Directors Info of Rothschild Connected Devices Innovations, LLC (Ex. 3 at RCDI0000712)).

### B. The Coca-Cola Company

4. Coca-Cola developed and manufactures the Coca-Cola Freestyle Dispensers (Declaration of Peter Wolski (Ex. 29) at ¶ 14)

## II.    THE ASSERTED PATENT

### A. U.S. Patent No. 8,417,377

5. U.S. Patent No. 8,417,377, titled "System and Method for Creating a Personalized Consumer Product," names Leigh M. Rothschild as the sole inventor and claim priority to U.S. patent application Ser. No. 11/471,323, filed on June 20, 2006 (now U.S. Patent No. 7,899,713) (D.I. 1-1 at 8).

6. The '377 Patent was issued on April 9, 2013 (*id*. at 2).

7. RCDI alleges that Coca-Cola infringes claims 11, 12, and 21-23 of the '377 Patent (Carey March 21, 2018 email (Ex. 4)).

## III.    RCDI'S ALLEGATIONS AND ADMISSIONS

8. RCDI admits that a beverage is a "homogenous mixture" (RCDI's Rebuttal Claim Construction Brief, D.I. 59 at 11-12).

### A.    RCDI's Unfiled Amended Complaint

9. RCDI's original complaint, filed on October 30, 2015, alleges infringement of Claims 1 and 11 of the '377 Patent, and Claim 13 of U.S. Patent No. 8,788,090 ("the '090 Patent") (D.I. 1).

10. Coca-Cola has repeatedly told RCDI that Coca-Cola cannot infringe the '377 Patent, because the asserted claim requires a "mixing chamber." (April 14, 2017 Letter to RCDI (Ex. 23)).

.

11. RCDI was forced to withdraw its infringement allegations with respect to the '090 Patent because Coca-Cola informed RCDI that the asserted claims

of the '090 Patent had never been issued by the U.S. Patent Office, which made RCDI's allegations of infringement baseless (Coca-Cola's First Supplemental Response to Plaintiff's First Set of Interrogatories at 6-7 (Ex. 24); March 3, 2016 email to RCDI (Ex. 6)).

12. RCDI subsequently withdrew the '090 Patent (March 8, 2016 email from Ernesto Rubi (Ex. 25)).

13. Coca-Cola also notified RCDI that it could not prove infringement of Claim 1 of the '377 Patent, because the accused Freestyle Dispenser did not have a mixing chamber as required by the Claim. (Coca-Cola's First Supplemental Response to Plaintiff's First Set of Interrogatories at 6-7 (Ex. 8)).

14. In response, RCDI subsequently withdrew its contentions with respect to independent Claim 1 of the '377 Patent (*see* D.I. 35, Mar. 17, 2016 Motion to Amend Complaint ("TCCC has directly and/or indirectly infringed, literally or under the doctrine of equivalents, claims 11-13, 15, 17, 19 and/or 21-25 of the '377 Patent."); March 8, 2016 email from Ernesto Rubi (Ex. 25)).

15. Despite the Court's May 16, 2018 order that "RCDI shall re-file its Amended Complaint, which shall be the operative complaint in this case," RCDI never filed an amended complaint (D.I. 121).

16. In RCDI's Proposed Amended Complaint, RCDI alleges that Coca-Cola infringes Claims 11-13, 15, 17, 19 and 21-25 of the ''377 Patent (D.I. 35-1 at ¶4).

17. In response to Coca-Cola's First Set of Interrogatories Interrogatory No. 1, RCDI has only stated that it "intends to assert only claim 11 of the '377 Patent, and dependent claims therefrom" (RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories (Ex. 9) at 5).

18. RCDI's counsel sent an email to inform Coca-Cola's counsel that it was alleging infringement of claims listed in its proposed amended complaint (Claims 11-13, 15, 17, 19 and 21-25 of the '377 Patent), just one week before Coca-Cola's Expert Report on Invalidity was due, and also stated it would "drop claims 13, 15, 19, 24 and 25 from that list" (Carey March 21, 2018 email (Ex. 4)).

19. Upon receiving RCDI's April 4, 2018 Expert Report, Coca-Cola learned, for the first time, that RCDI had also apparently dropped Claim 17 of the '377 Patent (Curley Infringement Report (Ex. 5) at ¶2).

20. To this day, RCDI has made no formal allegation that Coca-Cola infringes any particular claims of the '377 Patent, other than Claim 11 (RCDI's Response to Defendant's First Set of Interrogatories (Ex. 9)).

## B.     RCDI's Infringement Contentions

21. After this action was transferred to this District from the Southern District of Florida in 2016, Coca-Cola requested this Court to order RCDI to comply with Local Patent Rule 4.1 by serving infringement contentions. (December 1, 2016 Status Conference at 4:20-5:7. 7:18-23 (Ex. 10)

22. This Court declined Coca-Cola's request to order RCDI to comply with L.R. 4.1 because the parties had already filed their opening claim construction briefs in Florida (*id*. at 7:18-23)

23. Coca-Cola served RCDI with contentions interrogatories on December 2, 2016, which mirrors the language of L.R. 4.1:

> **INTERROGATORY NO. 1:** Identify each claim of the '377 Patent that You contend Coca-Cola has infringed, and for each identified claim, state the entire factual basis for Your contention that the claim is infringed, including without limitation: (i) an identification of each accused apparatus, method, composition, or other accused instrumentality; (ii) where each element of each claim is found within each accused instrumentality, including the identity of the structures, acts, or materials in the accused instrumentalities that perform the claimed function; and (iii) whether each element of each asserted claim is claimed to be literally present, present under the doctrine of equivalents, or both, in each accused instrumentality that performs the claimed function.

(Coca-Cola's Dec. 2, 2016 First Set of Interrogatories to Plaintiff at 7 (Ex. 31).

4

24. RCDI first responded to Interrogatory No. 1 on January 3, 2017, and then served a supplemental response on January 4, 2017, and a second supplemental response on January 10, 2017 in response to Coca-Cola's objections to the inadequacy of the responses.  (*see* RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories (Ex. 9) at 3); RCDI's Jan. 4, 2017 Supplemental Response to Defendant's First Set of Interrogatories (Ex. 12) at 2); RCDI's Jan. 10, 2017 Second Supplemental Response to Defendant's First Set of Interrogatories (Ex. 31) at 3).

25. RCDI has never amended its response to Interrogatory No. 1 to formally include the claims listed in its proposed amended complaint, or the other claims RCDI dropped from the case on March 21, 2018 and April 4, 2018. (*see* RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories (Ex. 9) at 3); RCDI's Jan. 4, 2017 Supplemental Response to Defendant's First Set of Interrogatories (Ex. 12) at 2); RCDI's Jan. 10, 2017 Second Supplemental Response to Defendant's First Set of Interrogatories (Ex. 31) at 3)).

26. The Local Patent Rules expressly decline to "excuse any party from responding to any proper discovery request made under the Federal Rules of Civil Procedure," except that a party may delay its responses if the Local Patent Rules provide for such a delay (LPR 3.1(a)).

27. The Local Patent Rules expressly state that a party's infringement contentions "shall have such binding effect on a party as a response to an interrogatory under Rule 33 of the Federal Rules of Civil Procedure" (LPR 4.5(a)).

28. RCDI's response to Interrogatory No. 1 remains limited to an allegation that Coca-Cola infringes Claim 11 of the '377 Patent. (RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories (Ex. 9)

29. RCDI has never fully responded to Coca-Cola's Interrogatory No. 1, even though it seeks exactly the same basic information required from every plaintiff that files a patent infringement action in this District (*see* L.R. 4.1).

30. RCDI has never responded to interrogatory number one or provided infringement contentions (*see* RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories at (Ex. 9) at 5); RCDI's Jan. 4, 2017 Supplemental Response to Defendant's First Set of Interrogatories (Ex. 12);

RCDI's Jan. 10, 2017 Second Supplemental Response to Defendant's First Set of Interrogatories (Ex. 32); RCDI's Feb. 26, 2018 Responses to Defendant's Third Set of Interrogatories (Ex. 14).

31. In its initial response to Interrogatory No. 1 on Jan. 3, 2017, RCDI produced a document entitled "Infringement of U.S. Patent No. 8,417,377, Claim 11," marked with Bates Nos. RCDI0001-RCDI0007 ("Initial Response") (RCDI's Jan. 3, 2017 Responses to Defendant's First Set of Interrogatories (Ex. 9) at 5).

32. In its Initial Response, RCDI identified the accused product for the "at least one compartment of a beverage," element for Claim 11 as: "Each Coca Cola Freestyle dispenser contains a number of cartridges. Each cartridge contains a flavor, which ismixed with one or more other flavors to create the user-desired beverage."

| Claim Element | Accused Product |
|---|---|
| at least one compartment containing an element of a beverage; | Each Coca Cola Freestyle dispenser contains a number of cartridges. Each cartridge contains a flavor, which is mixed with one or more other flavors to create the user-desired beverage.<br> |

(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) at RCDI000002).

33. In its Initial Response, RCDI identified the accused product for the "at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage," element for Claim 11 as "Each cartridge is connected via a valve to the mixing chamber. The back of each cartridge is connected to a feed line so as to enable the cartridge's flavor to be dispensed into the mixing chamber, and enabled the mixing of the final product."

Alston & Bird LLP

| Claim Element | Accused Product |
|---|---|
| at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage; | Each cartridge is connected via a valve to the mixing chamber. The back of each cartridge is connected to a feed line so as to enable the cartridge's flavor to be dispensed into the mixing chamber, and enabled the mixing of the final product.  |

(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) (RCDI000003)).

34. In its Initial Response, RCDI identified the accused product for the "a mixing chamber for mixing the beverage;" element for Claim 11 as "The mixing chamber is provided at or near the exit port of the Coca Cola beverage dispenser."

| Claim Element | Accused Product |
|---|---|

Alston & Bird LLP

| a mixing chamber for mixing the beverage; | The mixing chamber is provided at or near the exit port of the Coca Cola beverage dispenser.<br> |
|---|---|

(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) (*id.* at RCDI000004)).

35. In its Initial Response, RCDI identified the accused product for the "a user interface module configured to receive an identity of a user and an identifier of the beverage;" element for Claim 11 as "RCDI's proposed construction: "a component that enables communication between a user and a dispenser." According to RCDI's proposed construction, the user and the dispenser communicate using "any ... type of communication now known or practiced in the future that will allow [users] to identify themselves and/or input information to the beverage dispenser." (col. 7, ll. 1-4.)"

| Claim Element | Accused Product |
|---|---|
| a user interface module configured to receive an identity of a user and an identifier of the beverage; | RCDI's proposed construction: "a component that enables communication between a user and a dispenser."  According to RCDI's proposed construction, the user and the dispenser communicate using "any ... type of communication now known or practiced in the future that will allow [users] to identify themselves and/or input information to the beverage dispenser." (col. 7, ll. 1-4.) |

8



(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) (*id.* at RCDI000005).

36. In its Initial Response, RCDI identified the accused product for the "a communication module configured to transmit the identity of the user and the identifier of the beverage to a server over a network" element for Claim 11 as:

> RCDI has proposed the following construction: "a component that enables communication between the dispenser and a computer on a network." (D.E. 37 at 19).

> The specification discloses "a communication module...for coupling the dispenser to the global computer network...and for enabling communications between the dispenser and a server residing on the Internet." '377 patent at col. 6, ll. 57-61. The "communication module" is capable of receiving and transmitting data and is used by the dispenser to "communicate with the server." Id. at col. 7, ll. 56-57; see also id. at col. 8, ll. 29-31 ("the server will now transmit via the communications network to the communication module.").

> The communication module (a) transmits the userID and mix preference to the server, (b) receives from the server a userID and mix preference and (c) also communicates the mix preference to the controller.

| Claim Element | Accused Product |
|---|---|

Alston & Bird LLP

| | |
|---|---|
| a communication module configured to transmit the identity of the user and the identifier of the beverage to a server over a network | RCDI has proposed the following construction: "a component that enables communication between the dispenser and a computer on a network." (D.E. 37 at 19).<br><br>The specification discloses "a communication module...for coupling the dispenser to the global computer network...and for enabling communications between the dispenser and a server residing on the Internet." '377 patent at col. 6, ll. 57-61. The "communication module" is capable of receiving and transmitting data and is used by the dispenser to "communicate with the server." Id. at col. 7, ll. 56-57; see also id. at col. 8, ll. 29-31 ("the server will now transmit via the communications network to the communication module.").<br><br>The communication module (a) transmits the userID and mix preference to the server, (b) receives from the server a userID and mix preference and (c) also communicates the mix preference to the controller. |

(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) (*id.* at RCDI000006).

37. In its Initial Response, RCDI identified the accused product for "the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user generated beverage product preferences" element for Claim 11 as "Once the Freestyle's controller receives the user desired beverage mix, it actuates the at least one valve and dispenses into the mixing chamber the various flavors associated with the user-desired mix."

| Claim Element | Accused Product |
|---|---|
| | |

| | |
|---|---|
| the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user generated beverage product preferences | Once the Freestyle's controller receives the user desired beverage mix, it actuates the at least one valve and dispenses into the mixing chamber the various flavors associated with the user-desired mix. |

(Infringement of U.S. Patent No. 8,417,377, Claim 11 (Ex. 11) (*id.* at RCDI000007).

38. In its first supplemental response to the same Interrogatory No. 1, on Jan. 4, 2017, RCDI produced eight (8) U.S. Patents assigned to Coca-Cola, marked RCDI0008-RCDI0133, claiming:

> These documents identify a component of the Freestyle dispenser that RCDI alleges to be a "mixing chamber." Specifically, the publicly available patent documents refer to a dispensing nozzle assembly containing a micro-ingredient mixing chamber. This mixing chamber is found in the Freestyle dispenser. The inventors listed in the patent applications and issued United States patents referenced herein were part of the original six-member engineering team at Coca-Cola that designed the Freestyle dispenser.

(RCDI's Jan. 4, 2017 First Supplemental Responses to Defendant's First Set of Interrogatories at (Ex. 12 at 5).

39. In its second supplemental response to the same Interrogatory No. 1, on Jan. 10, 2017, RCDI again refers to documents it produced in its First Supplemental Response (RCDI0008-RCDI0133) and also identifies a document entitled "Invetech RFP – Nozzle Design for Manufacturing," marked TCCC00142586-87. (Ex. 13)

40. In its second supplemental response, RCDI further expounds on how the Invetech document and each of the eight Coca-Cola patents contained in

11

Alston & Bird LLP

RCDI0008-RCDI0133 allegedly describes mixing chambers contained in the Freestyle Dispenser. Specifically, RCDI's Second Supplemental Response to Interrogatory No. 1 states:

> Subject to and without waiving the foregoing objections, RCDI responds to this interrogatory as follows:
>
> The documents Bates labeled RCDI0008– RCDI000133 identify the Freestyle dispenser's mixing chamber.
> Coca-Cola's Freestyle beverage dispenser manufacturing partner Inventech describes the dispensing nozzle present in the Freestyle beverage dispenser as containing the "mixing chamber" on the tip of the dispensing nozzle. See TCCC00142586-7.
> Further, the publicly available patent documents refer to a dispensing nozzle assembly present in the Freestyle beverage dispenser containing a micro-ingredient mixing chamber.
>
> Figure 5 of United States Patent No. 8,678,239 B2 (the "'239 patent") shows a schematic view of a micro-ingredient mixing chamber 510 present in the Freestyle beverage dispenser. Further, Figures 6 through 9 in the '239 patent depict various cross-sectional views of the micro-ingredient mixing chamber 510 present in the Freestyle beverage dispenser.
>
> United States Patents 8,328,050 B2 (the "'050 patent") and 8,162,177 B2 (the "'177 patent") disclose a dispensing nozzle assembly present in the Freestyle beverage dispenser. The dispensing nozzle assembly disclosed in both the '050 and '177 patents "include[s] a micro-ingredient mixing chamber, a number of microingredient lines in communication with the micro-ingredient mixing chamber such that the micro-ingredients mix therein, and a mixed micro-ingredient exit such the mixed micro-ingredients are dispensed into the fluid stream." ('050 patent, 1:60-67, '177 patent, 1:55-63). Figure 15 of the '050 and '177 patents shows the mixing chamber 520 present in the Freestyle beverage dispenser. "The fluid from the injector ports 490 enters the cavity 490 via the top channel 510 and then mixes in the [mixing chamber] 520. The mixed fluids then leave the cavity 490 via the exit port 530. ('050 patent, 6:31-39, '177 patent, 6:29-38).

Figure 15 of United States Patent No. 8,047,402 B2 (the "'402 patent") discloses the Freestyle beverage dispenser a mixing chamber. ('402 patent, 6:29-38). The '402 patent further discloses that beverage "components may flow from the injector ports 430 and into the dispensing cavities 490 via the top channel 510, mix in the mixing area [(i.e., mixing chamber)] 520, and exit via the exit port 530. ('402 patent, 7:47-60).

Figures 5 through 9 of United States Patent 8,960,500 B2 (the "'500 patent") further disclose the micro-ingredient mixing chamber present in the Freestyle beverage dispenser. The '500 patent discloses that the "[t]he mixing chamber may include a number of micro-ingredient ports leading to an ingredient manifold, a water channel, a valve positioned between the ingredient manifold and the water
channel, and a fluid displacement device positioned within the ingredient manifold to pump the micro-ingredients through the valve and into the water channel." ('500 patent, 2:35-44).

United States Patent No. 7,866,509 B2 (the "'509 patent") discloses the Freestyle beverage dispenser's micro-ingredient mixing chamber. Specifically, the '509 patent discloses the arrangement of micro-ingredients lines, that feed the various beverage ingredients to be mixed to the micro-ingredient mixing chamber.('509 patent, 2:4-11). ("The clear micro-ingredients may be positioned about a rear of the injector ring and the dark micro-ingredients may be positioned about a front of the injector ring. The micro-ingredient mixing chamber may include a top channel in communication with the micro-ingredient lines and a mixing area. The microingredient mixing chamber may include a gasket therein.")

United States Patent 8,181,824 B2 (the "'824 patent") discloses a "mixing chamber 190. The mixing chamber 190 may be in communication with the sweetener sources 110 and the diluent source 130. The mixing chamber 190 may be of conventional design and size…" ('824 patent, 3:37-48).

Finally, United States Patent 7,383,966 discloses a dispensing nozzle found on the Freestyle beverage dispenser containing a mixing chamber for mixing a first fluid and one or more second fluids to form a third fluid. ('966 patent, 1:48-52).

13

(*id.* at 6-9).

41. In response to RCDI's Second Supplemental Response, Coca-Cola wrote a letter to RCDI, stating "none of the patents RCDI identified [in response to Coca-Cola's first interrogatories] discloses a dispensing nozzle in commercial use – either in the accused Freestyle dispensers or in any other device." (April 14, 2017 Letter to RCDI (Ex. 23)).

42. After providing its Second Supplemental Response to Interrogatory No. 1, RCDI made no further effort to amend its infringement contentions as they relate to Claim 11 elements, such as "mixing chamber", "valve", "user interface module", "communication module", and "controller." (RCDI's Feb. 26, 2018 Responses to Defendant's Third Set of Interrogatories (Ex. 14) at 4-7).

43.   Coca-Cola served its Third Set of Interrogatories to RCDI on Feb. 26, 2018, and Interrogatories Nos. 21-25 request RCDI to specifically identify "mixing chamber", "valve", "user interface module", "communication module", and controller (RCDI's Feb. 26, 2018 Responses to Defendant's Third Set of Interrogatories (*id.*).

44. RCDI refused to answer Interrogatories Nos. 21-25, stating:

> RESPONSE: RCDI objects to this interrogatory on the basis that it exceeds the number of interrogatories permissible under the Federal Rules of Civil Procedure. RCDI objects to this interrogatory as unduly burdensome to the extent it is duplicative of Interrogatory No. 1 served on December 12, 2016. RCDI further objects to this interrogatory because it seeks information that will be the subject of expert testimony that will be disclosed in accordance with the Federal Rules of Civil Procedure and the Court's schedule, and subject to obtaining remaining fact discovery that TCCC has yet to produce. RCDI's investigation and analysis are ongoing and RCDI reserves the right to amend, modify, and/or supplement this response.

(RCDI's Feb. 26, 2018 Responses to Defendant's Third Set of Interrogatories (Ex. 14) at 4-7).

### C.     Admissions by RCDI's expert, Mr. Curley

45. Mr. Charles Curley ("Mr. Curley") has been retained as RCDI's expert witness for this litigation. (Curley Infringement Report (Ex. 5) at ¶2).

46. On April 4, 2018, Mr. Curley submitted his Infringement Report (*see* Curley Infringement Report (Ex. 5)).

47. In his Infringement Report, Mr. Curley identifies the "mixing chamber" in the Freestyle Dispenser to be comprised of the top portion of the Freestyle's nozzle assembly, and the "finned extrusion" lower portion of the Freestyle's nozzle assembly (Curley Infringement Report (*id*. at ¶¶53-60).

48. On June 28, 2018, Coca-Cola took Mr. Curley's deposition in Miami, Florida.(*see* Curley deposition (Ex. 15)).

49. Mr. Curley testified that "a[] [beverage] element must be contained in a compartment" based on his understanding of Claim 11 (*id*. at 120:21-121:7, 122:6-16).

50. Mr. Curley testified that the only compartments the Freestyle Dispenser contains relevant to Claim 11 are flavor cartridges and the carbonation tank (*id*. at 126:13-18, 132:22-133:4).

51. Mr. Curley testified that his experience with carbonators is from his time as a bartender (*id*. at 253:4-6).

52. Despite confirming that all beverage elements must be contained in a compartment within the Freestyle Dispenser, (*id*. at 122:12-16), Mr. Curley testified that HFCS, which he testified is "actually stored outside of the dispenser" (*id*. at 175:10-13), and water that is sourced from a municipal water line (*id*. at 183:25-2) are both beverage elements (*id*. at 175:4-6).

53. Mr. Curley testified that the Freestyle Dispenser itself also includes the Freestyle Dispenser's backroom components (shown in the figure below), the Freestyle Mobile App *and* the Mobile Device running the App (i.e. iPhones/Android phones) (*id*. at 190:17-22, 195:8-25,196:18-22).

## Backroom Components



(Curley Rebuttal to Alexander's Non-Infringement Report (Ex. 16) at p. 9)

54. Mr. Curley, in his deposition testimony, uses the terms "pumps" and "micropumps" to refer to the Quad Pump Modules (QPMs) used within the Freestyle Dispenser. (Curley deposition (Ex. 15) at 236:3-4, 157:21-24, 158:16-159:7).

55. Mr. Curley's use of "pumps" and "micropumps" to refer to QPMs in his deposition is supported by Mr. Curley's use of these same words ("pumps", "small pumps" and "micropumps") to describe QPMs in his non-infringement report; For example, Mr. Curley uses "small pumps", "micropump, and "pump" to describe "Quad Pump Modules (QPM's)" (Curley Infringement Report (Ex. 5) at ¶¶ 26, 46, 48, 55 and 69).

56. Mr. Curley's use of "pumps" and "micropumps" to refer to QPMs in his deposition is supported by Mr. Curley's use of these same words ("pumps",

"small pumps" and "micropumps") to describe QPMs in his non-infringement report; For example, Mr. Curley uses "small pumps", "micropump, and "pump" to describe "Quad Pump Modules (QPM's)" (Curley Infringement Report (Ex. 5) at ¶¶ 26, 46, 48, 55 and 69).

57. Mr. Curley testified that the QPMs used in the Freestyle are not valves: "Well, the valve itself doesn't include the pump. The pump is -is something that operates the valve" (*id.* at 158:21-23).

58.  Mr. Curley testified that the Freestyle Dispenser's "user interface module" is not the Freestyle Mobile App (Curley deposition (Ex. 15) at 166:7-12).

59. Mr. Curley testified that the Freestyle Dispenser's "controller" does not actuate the mixing chamber (*id.* at 172:7-12).[1]

60. Mr. Curley testified that the "mixing chamber" he has identified in the Freestyle Dispenser "doesn't move" (*id.* at 172:7-10).

61.  When provided the opportunity by Coca-Cola's counsel to recant his testimony that the Freestyle Dispenser's controller does not actuate the mixing chamber, Mr. Curley declined (*id.* at 270:8-11).

62. Mr. Curley testified that he is an expert in vending machines and inkjet printing (*id.* at 228:6-8).

63. Mr. Curley testified that he has never been involved in the design of a post-mix beverage dispenser (*id.* at 229:25-230:2) and that is not an expert in post-mix beverage dispensing (*id.* at 233:21-234:1).

64. Mr. Curley testified that he is not an expert in beverage equipment outside of vending (*id.* at 234:18-23).

65. Mr. Curley testified that he is not an expert in TCP/IP protocol (*id.* at 239:3-13).

---

[1] Despite having Mr. Curley's transcript for almost one month, RCDI attempted to recant Mr. Curley's testimony just 2 days before the Opening Briefs for Motion for Summary Judgment Opening became due.  RCDI submitted an errata sheet that attempted to change Mr. Curley's testimony, where he clearly stated that the Freestyle Dispenser's controller does not actuate the mixing chamber because the mixing chamber does not move, to testimony that would reflect that the Freestyle Dispenser's controller does actuate the mixing chamber.

66. Mr. Curley testified that is not an expert in internet communications outside of local area networks (LAN) (*id*. at 243:14-17).

67. Mr. Curley testified that he is not an expert in any computer language other than machine assembly language and Visual Basic (*id*. at 246:18-21, 246:25-247:6).

## IV.   CLAIM CONSTRUCTION

68. The Court has construed the following terms of the Asserted Patent:

1. "element": plain and ordinary meaning (D.I. 79 at 7, 25)

2. "coupling": plain and ordinary meaning (*id*. at 8, 25)

3. "dispensing section": a component for directing the flow of a beverage (*id*. at 9, 26)

4. "mixing chamber": an area where beverage elements are combined (*id*. at 11, 26)

5. "user interface module": a component of a beverage dispenser that enables direct communication between the user and the dispenser (*id*. at 14, 26)

6. "actuate": plain and ordinary meaning (*id*. at 17, 26)

7. "server": a computer in a network that is used to provide services, such as access to files or shared peripherals or the routing of e-mail, to other computers in a network (*id*. at 19, 26)

8. "communication module": a component that enables communication between the dispenser and the server (*id*. at 21, 26)

9. "configured to actuate the at least one valve to control an amount of the element to be dispensed … based on the user gene[r]ated product preferences": capable of causing a valve to dispense an amount of a beverage element into a mixing chamber (*id*. at 22, 26)

Alston & Bird LLP

10. "the controller … configured … to actuate the mixing chamber based on the user generated product preferences": capable of causing the mixing chamber to mix a beverage responsive to user's beverage product preferences (*id*. at 24, 26)

69. Additionally, the parties have agreed upon construction of the following term of the Asserted patent:

"valve": plain and ordinary meaning (*id*. at 1, fn. 1)

70. The Court specifically recognized in is claim construction order that one of ordinary skill in the art would understand the claim language of "a beverage dispenser *comprising*" to mean it is physically part of the beverage dispenser (*id*. at 14).

## V.   RELATED TECHNOLOGY

### A. Beverage Dispensing Technology

71. The '377 Patent employs conventional mechanical aspects of beverage dispensers, the '377 Patent's inventor, Leigh Rothschild, does not contend to have invented certain mechanical components of a beverage dispenser (Rothschild deposition (Ex. 17) at 14:2-5).

72. The '377 Patent neither claims nor describes any improvements to the existing method of combining and dispensing beverage components to perform the claimed invention (*see generally* D.I. 1-1).

73. There are two primary types of prior art beverage dispensers: post-mix and pre-mix dispensers (Pete Wolski's Expert Declaration (Ex. 29) at ¶9).

74.  Pre-mix beverages are fully-mixed beverages, manufactured in a bottling plant or other facility, and delivered in sealed packaging.  Examples of pre-mix beverages include cans and bottles of Coca-Cola delivered by truck to a grocery store or vending machine. (*id.* at ¶ 10)

75.  Post-mix beverages are made by mixing a beverage base, such as a "syrup," with one or more diluent ingredients, such as water or carbonated water.  Post-mix beverages are often referred to as "fountain drinks,"

because they were traditionally made by a server at a soda fountain. (*id.* at ¶ 12).

76.  Until the advent of the Freestyle dispenser, post-mix beverages were typically made by automated post-mix dispensers that mix a diluent (e.g., carbonated water) with a beverage base ("syrup") typically stored nearby in a "bag-in-box" container. (*id.* at ¶ 13)

77.  Until the advent of the Freestyle dispenser, modern post-mix dispensers store beverage components separately, and mix the components on-demand, when a user presses a button or lever. (*id.* at ¶ 14)

78. In a traditional post-mix dispenser, a beverage dispenser with eight different beverages would require eight separate bag-in-box containers of syrup (*id.* at ¶35).

79. In 2000, the vast majority of carbonated, post-mix dispensers used post-mix drink syrup (with a 5:1 reconstitution ratio) to dispense a beverage (*id.* at ¶35).

80. In the late 1990s, the beverage industry began to focus on beverage customization and flavoring of dispensed beverages (Wolski Non-Infringement Report (Ex. 18) at ¶37).

81. Indeed, the '377 Patent admits that flavored beverage dispensing is a widespread and well-known technology (D.I. 1-1 at 8).

82. In an effort to increase sales, beverage dispensers began to offer some different types of drink options, which became a driving factor in the marketing of fountain beverages (Wolski Non-Infringement Report (Ex. 18) at ¶37).

83. "Flavor Shots" were introduced providing consumers the opportunity to add a shot of flavor to a branded soft drink, e.g. Cherry Coke (*id.* at ¶37).

84. "Flavor Shot" functionality was incorporated into the fountain beverage dispenser by companies such as Lancer Corp. and Cornelius, and these beverage dispensers also implemented improved multi-flavor dispensing

valve technology (dispensing multiple flavors through one dispense nozzle) to increase the density of brands provided (*id*. at ¶39).

85. This combination of new flavorings and increasing numbers of brands (usually within the same footprint as legacy dispensers) allowed consumers more choice and more personalization of their fountain drinks (*id*.).

### B. Networked Systems for Personalization of Products Based on User Preferences

86. By June 20, 2006, the earliest possible priority date of the ''377 Patent, networked systems for dispensing personalized consumer products based on user preference had been known for quite some time (*see generally* Alexander Invalidity Report (Ex. 19) at ¶¶8- 9).

87. These networked systems were able to personalize a variety of appliances ranging from customizable post-mix beverage dispensers (Boland), coffee and tea dispensers (Gutwein), juice dispensers (Rudick, Schroeder), nutritional beverage and food dispensers (Boland), and cosmetics and dietary formulation dispensers (Wilmott/Knoell/Bartholomew), to using mobile phones, computers, modems, and servers  (*id*. at ¶¶ 89-146).

## VI.   PRIOR ART

### A. Gutwein (U.S. Patent No. 7,438,941 (Ex. 20))

88. U.S. Patent No. 7,438,941 to Roger W. Gutwein et al.  ("Gutwein"), titled "Methods utilizing delayed dilution, mixing, and filtration for providing customized beverages on demand," was filed on April 28, 2004 and issued on October 21, 2008 (Ex. 20).

89. The Gutwein Patent is assigned to The Proctor & Gamble Company Ltd. and is prior art pursuant to 35 U.S.C. § 102(e) (*id*. at 1).

90. The Gutwein Patent discloses a beverage dispenser that provides customized beverages to a user based on the user's preference data (*id*. at 1; Ex. 19 at ¶106).

91. The Gutwein patent describes the use of a touchscreen with a beverage dispenser:

Touch screen 602 displays a series of Graphical user Interfaces (GUI) 603 which serve to facilitate the collection and display of information between the user and the customized beverage system 100.

(Ex. 20 at 6:29-33).



Fig. 6

(*Id.* at Fig. 6).

92. The Gutwein beverage dispenser is part of a networked beverage delivery system that operates both at and away from the user's home (*id*. at 5:17-29).

93. The "at home" and "away from home" beverage dispensers are network connected to a remote programming station system, which in turn allows the user to create and store a customized beverage formula that is used to dispense the user's preferred beverage (*id*. at 6:5-10; Ex. 19 at ¶109).

## B. Boland (U.S. Patent No. 7,762,181  (Ex. 21)

94. U.S. Patent No. 7,762,181 to Michael J. Boland et al. ("Boland"), titled "Customised nutritional food and beverage dispensing system," was filed on September 30, 2005 and issued on July 27, 2010 (Boland (Ex. 21)).

95. The Boland Patent is assigned to The Fonterra Co-Operative Group Ltd. and is prior art pursuant to 35 U.S.C. § 102(e) (*id*. at 1).

Alston & Bird LLP

96. The Boland beverage dispenser is a full self-service consumer product dispenser that operates as part of a networked system in communication with a server containing a customer database, formulation algorithms and nutritional data (id. at 4:65-5:4; Alexander Invalidity Report (Ex. 19 at ¶98).

97. Just like the '377 patent, this prior art patent specifically addresses the problem of providing access to stored, customized goods based on user preferences from any location.  (Ex. 21 at 9:40-50).

98. Specifically, Boland discloses a dispenser that offers a user individually customized beverage products based "not only customer choice but nutritional and health requirements" set forth in user health profiles stored on remote servers (*id.* at 7:67-8:3).

99. The Boland Patent describes additional functionality of a "touch panel" customer interface that allows a user to make selections by touching the image or representation of the product (*id.* at 3:54-55, Claim 19).

The Boland Patent teaches user interface technology that can be implemented in the beverage dispenser (*id*).

**VII.    THE COCA-COLA FREESTYLE DISPENSER**

100.    Coca-Cola began development of the Freestyle Dispenser in 2004 (Quartarone deposition (Ex. 22) at 13:12-15).

101.    The Freestyle Dispenser was introduced in 2009 (Quartarone deposition (Ex. 22) at 20:2-25).

102.    The Freestyle dispenser is a post-mix beverage dispenser (Pete Wolski Expert Declaration (Ex. 29) at ¶16).

103.    Unlike traditional automated post-mix dispensers, the Freestyle dispenser can mix over 100 different beverages (*id.* at ¶17).

104.     The Coca-Cola Freestyle does not use traditional bag-in-box syrups found in most traditional post-mix dispensers, and instead uses Coca-Cola's proprietary micro-ingredient technology, which uses highly-concentrated base flavors (i.e. Coca-Cola) and flavor additives (e.g. vanilla), to create over 100 different beverages (Wolski Non-Infringement Report (Ex. 18) at ¶¶43-45).

23

105.     A single micro-dosing ingredient can be used in many beverage recipes.  For example, The Coca-Cola brand micro-dosing ingredient is used in Coca-Cola Classic and its Cherry, Orange, Vanilla, Cherry Vanilla, Raspberry, and Lime flavored variants beverages (Wolski Non-Infringement Report (Ex. 18) at ¶51).

106.     Similarly, a beverage recipe can use multiple, different micro-dosing ingredients. For example, Cherry Coca-Cola consists of the Coca-Cola brand micro-dosing ingredient, the cherry flavored micro-dosing ingredient, HFCS, and carbonated water (*id.*).

107.     Micro-ingredients and micro-dose flavors are highly concentrated and are mixed with water in a ratio of only 150:1, as opposed to the nearly 5:1 ratio of conventional post-mix drink syrup (*id*. at ¶44).

108.     Because micro-ingredients are highly-concentrated, they are able to be packaged in a much smaller container than traditional post-mix drink syrup, resulting in significant space savings (*id.* at ¶44).

109.      Each micro-ingredient is contained in a micro-ingredient cartridge in the Freestyle dispenser (Declaration of Daniel Quarterone (Ex. 27) at ¶ 7; Ex. 29 at ¶ 20).

110.     Non-nutritive sweetener can also be used in the Freestyle dispenser, and is contained in a carton within the Freestyle dispenser.  (Ex. 27 at ¶ 8; Ex. 29 at ¶22).

111.     To create a beverage, the Freestyle follows a specific, pre-programmed recipe to combine specific amounts of (1) water (still or carbonated), (2) sweetener (HFCS or non-nutritive sweetener (NNS)), (3) micro-ingredient flavorings, and, optionally, (4) micro-dose flavor additives (Wolski Non-Infringement Report (Ex. 18) at ¶50).

112.     A person of ordinary skill in the art for the beverage dispensing subject matter of the '377 Patent would define beverage as a "homogenous mixture of all beverage ingredients" (Declaration of Peter Wolski (Ex. 29 at ¶ 8).

113.     High fructose corn syrup (HFCS) is used in the Freestyle dispenser to make beverages.  HFCS can only be contained in a bag-in-box carton outside

24

of the Freestyle dispenser and fed into and through the Freestyle dispenser in tubing (Ex. 27 at ¶ 10; Ex. 29 at ¶ 24; Wolski Non-Infringement Report at ¶¶50, 67).

114.    Micro-ingredients are not mixed within the Freestyle dispenser, they are mixed after leaving the dispenser's nozzle assembly, both in the air and in a Freestyle user's cup.  (*id.* at ¶ 21).

115.    As with micro-ingredients, non-nutritive sweetener is not mixed with micro-ingredients, within the Freestyle dispenser.  It is only mixed with micro-ingredients after leaving the dispenser's nozzle assembly, both in the air and in a Freestyle user's cup.  (Ex. 27 at ¶ 9; Ex. 29 at ¶ 23).

116.    The micro-ingredient cartridges do not exert negative pressure on the tubing – or any fluid within the tubing – between the QPM and the nozzle assembly.  (Ex. 27 at ¶ 19; Ex. 29 at ¶ 34).).

117.    The Freestyle dispenser does not use negative pressure within micro-ingredient cartridges to prevent unwanted dripping of micro-ingredients. (Ex. 27 at ¶ 24).

118.    The Freestyle dispenser does not use negative pressure within micro-ingredient cartridges as part of any kind of passive or active valve function (*id.*                at                ¶                25).

119.    The Freestyle dispenser does not use negative pressure within micro-ingredient cartridges to prevent unwanted dripping of micro-ingredients (*id.*. 29 at ¶ 36).

120.    The Freestyle dispenser does not use negative pressure within micro-ingredient cartridges as part of any kind of passive or active valve (*id.* at ¶ 37).

121.    The micro-ingredient cartridges are not fluidly connected to the nozzle assembly or to the tubes that convey micro-ingredients from the QPM to the nozzle assembly.  Accordingly, any negative pressure that may exist within a micro-ingredient cartridge is fluidly isolated from the nozzle assembly and the tubes that convey micro-ingredients from the QPM to the nozzle assembly. (Ex. 27. at ¶ 20; Ex. 29 at ¶ 35).

Alston & Bird LLP

122.    The Freestyle dispenser development program was once code named "Jet." It was named for a famous fountain in Geneva. (Ex. 27 at ¶ 21).

123.    The code name of the Freestyle dispenser development program, "Jet," has no relationship to inkjet printing technologies. (*id.* at ¶ 22).

124.    The Freestyle dispenser does not utilize inkjet printer technologies to dispense micro-ingredients or for any other function. (*id.* at ¶ 23).

125.    Water is used in the Freestyle dispenser to make beverages. Water is not contained or stored within the Freestyle dispenser. Water is fed into and through the Freestyle dispenser in tubing. Water is provided to the Freestyle dispenser from a water line source, such as a municipal water source. (Ex. 27 at ¶ 11; Ex. 29 at ¶ 25; Wolski Non-Infringement Report at ¶67).

126.    The Freestyle dispenser makes carbonated water by mixing regular (flat) water with $CO_2$. (Ex. 27. at ¶ 12; Ex. 29 at ¶ 26).

127.    $CO_2$ is not contained or stored within the Freestyle dispenser. $CO_2$ is fed into and through the Freestyle dispenser in tubing. $CO_2$ is provided to the Freestyle dispenser from an external source, such as a pressurized $CO_2$ tank. (*id.* at ¶ 27; Ex. 27. at ¶ 13).

128.    Carbonated water is not contained or stored within the Freestyle dispenser. Regular water is mixed with $CO_2$ to make carbonated water in a continuous process, in which regular water is exposed to $CO_2$ as the water flows through the Freestyle dispenser in tubing. (*id.* at ¶ 14).

129.    Regular water is mixed with $CO_2$ in what Coca-Cola refers to as a carb tank. The carb tank in the Freestyle dispenser does not store carbonated water. If a user were to continuously dispense a carbonated beverage from the Freestyle dispenser, the Freestyle dispenser would continuously make more carbonated water. (*id.* at ¶ 15; Ex. 29 at ¶ 29).

130.    The Freestyle Dispenser does not have the ability to store water in a "compartment" within the dispenser's housing (Wolski Non-Infringement Report at¶67).

131.    Carbonated water does not reside in a compartment contained in the Freestyle Dispenser, but is provided from an external water source, and

converted to carbonated water by a carbonator (Wolski Non-Infringement Report at ¶70).

132.    Only water, carbonated water, and HFCS flow through the center of the Freestyle's nozzle assembly.  (Ex. 27 at ¶ 17; Ex. 29 at ¶31).


### A.    The Air-Mix Nozzle of the Freestyle Dispenser

133.    The Freestyle dispenser uses an air-mix nozzle. (Ex. 29 at ¶ 18).

134.    The air-mix nozzle was designed to be used in the Freestyle Dispenser (ME Alumni, Coca-Cola Freestyle Winning Formula, by Roger Slavens, published in the Georgia Tech Alumni Magazine, http://www.me.gatech.edu/featured_ccfreestyle).          (Ex.          28).

135.    The Freestyle's air-mix nozzle is designed to prevent micro-ingredients from mixing with one another until they are outside of the dispenser.  In particular, the micro-ingredients are not mixed within the Freestyle dispenser, they are mixed after leaving the dispenser's nozzle assembly, both in the air and in a Freestyle user's cup. (*id*.; Ex. 27 at ¶ 6; Ex. 29 at ¶ 18).

136.    Because the air-mix nozzle keeps beverage elements isolated from each other during dispensing,  the Coca-Cola Freestyle dispenser merely dispenses "a number of elements together pouring down the stream that aren't mixed" (Wolski deposition at 21:13-23).


### B.    Dispensing from the Freestyle Dispenser

137.    To begin a pour, the Freestyle relies on the use of a physical "PUSH" button which must be depressed by the user to begin dispensing, and will stop dispensing once the PUSH button is no longer depressed (Wolski Non-Infringement Report (Ex. 18) at ¶¶56, 46).

138.    When the "PUSH" button is pressed, the flow control modules (FCMs) that control the flow of carbonated water, still water, and HFCS are actuated (Wolski Non-Infringement Report (id.) at ¶57).

### C. Quad Pump Modules (QPMs) in the Freestyle Dispenser

139.      The Freestyle dispenser uses quad pump modules (QPMs) to dispense precise amounts of micro-ingredients and non-nutritive sweetener. (Ex. 27 at ¶ 16; Ex. 29 at ¶ 30).

140.      The Freestyle's QPMs are pumps.  (*id*. at ¶ 32; Ex. 27 at ¶ 18 ).

141.      The Freestyle's QPMs are not valves.  (*id;* Ex. 29 at ¶ 33).

## IX.   THE COCA-COLA FREESTYLE MOBILE APP

176.      The Freestyle App and Dispenser use cellular networks to communicate (Alexander Non-Infringement Report at ¶49).

177.      The Freestyle Dispenser contains a modem that allows it to connect with cellular communication networks (*id*. at ¶50).

178.      The transmission of communications, or messages, between the Freestyle App (user) and Dispenser relevant to the '377 occurs exclusively over the cellular network (*id*. at ¶¶49, 61).

179.      Any communications between the Freestyle App user and the Freestyle dispenser must go through convoluted cellular communication pathways (*id*.; *id*. at ¶¶61-64, 75-78).

180.      Communication between the user and Freestyle Dispenser is far from direct, as shown by the following communication path.  In order for the Freestyle App user to be able to communicate with the Freestyle Dispenser, the following steps must be taken:

(1) The message sent from the user's Freestyle App must first be encapsulated into a "packet" in order to go through the cellular network. The message must be encapsulated three times before being transmitted in the cellular network (id. at ¶74).
(2) Thrice-encapsulated packets containing the Request message from the user's Freestyle App are launched into the cellular network using the cellphone's connection with a cell tower ("BTS," below) (*id*. at ¶74).

(3) From the cell tower (BTS), are routed to the SGSN (Serving GPRS Support Node) via the PCU (packet control unit) (*id*. at ¶74).

(5) From the SGSN, the packets travel through the GPRS Backbone, and then to the GGSN (Gateway GPRS Support Node) (*id*.).

(6) The GGSN provides the initial step for networking between the GPRS network and the internet, which is where the CDA is located (*id*.).

(7) From the GGSN, the packets must then pass through a firewall in order to flow into internet servers, such as the CDA (hosted by Amazon Web Services) (*id*. at 75).

181.



*Id*. at ¶71. Packet routing of the Request message

Therefore, packets, or messages, from the Freestyle App must be transmitted through seven distinct units, gateways, and firewalls in order to be sent into the CDA, which retrieves the consumer's stored Mixes and Favorites.

(8) The CDA then sends a thrice-encapsulated QR Initiate Request packet containing the consumer's stored Mixes and Favorites to the Freestyle Dispenser, so that the Dispenser may then display the App user's Mixes and Favorites on the screen.

(9) In order for the Freestyle Dispenser to receive the list of the App user's Mixes and Favorites from the CDA, the packet must then traverse through these seven distinct units again but in reverse order.

(10) Upon arrival to the SGSN, the packets are directed to the cellular modem in the Freestyle Dispenser (not shown above), which communicates with a cell tower (BTS, above) (*id.* at ¶62).

## VIII.  DECLARATION OF CHRISTOPHER DENNIS

142.      I am of legal age and under no legal disability. I have personal knowledge of the facts in this Declaration and know them to be true and correct. (Dennis Declaration (Ex. 30 at ¶ 1)

143.      I am Group Director, Product Management - Coca-Cola Freestyle for The Coca-Cola Company ("Coca-Cola") in Atlanta, Georgia. (*id.* at ¶ 2)

144.      Counsel for Coca-Cola informed me that the plaintiff in this case, Rothschild Connected Devices Innovations, LLC ("RCDI"), has sued Coca-Cola for patent infringement. (*id.* at ¶ 3)

145.      In early 2016, counsel for Coca-Cola informed me that RCDI served Coca-Cola with a notice to take my deposition. ((*id.* at ¶ 4)

146.      I understand from counsel for Coca-Cola that counsel for Coca-Cola never identified me as a potential witness in this lawsuit, or as a person likely to have information relevant to this lawsuit. (*id.* at ¶ 5)

147.      Regardless, RCDI took my deposition on March 15, 2016. (*id.* at ¶ 6)

148.      I understand that RCDI has claimed in this lawsuit that certain quotes from my deposition testimony support RCDI's claim that the Freestyle dispenser infringes RCDI's patent.  (*id.* at ¶ 7)

149.      I understand that in connection with its claims of infringement, RCDI had identified as a Coca-Cola "engineer."  (*id.* at ¶ 8)

150.      I am not an engineer by training or profession.  (*id.* at ¶ 9)

151.     I have never worked as an engineer at Coca-Cola or anywhere else. (*id*. at ¶ 10)

152.     I graduated from Georgia Tech in 1995 with a bachelor's degree in Management.  (*id*. at ¶ 11)

153.     I have worked in management at Coca-Cola for over 13 years. (*id*. at ¶ 12)

154.     Though I know a lot about Coca-Cola's products, I am not qualified to describe or discuss the technical features and components of Coca-Cola's products with any degree of technical certainty.  I know what our products do, but I do not know how they work.  (*id*. at ¶ 13)

155.     I have recently reviewed Exhibit 7, which RCDI's counsel asked as a deposition exhibit and showed to me, during my deposition.  At the time of the deposition, Exhibit 7 was an accurate internet posting of my professional resume (it was posted at LinkedIn.com). Exhibit 7 included an accurate list of my management positions at Coca-Cola, and stated that I have a bachelor's degree in Management.  (Dennis Declaration (*id*. at ¶ 14)

156.     During my deposition, I made clear to counsel for RCDI that I do not have a technical degree, and do not serve a technical, design, scientific, or engineering role at Coca-Cola.  (*id*. at ¶ 15)

157.     Indeed, on many occasions, counsel for RCDI specifically asked me about my understanding of various technical and patent terms only from my standpoint "as a layperson."   (*id*. at ¶ 16)

158.     I have no personal knowledge as to the technical accuracy of the Coca-Cola Freestyle Fluid Paths document, marked as Exhibit 11 and shown to me during my deposition.  (*id*. at ¶ 17)

159.     I have no personal knowledge regarding the technical, functional, or physical features of the portion of Exhibit 11 labeled as a "Carb Tank."  (*id*. at ¶ 18)

160.     I have no personal knowledge as to the technical accuracy of the Coca-Cola Freestyle Dispenser Operation B.U.S. document, marked as

Exhibit 12 and shown to me during my deposition.  (*id*. at ¶ 19)

161.    I understand that RCDI has quoted me as testifying, in connection to Exhibit 12, as follows: "[Blister refers to] the entire components of the touch screen and, you know, however the touch screen is controlled . . . the single board, computer, right, all that in one component." (*id*. at ¶ 20)

162.    Though this appears to be an accurate recitation of some of my testimony, that quotation omits portions of my answer to that question.  My full testimony was: "Blister is a term we use to describe the entire components of the touch screen and, you know, however the touch screen is controlled that we talked about earlier, the single board, computer, right, all that in one component.  It is called a Blister. I don't know where the name came from." (*id*. at ¶ 21)

163.    I was only responding to RCDI's counsel question, "What is the name, Blister?"  I was simply telling RCDI's counsel what I thought the nickname "blister"         meant.              (*id*.        at         ¶         22)

164.    I have no personal knowledge as to whether the term "blister" has technical significance or any other significance.  (*id*. at ¶ 23)

165.    I understand that RCDI's counsel has used my testimony regarding the term "blister" to support RCDI's claim that "The Blister includes the touch screen display surface and the touchscreen controller, which is integrated into a single board computer, to which the display is attached." (*id*. at ¶ 24)

166.    I have personal knowledge that Freestyle's touch screen user interface and the touch screen controller are not integrated into a single electronic component with the Freestyle dispenser's single board computer.  (*id*. at ¶ 25)

167.    When I answered RCDI's counsel's question, I was simply referring to how I use the term "blister."  I was not speaking for anyone else at Coca-Cola. I was not suggesting that "blister" is a technical term referring to any specific Freestyle components or any group of Freestyle components. (*id*. at ¶ 26)

Alston & Bird LLP

168.    I further understand that RCDI's counsel have stated that I testified that "What's more, every Freestyle unit is wirelessly connected to the internet and can provide this information back to us, as well as the restaurant and retail owners." I never made that statement in my deposition. That was a statement that RCDI's counsel read out loud during my deposition from the document marked Exhibit 8 in my deposition. (*id*. at ¶ 27)

By reference, we incorporate the following Exhibits 34 – 40 to this Statement of Undisputed Material Fact.

Alston & Bird LLP