# EXHIBIT 18

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSELS' EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ROTHSCHILD CONNECTED DEVICES INNOVATIONS, LLC, | ) | |
| Plaintiff, | ) | **Civil Action No. 1:16-cv-01241-TWT** |
| v. | ) | |
| THE COCA-COLA COMPANY, | ) | |
| Defendant. | ) | |

**EXPERT REPORT OF PETER WOLSKI**
**REGARDING NON-INFRINGEMENT**

May 11, 2018

## I. INTRODUCTION

1. Plaintiff Rothschild Connected Devices Innovations ("RCDI") alleges that defendant The Coca-Cola Company ("Coca-Cola") infringes RCDI's U.S. Patent No. 8,417,377 ("'377 Patent") asserted in this suit. RCDI alleges that Coca-Cola's Freestyle product infringes claims 11, 12, and 21-23 of the '377 Patent.

2. I have been retained as a technical expert by the law firm of Alston & Bird on behalf of Coca-Cola in this case to provide opinions and conclusions regarding RCDI's allegations of infringement of the '377 Patent by Coca-Cola's Freestyle product. This Report also sets forth my responses to the expert report of Charles Curley. I understand that I may be called upon in this case to render other opinions in response to additional information or positions taken by RCDI's experts.

3. This report is based on information currently available to me. I reserve the right to continue my investigation and supplement this Report in light of any additional information made available to me. This may include a review of documents and information that may have recently been produced, as well as transcripts for any depositions that are taken after I submit this report. For example, I reserve the right to perform any investigation that may be necessary to

respond to any reports or assertions provided by RCDI, to address any late produced information or documents from RCDI, or any other appropriate reason for me to supplement this Report. I may thus expand or modify my opinions as my investigation continues.

## II. QUALIFICATIONS AND COMPENSATION

4. I have been employed in the beverage dispensing industry for over 20 years. I have substantial experience in the development and commercialization of post-mix beverage dispensers. I have managed teams of engineers that were responsible for the research and development of post-mix beverage dispensers for IMI Cornelius, an industry leader.

5. My curriculum vita is attached as Exhibit 1. I received my Bachelor's of Science in mechanical engineering in 1984 from Syracuse University.

6. From 1993 to 2001, I held a number of key technical roles including Director of Engineering and Quality and Vice President of Engineering for IMI Cornelius, where I managed a team of engineers responsible for product development. IMI Cornelius is an industry leader in the design and manufacture of commercial beverage dispensing and ice making equipment.

7. From 2001 to 2002, I served as Executive Vice President of Engineering at IMI Cornelius, and was responsible for all engineering and research

and development programs within the company's U.S. division. During that time, the products we developed included post-mix soda fountain dispensers, dispensing valves, post-mix juice dispensers, and frozen carbonated beverage dispensers, among others.

8. From 2001 to 2007, I was responsible for managing IMI Cornelius' patent portfolio, including maintenance of approximately 263 patents assigned to the company, as well as for applying for and acquiring intellectual property rights. My duties also included the management and coordination of outside legal counsel including coordinating defenses against patent infringement claims by other entities. I also was responsible for avoiding any infringement of others' patents.

9. From 2002 to 2005, I served as the Executive Vice President of Products, Services, and Technology, where I also assumed responsibility for all product and general marketing, program management, technical field service and training, as well as all engineering and research and development. As such, I was keenly aware of the state of beverage dispensing technology in the industry during that era.

10. In 2005, I moved away from managing the day to day engineering of beverage dispensers and managed the market development for IMI Cornelius while retaining the program management of all product development. I worked with

many large companies introducing beverage programs and new products for companies like McDonald's, Coca-Cola, PepsiCo, and Yum! Brands.

11. From 2007 to 2014, I held a number of senior management positions at DCI Marketing, a sister company to IMI Cornelius under IMI plc ownership. During this period, I remained involved in the beverage dispensing area specifically leading teams that worked with PepsiCo in developing the user interface and remote communication systems for the Pepsi Fusion beverage dispenser and the Social Vending unit.

12. Since 2014, I have offered my services as an independent consultant providing business and product development advice to many global brands. I am the named inventor of nine patents (and one pending application) related to beverage dispensing. My Curriculum Vitae submitted as Attachment B discloses my professional work experience in these areas.

13. I am being compensated at my customary hourly rate of $470 for my work on this dispute between Coca-Cola and RCDI. This compensation is unrelated to the outcome of this matter.

14. Based on my work experience, described in additional detail in my CV, I am knowledgeable about post-mix beverage dispensing including the functionality of individual components of post-mix beverage dispensers.

## III. INFORMATION AND MATERIALS CONSIDERED

15. In performing my analysis, I have relied on my own personal knowledge and extensive experience, including my extensive experience in the design and development of post-mix beverage dispensing systems. I have reviewed the '377 Patent, the prosecution history for the '377 Patent, and the Court's November 9, 2017 Opinion & Order regarding claim construction of Judge Thomas W. Thrash, Jr. I have reviewed the April 4, 2018 Opening Expert Report of Charles Curley and the documents and information referenced therein or attached thereto.

16. I have also considered and may rely on the documents and information identified in this Report, the Non-Infringement Report of Peter Alexander, and the respective reports' attached appendices and exhibits. A list of all other documents that I relied upon in preparing this report listed in Attachment A.

## IV. SUMMARY OF OPINIONS

17. This section is only intended to be a high-level summary for the different types of opinions in the report and not an exhaustive list.

18. As detailed below, it is my opinion that the Coca-Cola Freestyle Beverage Dispenser does not infringe any of the asserted claims of the '377 Patent,

either literally or under the doctrine of equivalents. Specifically, the Coca-Cola Freestyle does not have "at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage," or "a mixing chamber for mixing the beverage," as required by the asserted claims of the '377 Patent. Furthermore, RCDI has failed to provide any evidence that the Coca-Cola Freestyle dispenser has a "valve" or "mixing chamber" as required by the asserted claims of the '377 Patent.

19. In forming my opinions on infringement, I have applied my understanding of the legal standards for infringement, as discussed below.

20. To the extent that Mr. Curley is allowed to supplement his report to provide further allegations, I reserve my right to supplement this report.

## V. LEGAL STANDARDS

21. I am not a patent attorney and do not expect to offer any opinions regarding the law. However, I have been advised of certain legal principles that pertain to the subject matter for which I have been asked to provide my professional opinions. I have applied my understanding of these legal principles in forming my opinions.

22. Below, I will describe the law that I applied in considering the issues of claim construction, infringement, and non-infringement. I understand that

determining whether a given patent claim is infringed requires a two-step analysis. First, the claim must be construed, and then the properly construed claim must be compared to the products accused of infringement.

### A. Patent Infringement

23. I understand that each construed claim must be compared to the accused device or process to determine whether every claim element is found in the accused device or process. A patent is literally infringed only when the accused product contains each and every claim limitation, or where a single party performs each and every step of a method claim. If any claim limitation is absent from the accused device or method, there is no literal infringement as a matter of law.

24. I also understand that a method claim cannot be infringed unless each element of the method claim is actually performed by a single actor. The fact that equipment or software might be capable of performing the elements of a method claim is insufficient to establish infringement of the method claim.

25. I also understand that because dependent claims incorporate all of the limitations of the independent claims from which they depend, dependent claims cannot be literally infringed if one of the limitations in the corresponding

independent claim is missing, although there also may be additional reasons why a dependent claim is not infringed.

26. I am also informed that a party may be accused of certain forms of indirect infringement even if that party does not directly infringe. However, a finding of contributory infringement or inducement of infringement by an accused party first requires underlying proof of direct infringement by some party. Upon a failure of proof of direct infringement, any claim of inducement of infringement or contributory infringement fails.

27. I understand that even if all limitations of a claim are not literally met, an accused product or process may still infringe under the doctrine of equivalents. A doctrine of equivalents analysis is performed on an element-by-element basis. Thus, one must analyze each claim element separately and, for each element not literally met, determine whether the difference between the element in the accused product and the claim element is insubstantial.

28. I understand that there is no set formula for determining whether an element in a product is an equivalent of a claim limitation. The key inquiry is whether there are only insubstantial differences between the element and the claim limitation.

29. I understand that one common way of determining equivalence is to examine whether the accused structure or step (i) performs substantially the same function, (ii) works in substantially the same way, (iii) to achieve substantially the same result as the corresponding limitation of the claim. The known interchangeability of substitutes for a limitation of a claim is an express objective factor bearing on whether the accused structure or step is substantially the same as that claimed.

### B. Claim Construction

30. I understand that the parties have agreed to the constructions of several terms in the '377 Patent and that the Court has provided constructions for terms that could not be agreed upon. I have faithfully applied those constructions in my analysis.

31. I further understand that, absent an agreed-upon construction or a construction provided by the Court, the terms as used in the asserted claims of the '377 Patent are to be afforded their plain and ordinary meaning to one of ordinary skill in the art at the time of the invention. I further understand that my analysis should cover a comparison of the properly construed terms in the asserted claims to the accused products on a limitation-by-limitation or element-by-element basis.

32. In view of my education and experience, I have an understanding as to how the invention defined by the asserted claims of the '377 patent would have been appreciated by a person of ordinary skill in the art at the time of the invention. In determining the plain and ordinary meaning of terms that have not been construed by the Court, I have taken into consideration the understanding of a person of ordinary skill in the art and the intrinsic record of the patent.

## VI. ORDINARY SKILL IN THE ART

33. In this report, I refer to a "person of ordinary skill in the art." For the subject matter of the '377 Patent, it is my opinion that a person of ordinary skill in the art during the time frame of 2006 to present day, would have a combination of a bachelor degree in engineering or a related field, and at least two years of work experience in an area involving computer networking and user interfaces, especially including the application of computer networking and user interfaces in the post-mix beverage dispensing industry.

## VII. CLAIM CONSTRUCTIONS

34. I understand that this Court issued a claim construction order on November 9, 2017 and adopted constructions for the disputed claim terms of the '377 Patent. I further understand the parties have agreed that the term "valve"

should be given its plain and ordinary meaning. I have applied the following constructions in my analysis:

| Claim Term | Court's Construction or Party Agreement |
|---|---|
| "element" | Plain and ordinary meaning |
| "coupling" | Plain and ordinary meaning |
| "valve" | Plain and ordinary meaning |
| "dispensing section" | "a component for directing the flow of a beverage" |
| "mixing chamber" | "an area where beverage elements are combined" |
| "user interface module" | "a component of the beverage dispenser that enables direct communication between a user and the dispenser" |
| "actuate" | Plain and ordinary meaning |
| "server" | "a computer in a network that is used to provide services, such as access to files or shared peripherals or the routing of e-mail, to other computers in a network" |
| "communication module" | "a component of the beverage dispenser that enables communication between the dispenser and the server" |
| [the controller] "configured to actuate the at least one valve to control an amount of the element to be dispensed . . . based on the user gene[r]ated product preferences" | "capable of causing a valve to dispense an amount of a beverage element into a mixing chamber" |
| [the controller] "configured . . . to actuate the mixing chamber based on the user gene[r]ated product preferences" | "capable of causing the mixing chamber to mix a beverage responsive to user's beverage product preference" |

Nov. 9 2017 Claim Construction Opinion and Order of Judge Thomas W. Thrash ("Nov. 9 2017 Opinion and Order").

## VIII. OVERVIEW OF THE COCA-COLA FREESTYLE DISPENSER

### A. Background of Freestyle and Post Mix Fountain Beverage Dispensers

35. In 2000, the vast majority of carbonated, post-mix dispensers used post-mix drink syrup (with a 5:1 reconstitution ratio) to dispense a beverage. Illustrated below is a seven-liter bag-in-box post-mix syrup container for Coca-Cola Classic. Each box, one for each available flavor, would connect through a hose to a post-mix beverage dispenser.




36. The prior art of beverage dispensers offered only a handful of brand options, usually under ten drink brands. Retailers and customers were limited to these brand options. If a retailer wanted to change a drink brand, it would have to

replace an existing brand; it could not add another brand without doing so. In addition, consumers were not able to customize their drinks. Instead, they were restricted to the limited selections offered by a conventional beverage dispenser.




37. In the late 1990's, the industry began to focus on customization and flavoring of dispensed beverages. In an effort to increase sales, beverage dispensers began to offer some different types of drink options which became a driving factor in the marketing of fountain beverages. The new customization of drinks became available in convenience store across the U.S. Terms like "Big Gulp Suicides" were used by 7-Eleven stores to describe the random mixing of multiple brands and flavors together in a single cup. In addition, "Flavor Shots" were introduced providing consumers the opportunity to add a shot of flavor to a branded soft drink, e.g. Cherry Coke.

38. Initially, the additional flavor shots were available via hand pumps that were external to the beverage dispenser. This approach helped launch the concept of consumers adding additional flavoring to their drinks but proved inefficient, limited, and wasteful. Unfortunately, customers were given a choice of flavor options without a recipe or any indication of how much of a flavor shot should be added causing some beverages to be over-powered with optional flavors. This resulted in beverages being poured out and customer dissatisfaction.

39. The solution was to incorporate the "Flavor Shot" functionality into the fountain beverage dispenser. Companies such as Lancer Corp. and Cornelius developed dispensers incorporating flavor shot technology as well as employing improved multi-flavor dispensing valve technology (dispensing multiple flavors through one dispense nozzle) to increase the density of brands provided. This combination of new flavorings and increasing numbers of brands (usually within the same footprint as legacy dispensers) allowed consumers more choice and more personalization of their fountain drinks.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSELS' EYES ONLY**




40. The reason this approach to fountain beverage dispensing became widely available in convenience store markets was due to a number of factors. Large convenience operators/chains employed a multi-brand approach to the marketing of soft drinks. In many instances, they could offer a curated selection of the top selling soft drinks specific to local consumer tastes since convenience stores typically did not have exclusive contracts with one particular beverage company. This was termed a "Dual Cola" strategy, as the primary providers of the brands were Coca-Cola and Pepsi Cola, although other brand owners also participated, i.e. Dr. Pepper.

41. In contrast, quick serve restaurants and the general street trade restaurants enter into exclusive contracts for fountain beverages with either Coca-Cola or PepsiCo. These contracts usually wrap together the capital cost of the dispensing system with the cost of syrup/product, service and in some cases marketing. The beverage companies provide a standard offering to all their

customers adjusted to the potential volume of the particular customer. Because of these agreements, only the contracted brands were allowed. Flavor Shots were typically not included since these additional flavorings were net cost drivers. Due to the lack of control in the portioning and mixing of the flavor with the base brand, beverage companies were cautious about providing these customization options.

42. Customers of the large beverage brands such as Coca-Cola and Pepsi began to request an expanded beverage offering beyond the traditional six or eight branded dispensers. In some markets, large brands began to offer flavor shot technology embedded in their dispensers, but did not provide multi-flavor technology on a broad basis. This was due mainly to the increased complexity and expense in the supply chain, as well concerns with brand integrity (drink quality standards).

43. Coca-Cola in cooperation with DEKA took the initiative to lead the multi-brand, multi-flavor movement and develop a technology that allowed for much more variety in beverage selection and customization than was currently available with conventional post-mix technology. The conventional post-mix formula consisted of a base brand syrup with an incorporated sweetener. Employing a different technology, Coca-Cola used a more compact and

concentrated syrup technology by deploying a previously patented technology they owned called "Tri-Mix" (U.S. Patent No. 4,753,370). Tri-mix technology consists of mixing highly-concentrated base brand micro-dosed ingredients (Micro Ingredients), a sweetener, and water to create a beverage.

44. This new micro-dosing system (versus the traditional post-mix syrup system) enabled two key attributes to making multi-branded/flavored dispensing economically viable to customers: 1) a space efficient dispensing system was achieved due to the reduced amount of fluid that needed to be pumped, metered, and mixed (150:1 vs. 5:1), and 2) allowing multi-flavor valves to expand from four products dispensed from one nozzle ratio to over twenty brands plus flavorings in the same space. This economy results in over one hundred different beverages to be dispensed from a point of dispense. Thus, more brands and flavors are dispensed in the same or even smaller retail footprint than what was used by legacy dispensers. Because a beverage uses a small amount of micro-dosed ingredient (Micro Ingredients) compared to traditional drink syrup, the size of the ingredient package are drastically reduced enabling the economic delivery of the micro-dosed ingredient via the U.S. Postal Service, UPS, or FedEx instead of more expensive direct delivery methods employed by the large brands for traditional post-mix

syrup. In addition, packaging costs associated with the beverage components are reduced.

45. Once the new micro-dosing system was developed, it enabled the incorporation of enhanced consumer customization. To support the selection of the voluminous flavors available, Coca-Cola developed a step based user interface to take advantage of the ability to create the myriad of drink combinations available to the consumer in a simple, easy, and updateable way. Alternatively, the dispenser would have to employ over a hundred buttons, one for each drink selection. This would also restrict the addition of new flavors in the future. Touch screen technology was a known solution, identified in prior patents and drink-related applications. Thus, touchscreen technology was a natural design selection for this application.

46. The final design solution for the Freestyle dispenser utilized a hybrid of a touch screen user interface and a separate electromechanical button to create the user selection and pour functionality. The touch screen is used to step through the brand and flavor choices to select a drink recipe, while an electromechanical push button served as the pour signal.

47. By creating a new micro-dosing beverage formulation to satisfy the consumer desire for choice and customization, Coca-Cola was required by design

process to make technology selections based on functional need and economic benefit. This resulted in using many existing technologies such as touch screens and monitoring systems that were not previously used in fountain dispensers, but now were prudent based upon the ability to dispense hundreds of different types of beverages from one dispenser.

**B. Beverage Dispensing Features of a Freestyle**

**1. Micro-dosing Technology vs. Legacy Fountain dispensers**

48. The Coca-Cola Freestyle uses a proprietary micro-dosing technology that allows it to dispense over a hundred different beverages while occupying a similar footprint as a legacy fountain dispenser. The Freestyle dispensers are designed to create a beverage in real time meaning a beverage is manufactured by combining different micro-dosing ingredients ("micro-ingredients"), a sweetener, and water (plain or carbonated) at the time of dispensing.

49. A non-Freestyle dispenser uses a post-mix drink syrup that is diluted with water at the time of dispensing to create a beverage. Because water is readily available from municipal sources and can be added separately, the concentrated post-mix drink syrups use less space than storing pre-mix beverage containers or ready to drink bottles and cans. These legacy dispensers are ubiquitous in fast food restaurants and convenience stores.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSELS' EYES ONLY**

50. The Freestyle's micro-dosing cartridges use even less space than legacy post-mix drink syrup containers and are stored inside the Freestyle. In Freestyle system, the traditional post-mix drink syrup is further deconstructed to extract and isolate the sweetener. The sweetener (which can be HFCS or a non-nutritive sweetener for diet drinks) is generally around 16% (for HFCS) of a soft drink beverage's volume, much less for non-nutritive. The amount of sweetener varies slightly depending on the beverage. The HFCS is remotely stored outside the dispenser, typically in a separate room. The non-nutritive sweetener is stored inside the machine in an adjacent space to the Micro Ingredients. As a result of separating the sweetener from the rest of the micro-dosing ingredient, the Freestyle requires micro-dosing ingredients (micro-ingredients), a sweetener, and water to create a beverage.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSELS' EYES ONLY

## Coca-Cola Freestyle Overview

- Coca-Cola Freestyle is a real time finished beverage manufacturing plant – taking "raw materials" including HFCS, Micro Ingredients (Components, mixes and flavors) and Carbonated Water and mixing them together with the most technically precise instrumentation in the industry.
- Some components are new for Coca-Cola Freestyle and new to the beverage industry. These include the state of the art, micro pumping systems, (quad pumps-or QPM's), ingredient agitation devices, micro-ingredient cartridges and on-board computer technology.
- Some components including the legacy module and cooling and carbonating system are similar to components found on our Legacy and Bevariety dispensers.
- Combined these components are used to dispense the highest quality beverages and the most brand variety available from a dispenser in the beverage industry.




freestyle Classified - Internal use 68

*See* TCCC00000075 (CCFS Operating Plan) at 142.

51. A single micro-dosing ingredient can be used in many beverage recipes. Similarly, a beverage recipe can use multiple, different micro-dosing ingredients. For example, Cherry Coca-Cola consists of the Coca-Cola brand micro-dosing ingredient, the cherry flavored micro-dosing ingredient, HFCS, and carbonated water. The Coca-Cola brand micro-dosing ingredient is used in Coca-Cola Classic and its Cherry, Orange, Vanilla, Cherry Vanilla, Raspberry, and Lime

flavored variants. The cherry flavored micro-dosing ingredient can be used in other flavors like Cherry Sprite.

52. Creating beverages using this deconstructed method allows the Freestyle to dispense over a hundred different beverages using twenty-four micro-dosing cartridges, two types of sweetener, water, and carbonated water. Beverages available from a Freestyle include popular Coca-Cola brands (such as Coca-Cola, Sprite, and Fanta), non-carbonated beverages (such as Dasani, Hi-C, and Minute Maid), and low/no-calorie beverages (such as Diet Coke).

53. Because the micro-dosing ingredient is so concentrated (less than 1% of each beverage's volume), precision and accuracy is required to dispense the correct amount of micro-dosing ingredient. The Freestyle dispensers utilize QPMs (quad pump modules) which include micro-pumps (positive displacement solenoid pumps manufactured by Ulka) to dispense a precise amount of micro-dosing ingredient. The micro-pumps allow the Freestyle to draw a precise volume of micro-dosing ingredient that is mixed with a flowing water and sweetener mixture in the beverage stream outside the dispenser that flows into a consumer receptacle.

54. The Freestyle uses flow control modules (which include valves) to dispense still water, carbonated water, and HFCS where the high flow rate and

relative volume (compared to the micro-ingredients) are more suited to systems using valves to control flow.

55. The HFCS (high fructose corn syrup) or sweetener is located in a bag-in-box container that is external to the Freestyle dispenser. The HFCS is fluidly transmitted to the Freestyle dispenser for dispensing. The micro-dosing ingredients are individually held in separate cartridges. For diet drinks, the Freestyle holds a bag-in-box non-nutritive sweetener that would be used instead of HFCS.

**2. Dispensing a Beverage**

56. After selecting the desired beverage option via the user interface screen, the user must press the mechanical "PUSH" button to dispense the beverage. The Freestyle will dispense the selected beverage and will stop when the PUSH button is no longer depressed.

57. When the PUSH button is pressed, the flow control modules (FCMs) that control the flow of carbonated water, still water and HFCS are actuated. Each FCM opens to allow the flow of liquid at a metered rate.

58. For Cherry Coca-Cola, for example, carbonated water and HFCS flow (at a specific metered rate) through their respective tubes and towards the nozzle of the Coca-Cola Freestyle.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSELS' EYES ONLY**

**THE NOZZLE**

There's only one nozzle on this machine, and it comes off to be cleaned daily. It also must be secured tightly. If this is lost or misplaced it renders Coca-Cola Freestyle inoperable. So, it's important as you talk to customers to get them engaged with our small parts program, order spare nozzles, and have them tucked away in the manager's office.

As you look up into the nozzle assembly, you'll see a lot of holes. You'll see lines, almost like IV tubes that fit into these small holes. This is where the micro ingredients go and they are mixed at the nozzle itself.

The nozzle assembly is an air-mix nozzle. Air mix means the micro ingredients do not hit the nozzle tip itself. The water and the sweetener will typically hit the nozzle tip. This minimizes color and flavor carry over.

What you need to know about the nozzle assembly:

- Air-mix nozzle keeps all ingredients separate until dispensed into the cup, and micro-ingredients do not hit nozzle tip.
- Welded base eliminates flavor and color carry over.
- One nozzle for all products.
- There is a separator cup that can measure the effectiveness of QPMs and dispensing.
- The terminology here is PurePour™ technology.



**Unique Nozzle**

- One nozzle, 100+ flavors
- Air mixed with micro-dosed ingredients are kept separate until injected into the fluid stream
- Eliminates flavor and color carry over

TCCC0005545 (CCFS The Equipment) at TCCC0005556

59. The micro-pump connected to the Coca-Cola brand micro-dosing cartridge begins to pump the Coca-Cola micro-dosing ingredient at a rate to achieve a specific ratio of micro-dosing ingredient, water, and HFCS. The micro-dosing ingredients are dispensed via a series of tubes that surround the nozzle. Each micro-dosing ingredient is dispensed through its own opening. The micro-ingredients are dispensed through the holes around the nozzle and mix with water and HFCS in the air before it lands in the cup. The design concept is to ensure no ingredients are mixed or in some cases even touch a surface in the dispenser to prevent flavor carry over (residue).

60. When the user stops pressing the PUSH button, the two FCMs (carbonated water and HFCS) stop the flow of liquid. The micro-pumps for the Coca-Cola and cherry micro-dosing ingredients stop as well.

## IX. CONCLUSIONS REGARDING MR. CURLEY'S INRINGEMENT ALLEGATIONS

61. In this section, I present the results of my investigation into Mr. Curley's opinions that the Coca-Cola Freestyle infringes the '377 Patent.

### A. The Freestyle Dispenser Does Not Include an "Area Where Beverage Elements are Combined"

62. Claim 11 of the '377 Patent recites "[a] beverage dispenser comprising […] "at least one compartment containing an element of the product"; "at least one valve coupling the at least one compartment to a mixing chamber for mixing a final product;" and "a mixing chamber for mixing the beverage." *See* '377 Patent at cl. 11. In his report, Mr. Curley alleges that the Coca-Cola Freestyle has a mixing chamber as required by claim 11. I disagree.

63. Under the court's claim construction, the **mixing chamber** of the '377 Patent must be area where **beverage elements** are combined. Under the language of claims 11(a) and (b) of the '377 Patent, these **beverage elements** must originate from **compartments** within the dispenser that are coupled to a mixing chamber for mixing a final product. *Id*. Mr. Curley identifies a portion of the Freestyle's

nozzle assembly to be the "area where beverage elements are combined." *See* Curley Report at ¶¶53-62. As described in detail below, however, Mr. Curley has failed to demonstrate that the portion of the nozzle assembly he has identified is "an area where beverage elements are combined."

64. In paragraph 25 of his report, Mr. Curley introduces the concept of a mixing chamber by stating, "[a] freestyle dispenser can have up to 40 individual flavor elements, which are stored in the cartridges and coupled to a mixing chamber by conduits." (Curley Report at ¶25). He further states that "[t]he mixing chamber is characterized by the intersection of a large array of conduits that couple to orifices that are aimed into the beverage stream." According to Mr. Curley, the alleged mixing chamber is located just below "this large confluence of conduits []inside the cabinet." *Id*. at ¶26.

65. In section IX of his report, Mr. Curley makes the claim that the Freestyle Dispenser has a Mixing chamber:

> 53. The court has construed the term "mixing chamber" to mean an area where beverage elements are combined. ***The Freestyle uses a mixing chamber to combine macro-ingredients and a jetting nozzle configuration to combine micro-ingredients in channels that lie within channels of a finned extrusion***. The carbonated water and/or non-carbonated water and/or high fructose corn syrup ("HFCS") are mixed in a circular chamber and then dispensed through a finned extrusion in a large stream. A ring of tiny nozzles surrounds the finned extrusion and injects flavor concentrate into the main stream along a droplet path which lies at angle to the main stream.
>
> *Id*. at ¶¶53-4.

66. To support his argument, Mr. Curley points to a portion of the nozzle assembly as "[t]he circular central mixing chamber [which] is used to mix the macro-ingredients which include high fructose corn syrup, carbonated water and plain water." I disagree with Mr. Curley's identification of this portion of the nozzle assembly could satisfy the claim requirements of "at least one compartment containing an element of the product" and "a mixing chamber for mixing the beverage." because neither the HFCS nor the water are stored in "compartments" in the Freestyle dispenser; each is provided by a source external to the dispenser. Accordingly, neither the HFCS nor the water can be an "element" as that term is used in Claim 11.

67. In the Freestyle dispenser, water and HFCS are provided from sources external to the dispenser. The HFCS is stored in a traditional bag-in-box container in a remote location, typically in a separate room, and is pumped into the dispenser. Water must be provided to the Freestyle dispenser from an external water source, such as a municipal water line into the building in which the Freestyle is installed. The Freestyle dispenser does not have the ability to store water in a "compartment" within the dispenser's housing.

68. Mr. Curley's theory regarding a "mixing chamber" in the Freestyle dispenser is wrong because the mixing chamber of the '377 Patent must be an

"area where beverage elements are combined. Mr. Curley concedes that water (including both still and carbonated water) and HFCS are the only substances that can be combined in the portion of the nozzle assembly he designates as a "mixing chamber." Because water and HFCS cannot be "elements of a beverage," however, the area in which Mr. Curley says they are mixed cannot be a mixing chamber. Notably, Mr. Curley does not identify any **"mixing chamber" in the Freestyle dispenser in which one or more micro-ingredients are mixed or combined.** Accordingly, Mr. Curley has failed to identify a "mixing chamber" in the Freestyle dispenser.

69. In paragraph 126 of his report, Mr. Curley alleges that "[t]he Freestyle dispenser comprises a <u>compartment that contains carbonated water</u>, which is an element of a beverage." Curley Report at ¶126 (emphasis added). By resorting to the theory that "carbonated water … is an element of a beverage," Mr. Curley concedes that HFCS and still water are **not** elements – i.e., they are not stored in compartments within the Freestyle dispenser. Nonetheless, Mr. Curley is incorrect to assume that carbonated water is stored in a compartment within the Freestyle dispenser.

70. Contrary to Mr. Curley's theory, carbonated water does not reside in a compartment within the Freestyle dispenser, but is instead provided from a main

water source (e.g., municipal water line). This still water is then converted to carbonated water using a carbonation device known in the industry as a carbonator. The function of the carbonator is to convert standard (municipal) still water to carbonated water by chilling the water and then introducing it to carbon dioxide in a pressurized environment. The Freestyle dispenser continuously converts water to carbonated water in this way, and provides that carbonated water to a point of use in a continuous process. Neither still water nor carbonated water is stored in a "compartment" in the Freestyle dispenser. The carbonator is simply a component of a continuous process of converting still water to carbonated water in the Freestyle dispenser. This is another reason that Mr. Curley has failed to show that the Freestyle dispenser includes a "mixing chamber."

71. Mr. Curley's claim that the Freestyle dispenser has a mixing chamber is also incorrect because the alleged beverage elements – still water, HFCS, and carbonated water – are not combined in the inner nozzle assembly. In his statements in paragraphs 53 and 54, Mr. Curley makes the claim that the Freestyle Dispenser uses a mixing chamber to mix carbonated water and/or HFCS:

> 53. The court has construed the term "mixing chamber" to mean an area where beverage elements are combined. The Freestyle uses a mixing chamber to combine macro-ingredients and a jetting nozzle configuration to combine micro-ingredients in channels that lie within channels of a finned extrusion. ***The carbonated water and/or non-carbonated water and/or high fructose corn syrup ("HFCS") are mixed in a circular chamber and then***

> ***dispensed through a finned extrusion in a large stream***. A ring of tiny nozzles surrounds the finned extrusion and injects flavor concentrate into the main stream along a droplet path which lies at angle to the main stream.

*Id*. at ¶¶53-4.

72. Mr. Curley's allegation fails to show that the Freestyle has a mixing chamber as construed by the court.

73. When a user pushes the PUSH button to pour a drink, water and HFCS are actuated and begin to flow from the external sources through their respective tubes and towards the nozzle assembly. These elements are then dispensed from their respective tubes and down the nozzle forming a barrier between the micro-dosing ingredients and the nozzle stream for later introduction and air-mixing with the micro-ingredient elements for the final product. *See* TCCC0005556.

74. Thus, the "circular chamber" that Curley identifies as the alleged "mixing chamber" is merely an outlet where HFCS and water are released to the environment outside the Freestyle dispenser to create a continuous stream into which micro-ingredients are introduced at the nozzle's tip, using the air mix method described above.

75. In fact, The Freestyle is specifically designed to ensure that all mixing occurs outside of the dispenser. This is to ensure that there is no cross-contamination or "carry over" of flavor from one drink to the next. The desire is to

eliminate any ingredient residue from the prior drink residing on or inside a component prior to the next drink being poured, e.g., preventing the remaining residue of one Freestyle user's Orange Fanta from dripping into the next user's Sprite. "Pungent" micro-ingredients, such as Fanta and Root Beer, can permeate certain plastics and create undesired and long-lasting "flavor crossover or carryover" if those micro-ingredients were permitted to stay in contact with plastic product contacting parts.

**B. The Freestyle Dispenser Does Not Contain a "Valve"**

76. Mr. Curley asserts the Freestyle has a valve that satisfies claim limitations 1(a) "at least one compartment containing an element of the product; and 1(b) "at least one valve coupling the at least one compartment to a mixing chamber for mixing a final product." According to Mr. Curley, "[w]ithout valves, the fluidic beverage elements would flow unceasingly and uncontrollably, until exhausted." I disagree. At the very least, Mr. Curley must concede that there are numerous well-known means other than a valve for stopping a fluidic beverage from flowing uncontrollably.

77. According to the claim 11 of the '377 Patent, beverage elements stored in compartments internal to the dispenser are metered from the compartments to a mixing chamber by valves. The only beverage components

stored in what RCDI has alleged are "compartments" in the Freestyle dispenser are the micro-ingredients stored in cartridges, as well as non-nutritive sweeteners. Every micro-ingredient and the non-nutritive sweetener is stored within the Freestyle dispenser in cartridges that are "coupled" to the nozzle assembly via pumps in the QPM modules. Despite Mr. Curley's mistaken claims, the Freestyle dispenser does not employ valves to propel or control the flow of the micro-ingredients or the non-nutritive sweetener.

78. The micro-ingredient pumps connecting the QPM modules and the dispensing section are positive displacement pumps, meaning they simultaneous produce and control the flow, and therefore do not require a valve. Contrary to Mr. Curley's allegations, the beverage elements would not flow "unceasingly and uncontrollably, until exhausted" without valves. Mr. Curley could have determined this for himself by observing a Freestyle dispenser in operation. Indeed, the Freestyle dispenser's micro-ingredients will not flow at all until the Freestyle dispenser's positive displacement pumps are activated.

79. Valves are employed in the Freestyle dispenser to control the flow of HFCS and still or carbonated water. But, as I explained above, HFCS and still or carbonated water are not stored in compartments within the Freestyle dispenser and cannot, therefore, be "elements" as required by the asserted claims of the '377

Patent. Moreover, the valves that control the flow of water and HFCS cannot be actuated by a controller to control an amount of element to be dispensed from a compartment as the beverage element, because HFCS and water do not reside in a compartment, but are provided from outside the dispenser.

### C. Mr. Curley's Statements Regarding Inkjet Printer Technology Are Irrelevant to the Freestyle Dispenser Technology

80. In his report, Mr. Curley declares that "Coke has adopted inkjet printer technology to inject streams of beverage concentrate elements into the mixing nozzle." (Curley Report at ¶40). He is wrong. Not surprisingly, Mr. Curley provided no evidence to support this inaccurate conclusion. Mr. Curley's conclusions regarding similarities between Coca-Cola's micro-dosing technology and inkjet printer technology should be disregarded.

81. Mr. Curley's statement in paragraph 40 is inaccurate. Based on my extensive experience working in the post-mix beverage dispensing industry, I have personal knowledge that Coca-Cola has not employed inkjet printing technologies in its FS dispenser. The Freestyle dispenser is equipped with Ulka "solenoid pumps," also called metering pumps, and FCM technology to actuate and control the dispensing of a beverage. Indeed Coca-Cola's FCM technology was developed in conjunction with DEKA, and leverages DEKA's expertise in micro-dosing technologies developed for the pharmaceutical industry. The micro-dosing

technology of Freestyle's ingredient products is simply not related to inkjet printer technology and does not employ the principles of inkjet printing that Mr. Curley sets forth in paragraphs 40-46.

82. Even assuming that the Freestyle dispenser employs technology related to inkjet printing, Mr. Curley's statement that the Freestyle "inject[s] streams of beverage concentrate elements into the mixing nozzle" is incorrect.

83. As explained above, the Freestyle dispenser does not inject concentrate into a mixing nozzle, the concentrate is instead injected into a stream outside the nozzle.

## X. OTHER COMMENTS

84. My opinions are subject to change based on additional opinions that RCDI's experts may present and information I may receive in the future or additional work I may perform.

85. At any future hearing or trial, I may rely on visual aids and may rely on analogies concerning difference between important and unimportant similarities.

86. In connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this report. I have not yet selected the particular exhibits that

might be used. In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so. Again, certain demonstrative evidence has not yet been created.

Dated: May 11th, 2018

Pete Wolski