# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ROTHSCHILD CONNECTED DEVICES INNOVATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE COCA-COLA COMPANY, <br><br> Defendant. | Case No.:   1:16-cv-01241-TWT |

## THE COCA-COLA COMPANY'S CORRECTED MOTION FOR SUMMARY JUDGMENT OF INVALIDITY, NON-INFRINGEMENT, AND <u>PARTIAL SUMMARY JUDGMENT ON DAMAGES</u>

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   Procedural posture ...............................................................................2

III.  UNDISPUTED FACTS.........................................................................3

    A.    The Accused Freestyle Dispensers.......................................4

    B.    The Asserted Patent...............................................................6

    C.    Prosecution of the '377 Patent .............................................7

    D.    Claim Construction ...............................................................9

IV.   LEGAL STANDARD ...........................................................................10

    A.    Summary Judgment..............................................................10

    B.    Summary Judgment of Invalidity Under 35 U.S.C. § 112(a) .............11

    C.    Summary Judgment of Invalidity Under 35 U.S.C. §§ 102(a) 103
        .................................................................................................12

    D.    Summary Judgment of Non-Infringement .........................................13

V.    ARGUMENT.........................................................................................14

    A.    The Asserted Claims are Invalid Under 35 U.S.C. §§ 112(a) and
        132 ........................................................................................14

        1.    The '377 Patent Specification Does Not Provide Adequate
            Written Description for the Limitation: "Identifier of the
            Beverage."...............................................................14

        2.    "Identifier of the Beverage" Violates 35 U.S.C. § 132(a)
            Because New Matter Was Introduced into the '377 Patent
            Disclosure During Prosecution. ...............................18

i

B.    The Asserted Claims Are Invalid as Anticipated by the Freestyle
      Dispensers. ........................................................................................19

      1.    The Asserted Claims are Only Entitled to a Priority Date
            of January 31, 2013. ...............................................................19

      2.    The Freestyle Dispensers Anticipate the Asserted Claims
            of the '377 Patent under RCDI's Theory of Infringement. ......21

C.    The Asserted Claims are Invalid as Anticipated by the Prior Art.
      ...........................................................................................................23

      1.    Prior Art Not Considered by the U.S. Patent Office
            Demonstrate that the Asserted Claims are Invalid. .................24

      2.    Independent Claim 11 is Anticipated by Gutwein....................25

      3.    Gutwein Anticipates Dependent Claims 12, 13, 17, 21-23.
            ...............................................................................................40

      4.    Independent Claim 11 is Anticipated by Boland. ....................45

      5.    Boland Anticipates Dependent Claims 12, 13, 17, 21-23.........57

D.    Summary Judgment of Non-Infringement Should Be Granted ..........61

      1.    Claim 11 Was Amended in January 2013 to Add the Term
            "Identifier of the Beverage"....................................................61

      2.    The Coca-Cola Freestyle Dispenser Does Not Have the
            "Communication Module" Required by Claim 11 .................67

E.    Coca-Cola Is Entitled to Summary Judgment That Damages Are
      Limited to "Handshake-Based" Sales. ...............................................72

VI.    CONCLUSION.............................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
    567 F.3d 1366 (Fed. Cir. 2009) ........................................................11

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ........................................................12

*Anascape, Ltd. v. Nintendo of Am., Inc.*,
    601 F.3d 1333 (Fed. Cir. 2010) ..................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................10

*In re Aoyama*,
    656 F.3d 1293 (Fed. Cir. 2011) ........................................................12

*Application of Winkhaus*,
    527 F.2d 637, 640 (C.C.P.A. 1975) ..................................................19

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) ........................................................20

*Atlas Powder Co. v. Ireco Inc.*,
    190 F.3d 1342, 51 USPQ2d 1943 (Fed.Cir.1999) ......................49, 51

*Bayer AG v. Elan Pharm. Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000) ........................................................13

*Bradford Co. v. Conteyor N. Am., Inc.*,
    603 F.3d 1262 (Fed. Cir. 2010) ........................................................20

*Capon v. Eshhar*,
    418 F.3d 1349 (Fed. Cir. 2005) ........................................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)......................................................................................10

*Commissariat a l'Energie Atomique v. Samsung Elecs. Co.*,
524 F. Supp. 2d 520 (D. Del. 2007).............................................................24

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) .....................................21, 22, 23, 65

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir.2002) ...............................................................12, 49

*Driessen v. Sony Music Ent.*,
640 F. App'x 892 (Fed. Cir. 2016) ...........................................................14, 16

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ..................................................................73

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002)......................................................................................11

*Hakim v. Cannon Avent Group, PLC*,
479 F.3d 1313 (Fed. Cir. 2007) ...................................................................12

*Kim v. Earthgrains Co.*,
60 F. App'x 270 (Fed. Cir. 2003)..................................................................22

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)......................................................................................13

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) ...................................................................11

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011)..................................................................................13

*Pediatric Medical Dev., Inc. v. Indiana Mills & Mfg., Inc.*,
984 F. Supp. 2d 1362 (N.D. Ga. 2013).........................................................14

iv

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
518 F.3d 1353 (Fed. Cir. 2008) ........................................................................20

*PowerOasis, Inc. v. T–Mobile USA*, *Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ........................................................................17

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ..........................................................................73

*Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*,
389 F. Supp. 3d 1169 (N.D. Ga. 2019) .............................................................24

*Schering Corp. v. Geneva Pharms., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003) ........................................................................12

*Titanium Metals Corp. v. Banner*,
778 F.2d 775, 227 USPQ 773 (Fed.Cir.1985) ...................................................49

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998) ........................................................................21

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ........................................................................13

*Upsher-Smith Labs v. Pamlab, L.L.C.*,
412 F.3d 1319 (Fed. Cir. 2005) ...................................................................21, 22

*Walker v. Darby*,
911 F.2d 1573 (11th Cir. 1990) ........................................................................11

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ........................................................................13

## Other Authorities

Fed. R. Civ. P. 56(a) ........................................................................................10

U.S. Patent 8,417,377 .............................................................................*passim*

U.S. Patent No. 6,759,072 ...............................................................................25

U.S. Patent No. 7,295,889..................................................................................8

U.S. Patent No. 7,762,181.........................................................................25, 45

U.S. Patent No. 7,899,713...........................................................................7, 20

U.S. Patent No. 8,788,090.............................................................................2, 3

## I.      INTRODUCTION

The Coca-Cola Company ("Coca-Cola") moves the Court for partial summary judgment as to damages, as well as summary judgment of invalidity and non-infringement of the asserted claims of U.S. Patent 8,417,377 ("the '377 patent") asserted by Rothchild Connected Devices Innovations, LLC ("RCDI") (D.I. 136).

Since the Federal Circuit rendered a new construction for the claim "user interface module," RCDI has apparently decided to swing for the fences in this case and now contends that all Coca-Cola Freestyle dispensers infringe the '377 Patent, regardless of whether they are used in combination with the Freestyle Mobile App. RCDI's overreach on the merits has been eclipsed by its overreach on damages. RCDI's original claim for $8 million in damages in this same case – supported by the expert report of a now terminated damages consultant – has ballooned to $125 million in damages, advocated by RCDI's new damages consultant.

The United States patent system relies on a fundamental bargain between the patentee and the public: in exchange for a limited monopoly, the patentee must fully disclose its invention to the public. The written description requirement holds the patentee to its end of the bargain. A patent claim violates this requirement, and is therefore invalid, where the patentee adds new matter to the claim during the patent's prosecution. That is exactly what happened here.

Plaintiff, Rothchild Connected Devices Innovations, LLC ("RCDI"), introduced the asserted claims to the patent in (2013). Each asserted claim depends on independent Claim 11, which includes the phrase, "**identifier of the beverage**." This "identifier of the beverage" phrase does not appear anywhere in the patent's parent patent nor in the patent's original disclosure—it is new matter that the patent examiner first introduced during prosecution to overcome the prior art. The patent specification fails to disclose this critical claim language.

RCDI contends that Coca-Cola's Freestyle Dispensers, alone and/or in combination with the mobile applications, infringe the '377 patent. (SUMF at ¶¶72-75, 2/22/2021 RCDI Infringement Contentions (Ex. 43)). If the Court accepts RCDI's theory of infringement for independent Claim 11 of the '377 patent, then Claim 11 must also be invalid pursuant to 35 U.S.C. § 102(a) because it is undisputed that the Freestyle Dispensers were available and sold in the market as early as 2009.

## II.   PROCEDURAL POSTURE

On October 20, 2015, RCDI filed this action against Coca-Cola in the Southern District of Florida, accusing Coca-Cola's Freestyle dispenser of infringing the '377 patent, that issued in 2013, and U.S. Patent No. 8,788,090, ("the '090 Patent"). (D.I. 1). The '090 Patent is a continuation of the '377 Patent that was subsequently subject to an *inter partes* review where the Patent Trial and Appeals

Board determined that all claims asserted by the petitioner, were unpatentable under 35 U.S.C. § 103(a). (IPR2016-00443) (July 6, 2017). This action was transferred to this district on April 15, 2016, over RCDI's objection, after opening claim construction briefs were filed. (D.I. 46). This Court issued its Claim Construction Opinion and Order on November 11, 2017. (D.I. 79). Coca-Cola moved for summary judgment of non-infringement and invalidity on August 9, 2018. (D.I. 138). The same day, RCDI filed the First Amended Complaint, withdrawing its infringement accusations in connection with the '090 Patent. (D.I. 136).

In its first summary judgment Order, the Court denied summary judgment of invalidity but granted summary judgment of non-infringement as to all claims. (D.I. 201). RCDI appealed the Court's adverse disposition of its infringement claims to the Federal Circuit and the appellate court reversed the Court's summary judgment of non-infringement, based, in-part, on construction of the patent claim term "user interface module," and remanded the case for further proceedings. (D.I. 251).

## III.   UNDISPUTED FACTS

Coca-Cola's Statement of Undisputed Material Facts has been filed concurrently with this Motion. The undisputed material facts set forth in the arguments below cite to that statement, using a "SUMF at *xx*" notation.

3

### A.    The Accused Freestyle Dispensers

In 2009, Coca-Cola introduced its revolutionary Freestyle dispenser, after more than five years of research and development (SUMF at ¶140 (TCCC00005516 (Ex. 47)); (TCCC00019768 (Ex. 48)); (TCCC00019795-810 (Ex. 49)); (TCCC00098928-929 (Ex. 50)); (SUMF at ¶7, Wolski Reb. Rpt. (Ex. 44) at ¶21). This is undisputed.  (SUMF at ¶109, 3/24/2022 Kennedy Rpt. (Ex. 45) at ¶34).  Coca-Cola changed the formulation chemistry of post-mix dispensing with the introduction of its Freestyle post-mix dispenser.  ((SUMF at ¶139 ,Wolski Reb. Rpt. (Ex. 44) at ¶21).



The Freestyle dispenser uses a touchscreen user interface to facilitate the user's ability to choose among 140 drink options.  *Id.*  Notably, the 140 drink options are all branded beverages – i.e., beverages whose recipes are pre-determined by Coca-Cola and dispensed to meet Coca-Cola's exacting standard of ingredient accuracy.  *Id.*  When selecting a beverage, Freestyle users are presented with a menu-

4

based touchscreen user interface as shown below.  (SUMF at ¶141, TCCC00090568 (Ex. 52)).



Once the user selects from over 100 Coca-Cola different brands, the user may then choose to dispense that beverage.  The Freestyle dispenser has a physical "PUSH" button located on the dispenser, below the touchscreen.  *Id.*

In 2011, Coca-Cola launched the Coca-Cola Freestyle Mobile App. (SUMF at ¶157, 6/02/2022 Fancher Reb. Rpt. (Ex. 51) at ¶30).  The mobile application allowed users to (i) use a location finder to find a nearby dispenser; (ii) save a list of favorite branded beverages; and (iii) create and save custom drink mixes; and (iv) participate in a loyalty program to continued use of the app.  *Id*.  The Coca-Cola Freestyle Mobile Application was integrated into the Coca-Cola Mobile App in 2019 (together, "CCFS Mobile App").  *Id*.  The remaining functionalities of the CCFS Mobile App include (i) Freestyle dispenser location finder, (ii) creating and saving a drink mix and (iii) saving a favorite branded beverage.  (SUMF at ¶159, Fancher Reb. Rpt. (Ex. 51) at ¶32.  Consumers can interact with the Freestyle Dispensers

through what is referred to as a "handshake," where the user utilizes their phone camera and the CCFS Mobile App to scan a quick response ("QR") code placed on the front-facing exterior of the dispenser. *Id*. The communication between the CCFS Mobile App and the Freestyle Dispenser flows through the Coca-Cola Consumer Data Aggregator ("CDA") and into the Freestyle Dispenser. (SUMF at ¶160, *Id.* at ¶33).

### B. The Asserted Patent

The '377 Patent was issued on April 9, 2013 (D.I. 1-1 at 8). The '377 Patent issued after the Coca-Cola Freestyle became publicly available. ((SUMF at ¶7, Wolski Reb. Rpt. (Ex. 44) at ¶21).

RCDI has accused Coca-Cola of direct and induced infringement of independent claim 11, and dependent claims 12, 13, 17, and 21-23 (together, the "Asserted Claims") of the '377 Patent, entitled, "System and Method for Creating a Personalized Consumer Product." (D.I. 136). Specifically, RCDI alleges that the Freestyle Dispenser models 7000, 7100, 9000, and 9100 (the "Freestyle Dispensers") and all versions of the Coca-Cola Freestyle Mobile Application and Coca-Cola Application infringe the Asserted Claims. (SUMF at ¶¶72-75, 2/22/2021 Infringement Contentions, Ex. 43).

6

Claim 11 of the '377 Patent claims a beverage dispenser in communication with a server.

11. A beverage dispenser comprising:

at least one compartment containing an element of a beverage;

at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage;

a mixing chamber for mixing the beverage;

a user interface module configured to receive and identity of a user and an identifier of the beverage;

a communication module

configured to transmit the identity of the user and the identifier of the beverage to a server over a network,

receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server

and communication the user generated beverage product preferences to controller;

and the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user genetated [sic] beverage product preferences.

(D.I. 1-1).

## C.  Prosecution of the '377 Patent

The '377 Patent claims priority to U.S. patent application Ser. No. 11/471,323, filed on June 20, 2006 (now U.S. Patent No. 7,899,713) (the '713 Patent).  (D.I. 1-1 at 8).  The '377 Patent share a common specification with the '713 Patent.  *Id*.

7

On July 20, 2012, the during prosecution of the '377 Patent, the United States Patent and Trademark Office ("USPTO") rejected all of the claims of the '377 patent as being unpatentable over the prior art. (SUMF at ¶10, 7/20/2012 Non-Final Rejection, Ex. 53 at FH119).  The patent examiner determined that, under 35 U.S.C. 102, almost all of the claims were anticipated by Lahteenmaki, U.S. Patent No. 7,295,889.  *Id* at FH120.  On October 9, 2012, to overcome the patent examiner's identification of prior art that rendered the '377 patent as unpatentable, the applicant responded with several claim amendments and arguments.   (SUMF at ¶11, 10/09/2012 Amendment, Ex. 53 at FH134).

On November 9, 2012, every claim of the '377 Patent was again rejected by the patent examiner, under 35 U.S.C. § 103, as being unpatentable over the prior art. (SUMF at ¶12, 11/9/2012 Final Rejection, Ex. 53 at FH145).  The patent examiner explained that "[i]t ***would have been obvious*** to one skilled in the art ***to allow a user to specify specific preferences with regard to what the user would like included*** and that based on these selections controlling the valve and mixer to appropriately create the mixture because controlling these settings are inherent in the making of custom mixtures and allowing user specific choices improves the customers satisfaction with the final product."  *Id.* (Emphasis added).

8

On January 7, 2013, to overcome the Final Rejection, the inventor responded with more amendments to the claims, including several substantial changes to Claim 11.  (SUMF at ¶13, 1/7/2013 Response After Final Action, Ex. 53 at FH158).  The patent examiner again rejected the inventor's amendment as insufficient to allow the claims.  On January 31, 2013, patent examiner issued a notice of allowance and an Examiner's Amendment.  (SUMF at ¶17, 1/31/2013 Notice of Allowance, Ex. 53 at FH174)).  The patent examiner proposed that the term "identifier of the beverage" be added to Claim 11.  *Id* at FH175.  The patent examiner explained the ordered process of Claim 11, in his reason for allowance as follows: "[a] beverage or product dispenser which receives [sic] beverage or product identifier and a user identity and transmits these to a server over a network and receives back controller information related to at least one valve, in combination with the remaining claim language is not taught or fairly suggested by the present prior art of record."  *Id*.

### D.   Claim Construction

The following '377 Patent claim terms discussed in this Motion have been construed by this Court and the Federal Circuit as follows:

| '377 Patent Claim Term | Construction |
| --- | --- |
| "user interface module" | "a component the user interacts with to communicate with the dispenser" |

| "communication module" | "a component of the beverage dispenser that enables communication between the dispenser and the server" |
|---|---|
| [the controller] "configured to actuate the at least one valve to control an amount of the element to be dispensed . . . based on the user gene[r]ated product preferences" | "capable of causing a valve to dispense an amount of a beverage element into a mixing chamber" |
| [the controller] "configured . . . to actuate the mixing chamber based on the user gene[r]ated product preferences" | "capable of causing the mixing chamber to mix a beverage responsive to user's beverage product preference" |

(SUMF at ¶129 (D.I. 251)).

## IV.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247–48. "A mere 'scintilla' of evidence supporting the opposing party's position

will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### B.   Summary Judgment of Invalidity Under 35 U.S.C. § 112(a)

Patent laws require inventors to describe their work in 'full, clear, concise, and exact terms. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722, 731 (2002).  All claim limitations must appear in the specification. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).  35 U.S.C. § 112 defines these boundaries by setting forth requirements for both the patents written description and the definiteness of the claims.   "The 'written description' requirement implements the principle that a patent must describe the technology that is sought to be patented; the requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005). It is for this reason, that "[t]he written description doctrine prohibits new matter from entering into claim amendments, particularly during the continuation process." *Agilent Techs., Inc. v. Affymetrix, Inc*., 567 F.3d 1366, 1379 (Fed. Cir. 2009). The written description serves "to prevent an applicant from later asserting that he invented that

11

which he did not." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).

## C.    Summary Judgment of Invalidity Under 35 U.S.C. §§ 102(a) 103

A patent is invalid as anticipated by a prior art reference under 35 U.S.C. § 102 where the reference expressly or inherently discloses each of the patent's claim limitations. *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1319 (Fed. Cir. 2007) ("'Anticipation' means that the claimed invention was previously known, and that all of the elements and limitations of the claim are described in a single prior art reference"). Determining whether claims are anticipated involves a two-step analysis. The first step involves construction of the claims of the patent at issue. The second step involves comparing the claims to the prior art. *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir.2002) (quoting *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir.1999)). "In general, a limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art." *Schering Corp. v. Geneva Pharms., Inc*., 339 F.3d 1373, 1378-1379 (Fed. Cir. 2003) (anticipation does not require "skilled artisans to recognize the inherent

characteristic in the prior art that anticipates the claimed invention."  Anticipation must be proven by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011).  The burden is easier to meet when the invalidating reference asserted against the claims was not considered by the examiner during prosecution. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

A patent is also invalid if the claimed invention would have been obvious to one of ordinary skill in the art. *See* 35 U.S.C. § 103(a).  Obviousness is a question of law, with underlying factual considerations.  "Where . . . the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

### D.   Summary Judgment of Non-Infringement

To prove direct infringement, a "plaintiff bears the burden of proof to show the presence of every element" in an accused product.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Summary judgment of non-infringement is appropriate "when a reasonable jury could reach

13

only one conclusion about infringement," or "where the patent owner's proof is deficient in meeting an essential part of the legal standard of infringement, since such failure will render all other facts immaterial." *Pediatric Medical Dev., Inc. v. Indiana Mills & Mfg., Inc.*, 984 F. Supp. 2d 1362, 1365 (N.D. Ga. 2013) (internal quotes omitted).

## V.    ARGUMENT

### A.    The Asserted Claims are Invalid Under 35 U.S.C. §§ 112(a) and 132

#### 1.    The '377 Patent Specification Does Not Provide Adequate Written Description for the Limitation: "Identifier of the Beverage."

In January 2013, overcome the prior art identified by the patent examiner during prosecution of the '377 Patent, a new term, "identifier of the beverage," was added by Examiner's Amendment to Claim 11. *See supra*, II.C.   The term was completely new to the specification of the '377 Patent, and still only appears in Claim 11. Without support in the specification, Claim 11 and its dependent claims are invalid. *Driessen v. Sony Music Ent.*, 640 F. App'x 892, 896 (Fed. Cir. 2016) ("When, as here, a patent applicant adds new claims after the original filing date, "the new claims ... must find support in the original specification.") (citing *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE*, 264 F.3d 1111, 1118 (Fed. Cir. 2001)).

14

Pursuant to 35 U.S.C. § 112, any new claim language must be supported in the specification. Here, neither the abstract—nor the specification—either in the '377 Patent or its parent, explicitly disclose what is meant by "identifier of the beverage." The abstract describes the steps for identifying a "user" to a "server" over a network and retrieving "the user's product preferences from a database at the server" and transmitting "the user's product preferences to the product over the network" and then "mixing at least one element." (D.I. 1-1). But, the abstract recites ***nothing*** about an "identifier of the beverage." Likewise, Figures 1 - 5 of the '377 Patent disclose ***nothing*** about an "identifier of the beverage." Figure 3 discloses only "identify product to server" and transmitting "product preferences." Figure 5 discloses identifying a user and determining "beverage product preferences for user"—but ***neither of those*** describe what is meant by "identifier of the beverage."

RCDI argues that the specification of the '377 Patent discloses an "identifier of the product," which one of ordinary skill in the art would recognize is similar to the missing term "identifier of the beverage." The term "identifier of the product," however, only appears in Claims 1 and 10, and was added to the '377 Patent for the first time by amendment on January 7, 2013. (SUMF at ¶13, 1/7/2013 Response After Final Action, Ex. 53). Notably, the '377 Patent is divided into two significantly different embodiments: the beverage dispenser that is the subject of this

dispute (Col. 6, l. 5 – Col. 8, l. 56), and a "product" (e.g., shampoo) that contains all the ingredients necessary for a user to customize that same "product" by mixing some of the included ingredients within the packaging of the product itself (Col. 2, l. 21 – Col. 6, l. 4) (D.I. 1-1).

The specification describes providing "product preferences of a user to a [ ] mixing device" (2:26-27) and the dispenser retrieving the "user's product preferences from memory" (6:13-14); dispensing a beverage "according to a user's preferences" (6:29); storing a "user's beverage product preferences" in a database (7:25-29, 8:21-22); communicating "beverage product preferences" (8:29-36); a "user's beverage product preferences" causing the dispenser to release mix and dispense the beverage (8:36-46)—but, nowhere does the patent describe, disclose or explain an "**identifier of the beverage**." (D.I. 1-1). The mere presence of these words in isolation does not suffice to show the elements of the claim limitation at the time of the application. *See, e.g., Driessen v. Sony Music Ent.*, 640 F. App'x 892, 896 (Fed. Cir. 2016). There is no basis in the written description of the '377 Patent for the step, "identifier of the beverage."

Claim 11 requires that an "identifier of the beverage" be received by the "user interface module" and transmitted from a "communications module" to a "server over a network" to allow for the communications module to "receive user generated

16

beverage product preferences **based on** [ ] the identifier of the beverage from the server." (D.I. 1-1). But nowhere does the patent disclose this identifier of the beverage, how a communications module outputs this undisclosed identifier, or how this new matter is configured to be sent from a server.  As a result, the specification fails to inform skilled artisans about the scope of the claimed "i**dentifier of the beverage**" with the reasonable certainty that the law requires.  Accordingly, no statements in the disclosure of the '377 Patent contemplate an "identifier of the beverage." *PowerOasis, Inc. v. T–Mobile USA*, *Inc*., 522 F.3d 1299, 1307 (Fed. Cir. 2008) ("Compliance with the written description requirement is a question of fact, but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party.").  Thus, there are no material facts in dispute, and the specification of the '377 Patent, as a matter of law, fails to reasonably convey to those skilled in the art that RCDI possessed an alleged invention for creating a personalized consumer product as of the patent's priority date.

RCDI cannot reasonably argue that the January 2013 addition of the term "identifier of the beverage" was somehow insignificant or obvious within the context of the specification of the '377 Patent.  The Patent Examiner explicitly stated that the addition of those claim terms – by themselves – rendered Claim 11 patentable

17

over the prior art.  (SUMF at ¶13, 1/7/2013 Response After Final Action, Ex. 53 at FH156).  RCDI cannot have it both ways.  RCDI cannot, on the one hand, argue that the invention of Claim 11 was novel and revolutionary while also arguing, on the other hand, that the very point of novelty – determining a user's beverage preferences based on the user's identification of the beverage he desires – constitutes a trivial amendment to the '377 Patent.

Accordingly, summary judgment of invalidity under 35 U.S.C. § 112 for lack of written description is proper as to Claim 11 and its dependent claims.

### 2.      "Identifier of the Beverage" Violates 35 U.S.C. § 132(a) Because New Matter Was Introduced into the '377 Patent Disclosure During Prosecution.

Every asserted claim of the '377 Patent was rejected by the U.S. Patent Office patent examiner on November 9, 2012, under 35 U.S.C. § 103, as being unpatentable over the prior art.  *See supra*, Section II.C.  The patent examiner determined that it would have been obvious to one skilled in the art to allow a user to specify specific preferences with regard to what the user would like to include in a "mixture," and based on these selections, controlling a valve and mixer to appropriately create a mixture because controlling these settings are inherent in the making of custom mixtures and allowing user specific choices improves the customers satisfaction with

the final product.  *Id.*  To overcome the prior art, as discussed above, "**identifier of the beverage**," was added to independent Claim 11.  *Id.*

This new claim element directly contravenes the prohibition on new matter codified by 35 U.S.C. § 132(a) ("No amendment shall introduce new matter into the disclosure of the invention.").  Claims added by amendment and drawn to invention not so described in specification are drawn to "new matter" and are prohibited.  *Application of Winkhaus*, 527 F.2d 637, 639 (C.C.P.A. 1975) (rejecting claims as "new matter" where there is no basis in the specification for the amended claims).  Accordingly, summary judgment of invalidity under 35 U.S.C. § 132(a) for the addition of new matter is proper as to Claim 11 of the '377 patent.

### B. The Asserted Claims Are Invalid as Anticipated by the Freestyle Dispensers

#### 1. The Asserted Claims are Only Entitled to a Priority Date of January 31, 2013.

As discussed above, new matter was added to the Asserted Claim of the '377 Patent on January 31, 2013 to overcome the prior art.  As such, the Asserted Claims of the '377 Patent are not entitled to a priority date of June 20, 2006, based on U.S. Application No. 11,471,323.

"To obtain the benefit of the filing date of a parent application, the claims of the later-filed application must be supported by the written description in the parent

19

'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" *Anascape, Ltd. v. Nintendo of Am., Inc*., 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).  "The specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art . . . [to] show that the inventor actually invented the invention claimed.").  Here, both the specifications of the '377 Patent and the '713 Patent are missing any reference or description to the claim limitation, "**identifier of the beverage**."  D.I. 1-1; (SUMF at ¶290, Ex.54).

As a general rule, "new matter is not entitled to the priority date of the original application." *Pfizer, Inc. v. Teva Pharm. USA, Inc*., 518 F.3d 1353, 1362 (Fed. Cir. 2008).  Pursuant to 35 U.S.C. § 112(a): "in order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112." *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1269 (Fed. Cir. 2010).  To satisfy § 112(a), the written description of the parent application

must have disclosed the later-claimed invention.  *Anascape, Ltd.*, 601 F.3d at 1335.

"A disclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998).  Here, the earlier patent does not disclose the later-claimed "identifier of the beverage."  Therefore, no Asserted Claim of the '377 Patent is entitled to a priority date of June 20, 2006 and is only entitled to an effective filing date of January 31, 2013, or alternatively, no earlier than August 11, 2010, the date the application that led to the '377 Patent was filed.

### 2.     The Freestyle Dispensers Anticipate the Asserted Claims of the '377 Patent under RCDI's Theory of Infringement.

It is a well-established axiom in patent law that a product "that which infringes, if later, would anticipate, if earlier." *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1294 (Fed. Cir. 2021) (quoting *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)); *Upsher-Smith Labs v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier'") (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003)).

RCDI accuses Coca-Cola's Freestyle dispenser models 7000, 7100, 9000, and 9100 of infringing the asserted claims.  (SUMF at ¶75, Ex. 43, (2/22/2021 RCDI

21

Infringement Contentions).  There is no genuine dispute that the Freestyle dispenser was brought to market and first sold in 2009.  *See supra,* Section II.B.; s*ee also,* (SUMF ¶109, Ex. 45, D. Kennedy Expert Report at ¶ 34; Ex. 46, D. Kennedy Dep. Tr. at 50:7-12) ("it was 2009 [when Coca-Cola] brought the Freestyle beverage dispensing machine to market and announcing it as a new beverage dispensing system that uses microdosing technology.").  *Id*. at SUMF at ¶116. It is also undisputed that Coca-Cola launched the Coca-Cola Freestyle Mobile App in 2011. (SUMF at ¶157, 6/02/2022 Fancher Reb. Rpt. (Ex. 51) at ¶30).

Under 35 U.S.C. § 102(a), a person is not entitled to a patent where the claimed invention was "on sale[] or otherwise available to the public before the effective filing date of the claimed invention."  The Federal Circuit has held that the party claiming invalidity due to anticipation can satisfy its burden on summary judgment by pointing to a party's allegation that a particular product infringes the patent if that same product "was on sale before the critical date."  *Kim v. Earthgrains Co*., 60 F. App'x 270, 272 (Fed. Cir. 2003). This is so because "it would be inconsistent for [a party] to argue that [particular products] fall within the scope of the claims for infringement purposes but not for anticipation purposes."  *Id*.; *see also CommScope, 10 F.4th at 1299*.

The Freestyle Dispensers and the Freestyle Mobile App are prior art to the '377 Patent because they were on sale and/or used in public prior to January 31, 2013. The Federal Circuit has repeatedly held, a "patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." *CommScope Techs. LLC* at 1299 (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1351 (Fed. Cir. 2001)). In this regard, the validity of Claim 11 rises and falls with RCDI's infringement allegations. Accordingly, the Court should hold that if judgment is entered in favor of RCDI with respect to infringement of Claim 11 of the '377 Patent, then judgment of invalidity must also be entered as a matter of law.

## C.     The Asserted Claims are Invalid as Anticipated by the Prior Art.

The system and method for customizing a beverage, as claimed in the '377 Patent, was nothing new in 2006.[1] Indeed, the customized beverage dispensing functionalities described by Gutwein and Boland in their patent applications were well known to those of ordinary skill in the art, including Coca-Cola's own engineers and employees. The functionalities described by Gutwein and Boland included many terms that will, by now, sound familiar to this Court: touchscreens, user interfaces,

---

[1] RCDI is not entitled to the 2006 priority date it claims, as discussed above. *See supra,* Section A.1-B.1.

23

instructions for determining a user's customized formulations, beverage delivery systems in communication over networks, communication modules, controllers, valves, and mixing chambers.

RCDI's invalidity expert, Charles Curley, failed to provide a validity analysis, or otherwise rebut Coca-Cola's non-infringement expert's analysis of invalidity, on an element-by-element basis. Coca-Cola has carried its burden of establishing that each element of each asserted claim is present in the Gutwein and Boland prior art references. This Court has previously held that RCDI's providing only general arguments, in the absence of a responsive claim-by-claim analysis would be unpersuasive. *See Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 389 F. Supp. 3d 1169, 1195 (N.D. Ga. 2019) ("A defendant bears the burden of proof in establishing that each claim is present in prior art. If it does provide evidence as to each element, then a failure by the plaintiff to provide a claim-by-claim analysis would be generally unpersuasive.") (vacated and remanded on other grounds); *see also Commissariat a l'Energie Atomique v. Samsung Elecs. Co.*, 524 F. Supp. 2d 520, 528 (D. Del. 2007) (finding that the plaintiff's general arguments did not rebut the defendant's *prima facie* evidence of anticipation on an element-by-element basis).

**1.   Prior Art Not Considered by the U.S. Patent Office Demonstrate that the Asserted Claims are Invalid.**

24

Coca-Cola's expert witness on invalidity, Peter Wolski provided a detailed analysis in his Report as to why the asserted claims are invalid when compared to the prior art. Mr. Wolski relies on nine primary references, and demonstrates how each of those references, independently, renders the asserted claims invalid. For the Court's convenience, this motion will focus on a subset of the prior art described in Mr. Wolski's Report. In particular, this motion focuses on two primary references, U.S. Patent No. 6,759,072 ("Gutwein") (SUMF, at ¶163, Ex. 55) and U.S. Patent No. 7,762,181 ("Boland") (SUMF at ¶173 Ex. 21). Each patent is prior art to the '377 Patent under 35 U.S.C. § 102(e) because it was "granted on an application for patent by another filed in the United States before the [claimed] invention" of the '377 Patent. *Id.* Each of Gutwein and Boland anticipates Claim 11 as that claim was interpreted by this Court and the Federal Circuit. *Id.*

## 2.    Independent Claim 11 is Anticipated by Gutwein

Claim 11 of the '377 Patent is invalid as anticipated by Gutwein. (SUMF at Ex. 55, at 1). U.S. Patent No. 6,759,072 to Roger William Gutwein, *et al*., titled, "Methods and Systems for Utilizing Delayed Dilution, Mixing and Filtration for Providing Customized Beverages on Demand," issued on July 6, 2004. *Id.* at 1. The Gutwein patent resulted from Application No. 09/638,704, filed on Aug. 14, 2000. *Id.* Gutwein is prior art to the '377 Patent because its Aug. 14, 2000 filing date

predates the June 20, 2006 filing date of the '377 Patent, as well as the January 31,

2013 priority date to which the asserted claims are entitled.

Gutwein anticipates claims 11, 12, 13, 17, and 21-23 of the '377 Patent.  *Id.*

at 1-27.  Gutwein discloses a beverage dispenser that provides customized beverages

to a user, based on the user's preference data:

> System for making and delivering a customized beverage product to a consumer having a user interface, a customization director in communication with a customization data store and the user interface, wherein the customization director includes executable instructions for determining a user's customized formulation; and a beverage delivery system in communication with the customization director, wherein the beverage delivery system includes executable instructions for delivering a customized beverage product. Method for delivering a customized beverage product to an individual including the steps of obtaining consumer preference data; determining a consumer beverage formulation corresponding to the consumer preference data; and providing the consumer a customized beverage corresponding to the customized beverage formulation, utilizing one or more of delayed dilution, delayed mixing, and delayed filtering, in any order.…

Gutwein at Abstract.

> One aspect of the present is the method for delivering an individually customized beverage product to a consumer. An exemplary method comprises the steps of obtaining consumer preference data from the consumer; determining a beverage formulation corresponding to the consumer preference data; and providing the consumer a customized beverage product corresponding to the beverage formulation.

*Id.* at 4:15–21.

> Another aspect of the present invention is the interactive system for delivering a customized beverage product to a consumer. In one

example, the system comprises a user interface; a customization director in communication with a customization data store, wherein the customization director comprises executable instructions for determining a user's customized formulation; and a beverage delivery system in communication with the customization director comprising executable instructions for delivering a customized beverage product.

*Id.* at 4:22–31.

Specifically, Gutwein anticipates each element of the asserted claims as follows (Claim 11's preamble and claim elements are depicted in bold):

**11(preamble) "A beverage dispenser comprising."** Gutwein discloses a beverage dispenser.  Gutwein at Abstract (SUMF at Ex. 55, pp. 27); (SUMF ¶287, Exs. 58, Wolski Report at ¶92; SUMF at ¶236, Curley Report at ¶47).  More specifically, Gutwein teaches a customizable beverage delivery system for making and delivering a customized beverage product.  *Id.; see also* Gutwein at Figures 1, 5, 6.  Gutwein defines the term, "beverage delivery system," as used within the reference as "the station, apparatus, device, equipment, or series thereof that is linked with the customization interface and is, optionally, equipped with variety creating systems/devices including delayed dilution means/systems, delayed mixing means/systems, and/or delayed filtration means/systems." (Gutwein, Ex. 55 at 13:47-53; SUMF at ¶236, Curley Report at ¶ 47).  Gutwein defines the term "variety creating systems/devices," as devices and processes that can transform one or more input materials into multiple varieties of beverages. (Gutwein, Ex. 55 at 13:34-39).

27

Such systems and devices including delayed dilution means/systems, delayed filtering means/systems, and/or delayed filtration means/systems. *Id.*  RCDI did not rebut that Gutwein teaches this claim element.

**11(a) at least one compartment containing an element of a beverage.** Gutwein teaches a dispensing system linking a consumer's choice of product to a beverage delivery system which contains an amount of extract/concentrate and areas in the beverage delivery system to accommodate, if desired, one or more aspects of delayed dilution, mixing and filtration. (SUMF at ¶172, Ex. 58, Wolski Report at Ex. A, p. 1).  Gutwein further teaches a holding area to contain brewed extract.  *Id.; see also* Gutwein at 25:53 (referencing the "holding chamber").  Because RCDI did not rebut that Gutwein teaches this claim element (Curley Rpt., Ex. 56), there is no dispute that Gutwein discloses the limitation of "at least one compartment containing an element of a beverage."

**11(b) at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage.**  RCDI contends that Gutwein does not disclose a "dispensing section configured to dispense the beverage."   SUMF at ¶237, Curley Report at ¶56.  This is not a reasonable analysis of Gutwein, which discloses a dispenser for dispensing a beverage. Regardless, Gutwein incorporates by reference, U.S. Pat. No. 4,757,752 to Robbins, issued on

28

June 19, 1988, as a suitable method for brewing tea extract in the system of the invention.  Gutwein 10:32-36; (SUMF at ¶172, Ex. 58, Wolski Report at Ex. A, p. 1). Robbins teaches that, in operation, a lever activates or opens a valve, which permits the flow of water through a conduct to a mixing head or valve.  Robbins 2:52-65; 4:9-23; (SUMF at ¶172, Ex. 58, Wolski Report at Ex. A, p. 1).  More specifically, Robbins discloses an apparatus that holds freshly brewed tea extract, and it teaches that when a brew cycle has been actuated a valve is opened to enable water to flow through conduits and passed to a heater, and from the heater hot water is passed onto the bed of tea leaves. Robbins further discloses that it will be recognized by those skilled in the art, that for vending machines, the length of the dispensing cycle could be controlled by a timer or flow meter such as that each time the dispensing circuit is activated, a constant amount of tea beverage flows from the apparatus. *Id*.

In addition to contending that the beverage dispenser of Gutwein does not disclose a "dispensing section configured to dispense the beverage," RCDI also argues that Robbins does not teach "coupling the at least one compartment to a dispensing section configured to dispense the beverage." (SUMF at ¶237, Curley Report at ¶56). But RCDI fails to proffer any explanation or analysis for this conclusion.  This Court construed "dispensing section" to mean "a component for directing the flow of a

29

beverage," which is exactly what the valve described in Robbins does.  (SUMF at ¶120).  Even if Gutwein did not disclose this element – it does – it would have been obvious for a POSITA to understand that the element, "dispensing section configured" is described fully in Robbins, including the passage, "each time the dispensing circuit is activated, a constant amount of tea beverage flows from the apparatus."  (SUMF at ¶171, Wolski Reb. Rpt. (Ex. 44) at ¶25).

**11(c) a mixing chamber for mixing the beverage.** Gutwein discloses a mixing chamber for mixing the beverage. It teaches an area where the beverage elements are combined, where the dilution of the beverage occurs at a ratio of water to brewed beverage extract that is consistent with the consumer's choice as to brew strength and variety.  (SUMF at ¶172, Ex. 58, Wolski Report at Ex. A, p. 1).  Gutwein describes the system may optionally utilize (either or both) the aspects of 'delayed mixing' and 'delayed filtration' to further increase the options of 'brewed' beverage deliverable, on demand, to the individual consumer based upon their preferences. *Id.* Gutwein teaches that products are delivered to the consumer via a system that combines the held extract with water at varying temperatures.  *Id.*  Thus, Gutwein discloses a mixing chamber for mixing the beverage.  RCDI did not rebut that Gutwein teaches this claim element.

30

**11(d) a user interface module configured to receive an[d] identity of a user and an identifier of the beverage.**  Gutwein discloses a user interface, a touch screen display, a beverage selection graphical user interface ("GUI"), and a beverage customization GUI. (SUMF at ¶172, Ex. 58, Wolski Report at Ex. A, p. 2).  As construed by the Federal Circuit, "user interface" means "a component the user interacts with to communicate with the dispenser." *See supra* Section III.D. Gutwein teaches a touch screen display that serves as both the input device for the collection of data from the user and the output device for displaying information relating to the user's beverage selection. Gutwein at 6:22-31; (SUMF at ¶172, Wolski Report at p. 2).  The touch screen displays a series of GUIs which serve to facilitate the collection and display of information between the user and the customized beverage system. *Id*.  Gutwein discloses GUIs that include the user's name, account information such as remaining balance, beverage selection suggestions based on previous consumption patterns and/or predicted beverage choice desires, and the like. Gutwein at 6:61-7:3; (SUMF at ¶172, Ex. 58, Wolski Report at p. 2). It further discloses a GUI which displays information corresponding to the design of a customized beverage, including roast color, beverage strength, beverage temperature, additional flavors, and the like.).  Gutwein at 7:32-53; (SUMF at ¶172, Ex. 58, Wolski Report at p. 2-3).  Gutwein teaches suitable ways of identifying the

31

consumer include, but are not limited to, personal identification number (PIN) either communicated to the system via keypad, touchscreen…").   Gutwein 13:56-63; (SUMF at ¶172, Ex. 58, Wolski Report at p. 3). Gutwein discloses an embodiment of the invention that includes a user interface, a customization director in communication with the user interface, a data store in communication with the customization director, and a beverage delivery system in communication with the customization director. Gutwein 15:55-65; (SUMF at ¶172, Ex. 58, Wolski Report at p. 3). In another embodiment of the present invention, the system further comprises an identification device in communication with the customization director and a consumer identifier. *Id*.  RCDI did not rebut that Gutwein teaches this claim element.

**11(e) a communication module configured to transmit the identity of the user and the identifier of the beverage to a server over a network, receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server and communication the user generated beverage product preferences to controller.**  Gutwein discloses the element, "communication module configured to."  Gutwein teaches that a network connector, shown as (509) in Fig. 5 (e.g., a token ring, ethernet, telephone line, fiber optic, cellular, coaxial cable, universal serial bus, parallel cable, serial cable, IEEE

1394 firewire, Bluetooth, infrared (IR), radio frequency (RF), laser, and the like) is connected to various components via a network communication device, shown as (508) in Fig. 5 (e.g., telephone modems, cable modems, DSL modems, peripheral ports, such as, serial, parallel, USB, IR, and the like and combinations thereof). Gutwein 5:27-39, Fig. 5; (SUMF at ¶172, Ex. 58, Wolski Report,, Ex. A, p. 3). RCDI's expert incorrectly states that "Wolski cites 'network connection 509' as prior art to the asserted 'communication module' of claim 11." (SUMF at ¶238, Curley at ¶57).   Gutwein clearly describes a communication module by "network communication device 508" and further describes various different methods and systems that individually, or in combination, constitute the functionally of a communication module. (SUMF at ¶291, Wolski Reb. Rpt. (Ex. 44) at ¶26).  The network connection device is schematically described in Figure 5. *Id*.  Further, Gutwein teaches how remote programming of the server via the network connection device (508),



Fig. 5

Gutwein discloses the claim element, "transmit the identity of the user and the identifier of the beverage to a server over a network." Gutwein teaches the structures of a network and demonstrates the recording and transfer of both a beverage identifier and user identifier to a variety of server systems. (SUMF at ¶172, Ex. 58, Ex. 58, Wolski Report, Ex. A at p. 3-4; SUMF ¶288, Wolski Reb. Rpt., Ex. 44 at ¶28). Gutwein teaches that it is within the skill of those in the art to design and build systems that share system resources and reduce redundancy of system components that are connected over a network, as shown in Fig. 5. *Id.* It teaches that the data/customization director (104) and the data storage device (106) are shown in several different methods either alone or in combination to act as a server to which the beverage and users' identifiers are uploaded. *Id*. RCDI's expert claims that Gutwein does not teach this element of the '377 patent because there is no disclosure

34

of the "configuration" of network communication device (509), how or what it transmits to data store (106). (SUMF at ¶240, Curley Report at ¶59). This is not the case because device (509) is a sub-system of system 100 and is therefore incorporated into it. (SUMF at ¶172, Ex. 58, Wolski Report, Ex. A at p. 3-4; SUMF at ¶288, Wolski Reb. Rpt. at ¶28). Further, the '377 Patent does not disclose how its claimed beverage dispenser transfers data (including ID's) to a server. Gutwein mirrors the level of disclosure of the '377 Patent in this regard. *Id*. Gutwein discloses steps for providing a customized beverage product to a customer, including the steps of obtaining consumer preference data corresponding to a customer; determining a consumer beverage formulation corresponding to that consumer preference data; and providing the consumer a customized beverage corresponding to the consumer beverage formulation. (SUMF at ¶172, Ex. 58, Wolski Report, Ex. A at p. 4).

Gutwein discloses the element, "receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server." Gutwein teaches a networked system, in which all devices are connected over a network, and saved beverage formulations may be stored on a server and may be accessed, based on the identity of the user. (SUMF at ¶172, Ex. 58, Wolski Report, Ex. A at p. 6-7). Gutwein discloses an embodiment describing the steps of determining a beverage formulation corresponding to the consumer preference data.

35

*Id*. RCDI claims that Gutwein does not disclose this element because it does not disclose the configuration of "network communication device 509," how it receives any information from "data store 106," or what information it receives from "data store 106." (SUMF at ¶240, Curley Rpt. at ¶61). On the contrary, Gutwein provides at least as much information as the '377 Patent does in this regard. Gutwein teaches network communication device 509 is a subsystem of system 100, and system 100 – as described via Figure 5 and the specification – has a variety of network configurations all employing communication device 509. (SUMF at ¶289, Ex. 44, Wolski Reb. Rpt. at ¶30). There are several cited references that show system 100 (utilizing communication module 509) both uploading and downloading user and beverage information. *Id.* This element is disclosed in Gutwein.

Gutwein also discloses the element, "communication the user generated beverage product preferences to controller." Gutwein teaches an interconnected system, including a user interface, a customization director, and a beverage delivery system in communication with the customization director and a consumer identifier to receive commands (i.e. the user generated beverage product preferences). (SUMF at ¶172, Ex. 58, Wolski Report, Ex. A at pp. 8-9). Gutwein teaches an embodiment whereby consumers can create custom formulations, send such information to the

36

customization director, which sends the corresponding commands to the beverage

delivery system. *Id*.; *see also* Fig. 1 below.



RCDI's expert states that Gutwein does not disclose that the "network

communication device 509" communicates the user generated beverage product

preferences to the customization director—but (509) is not the "network

communication device." (SUMF at ¶240, Curley Rpt. ¶63). Indeed, Gutwein shows

the interconnectedness between the network connector, the network communication

device, and the customization director.  *See* Fig. 1 and 5; (SUMF, Ex. 44, Wolski

Reb. Rpt. at ¶32).   Gutwein teaches the communication operation whereby the

communication module retrieves the consumer data and communicates the data to

the beverage delivery system. *Id.*

37

**11(f) the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user generated beverage product preferences.** Gutwein discloses the element, "the controller coupled to the communication module and configured to." Gutwein teaches a controller (customization director) is connected to the network and the other components of system 100 via the communication module (network connection device 508). Gutwein 5:55-58. RCDI's expert states that no disclosure teaches that "network communication device 509 is coupled to customization director 104." Curley Report at 64-66. (SUMF at ¶243, Curley Rpt. at ¶66). First, the network communication device taught in Gutwein is device 508, not 509. Second, Gutwein plainly teaches that, "customization director 104 is connected to the network and other components of system 100 via the network connection device 508." (SUMF at ¶292, Ex. 44, Wolski Reb. Rpt. at ¶34).

Gutwein discloses the element, "actuate the at least one valve to control an amount of the element to be dispensed." This Court has construed "configured to actuate the at least one valve to control an amount of the element to be dispensed . . . based on the user gene[r]ated product preferences" to mean "capable of causing a valve to dispense an amount of a beverage element into a mixing chamber." RCDI's

38

expert incorrectly claims that Gutwein does not teach that "customization director 104" actuates a valve within the "beverage delivery system 109" that controls an amount of an element to be dispensed.  (SUMF at ¶244-245, Curley Report at 67-68). Gutwein incorporates by reference Robbins, which teaches an active valve that mixes and dispenses beverages "on demand" or on an actuated basis.  (SUMF at ¶293, Ex. 44, Wolski Reb. Rpt. at ¶36).  The beverage delivery system disclosed by Gutwein, of which the mixing valve is a part of, produces the beverage upon command by activating the valve.  *Id.*

Gutwein discloses the element, "and to actuate the mixing chamber based on the user generated beverage product preferences."  This Court has construed "configured . . . to actuate the mixing chamber based on the user gene[r]ated product preferences" to mean "capable of causing the mixing chamber to mix a beverage responsive to user's beverage product preference."  RCDI's expert states that Gutwein does not teach that "customization director 104" is configured to actuate a mixing chamber.  (SUMF at ¶246-247, Curley Report, Ex. 56 at ¶¶ 69-70).  Gutwein teaches that the customization director analyzes customization options from the user and sends commands to the beverage delivery system.  *See* Fig. 4; (SUMF ¶294, Ex.44, Wolski Reb. Rpt. at ¶38). Gutwein discloses an area where the beverage is mixed as part of the beverage dispensing system, and Robbins further specifies the

method of mixing via a mixing valve.  Paragraph 28:45-53 specifies the beverage delivery system customizing based upon consumer data which is provided by the customization director.  *Id.*



Fig. 4

### 3.    Gutwein Anticipates Dependent Claims 12, 13, 17, 21-23.

**Claim 12**. Claim 12 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "configured to receive the product preferences of the user." (Gutwein, Ex. 55).  For overlapping limitations, claim 12 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.  Gutwein discloses a beverage customization user interface ("GUI") that displays information

40

corresponding to the design of a customized beverage.  *Id*. at 7:32-53.  The GUI displays one or more customizable beverage characteristic indicators which correspond to a given beverage characteristic which the system taught by Gutwein can adjust in conformity with the indicated preference of the system user.  *Id.* Customizable beverage characteristic indicators comprise a customizable beverage characteristic scale which conveys the total degree of variability possible with the given customizable beverage characteristics. *Id.* The user would, in the case of a touchscreen, touch that portion of the customizable beverage characteristic scale that represents the desired level of the given customizable beverage characteristic.  *Id.* RCDI did not rebut that Gutwein teaches this claim element.

**Claim 13.** Claim 13 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "further comprising a database for storing product preferences of a plurality of users; wherein the user interface module is further configured to receive an identity of the user, wherein the product preference for at least one user is retrieved from the database based on the user's identity and transmitted to the controller."  For overlapping limitations, claim 13 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.  RCDI argues that Gutwein does not disclose that the customization profile is retrieved from the database.  (SUMF at ¶248-249, Curley Report, Ex. 56 at ¶¶72-73).  Gutwein

discloses a data storage device that may contain data including beverage formulation, user identifications, user preference, and the like. (Gutwein at 5:63-65). Gutwein teaches a beverage card containing a unique identification number can be utilized by the system to retrieve a user's profile, and a user entering their password through a touch screen display. *Id.* at 27:24-32. Gutwein further teaches that the "customization director transmits the identification number and password ***to the data store to determine if they matched an existing record***. Finding a match, the customization director retrieves [the user's] customization profile and analyzes the profile to determine the beverage options to display to [the user]." *Id*. (emphasis added). Gutwein teaches that the record/data comes from the database.

**Claims 17, 21.** Claim 17 of the '377 Patent is identical to claim 13 of the '377 Patent, but adds the limitation of "wherein the user interface module further comprises a display for displaying the product preferences to the user, wherein the user interface module is further configured to receive confirmation of the product preference from the user."  For overlapping limitations, claim 17 is invalid for the same reason that claim 13 of the '377 Patent is invalid.  Claim 21 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "wherein the user interface module further comprises a display for displaying the product preferences to the user, wherein the user interface module is further configured to

42

receive confirmation of the product preference from the user."  For overlapping limitations, claim 21 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.  For both claims, RCDI argues that Gutwein does not disclose that the user interface module is further configured to receive confirmation.  (SUMF at ¶250, Curley Report, Ex. 56 at ¶76).  As discussed above, the GUI displays one or more customizable beverage characteristic indicators which conveys the total degree of variability possible with the given customizable beverage characteristics.  Gutwein at 7:32-63.  The user would, in the case of a touchscreen, touch that portion of the customizable beverage characteristic scale that represents the desired level of the given customizable beverage characteristic.  *Id*.  The GUI would then update such that the customizable beverage characteristic indicator would reflect the user's preference by displaying the customizable beverage characteristic position marker over the appropriate portion of the customizable beverage characteristic scale 804. *Id*.  When the user has finished formulating a customized beverage the user may either save the customized beverage formulation via selection of the save icon, or the user may have the system dispense the beverage.  *Id*. The ***confirmation function*** of the GUI as the save icon is part of the user interface.  *Id.*

**Claim 22**.  Claim 22 of the '377 Patent is identical to claim 21 of the '377 Patent, but adds the limitation of "wherein the user interface module is configured

43

to receive product preferences from the user and the communication module is configured to transmit the product preferences to the server."  For overlapping limitations, claim 22 is invalid for the same reason that claim 21 of the '377 Patent is invalid.  Notwithstanding RCDI's argument that "network communication device 509" does not transmit product preferences to the server, there is no "network communication device 509" disclosed in Gutwein.  (SUMF at ¶250, Curley at ¶78). ).  Gutwein teaches systems that share resources with build in redundancy.  Gutwein at 6:11-20.  For example, Gutwein describes systems that could employ a single data storage device that may, or may not, be located in physical proximity to the system component at which the user is currently located.  *Id*.  Additionally, Gutwein discloses that "system 100 could employ a single data director 104 to which all devices are connected to over network 507."  *Id*.

**Claim 23.**  Claim 23 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "wherein the product preference is a formulation including a predetermined amount of at least one element."  For overlapping limitations, claim 23 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.  RCDI argues that Gutwein does not disclose this element.  Gutwein discloses, "[b]everage selection GUI 700 also contains ***predetermined beverage selection*** icons and labels 708 which correspond to ***standard beverage***

44

*formulations*." *Id.* at 7:15-17 (emphasis added).  Standard beverage formulations require predetermined amounts of all elements, otherwise the formulations would not adhere to the brand standard set by the owner, such as Coca-Cola.

### 4.    Independent Claim 11 is Anticipated by Boland.

U.S. Patent No. 7,762,181 to Michael John Boland, et al., titled "Customised nutritional food and beverage dispensing system," issued on July 27, 2010 ("Boland"). (Boland, Ex. 21, at 1.).  The Boland patent resulted from Application No. 11/241,456, filed on September 30, 2005. *Id.*  Boland is prior art to the '377 Patent, because its September 30, 2005 filing date predates the June 20, 2006 filing date of the '377 Patent, as well as the January 31, 2013 priority date to which the asserted claims are entitled.

Boland anticipates claims 11, 12, 13, 17, and 21-23 of the '377 Patent.  *Id.* at 1-27.  Boland discloses a beverage dispenser that dispenses customized beverages to a user, based on the user's preference profile data, by combining beverage ingredients stored within the dispenser:

> A system for dispensing a customized nutritional serving is made up of ingredients stored within a device incorporating the system. The device has a controller in whose memory is stored an inventory of the ingredients available in the device, their compositions and properties and customer profile data. The controller is programmed to formulate a serving which best matches the customized serving selected by the customer within constraints set by the programming taking into account

45

the inventory of ingredients and the health profile of the customer…The device is then programmed to prepare and dispense the final selection.

(Ex. 21, at 1 (Boland at Abstract.))

Specifically, Boland anticipates each element of the Asserted Claims as follows (Claim 11's preamble and claim elements are depicted in bold):

**11(preamble) A beverage dispenser comprising**. Boland discloses a beverage dispenser. *Id*. Boland teaches a beverage dispensing system for dispensing customized servings of ingredients stored within the system. *Id*. The Boland patent title points to beverage dispensing; this is explained at paragraph 54 of the patent, as well as at 1:14-17. *Id*. More specifically, the Boland invention discloses an automated food and beverage delivery system which provides customized servings based on customer choice and stored customer profile, health and nutritional data. RCDI's expert argues that Boland discloses "a method of creating a consumer health database," or a "means for dispensing containers or other receptacles," or even a "supermarket" or a "building which houses a series of machines," but RCDI mischaracterizes the specification. (SUMF ¶251-254, Ex. 56, Curley Report at ¶¶131-134). As shown in Figure 1 of the patent, Boland teaches ingredient processing where a number of processes may take place, starting with blending, before dispensing. Figure 3 further shows an embodiment of a serving dispenser for dispensing a beverage serving." Boland, Ex. 21, Figure 3 (described at 4:35-36).

46

Further, fluid-based components are described in Boland's specification, which states, "[a] liquid ingredient manifold 66 is also provided. Manifold 66 is in communication with liquid sources 68." *Id.* at 10:17-18. A person of ordinary skill would understand this to be a beverage dispensing system that utilizes a powder based or liquid based ingredient system and provides a final mixed product, in a cup, using a process commonly known as, "Blend in Cup." (SUMF at ¶295, Wolski Reb. Rpt., Ex. 44 at ¶96). Boland further teaches an embodiment wherein some of the compartments contain liquids such as water, juice, milk or other potable liquids. (Boland, Ex. 21, at 3:5-6).

Indeed, the text of claims 1, 2, 3, and 19 in Boland makes clear that "a system for dispensing," "a serving dispenser," "the customer has confirmed a serving issues instructions to the ingredient storage and processing modules and the serving dispenser to prepare and dispense the serving" "the serving dispenser is at least partly operated by a customer or by an operator," and "a touch panel or keyboard integral with the dispensing system," anticipates Claim 11's "beverage dispenser." *Id.* at 1-32. The Boland specification describes the "system of the invention" as a "series of machines." One skilled in the art would understand that Boland's is describing a series of machines that dispense entirely different products, but use a similar command, control, and communication structure.

47

Further, Boland discloses embodiments where the "processing or dispensing operations may include actions of a customer or an operator, where the customer or operator may have to place a receptacle, such as a cup or pottle, under a dispenser and push a start button to dispense the serving. The customer or operator may have to assist in processing or dispensing ingredients by pushing buttons or levers as directed on a screen at the customer interface." *Id.* at 6:33-41. Thus, Boland teaches this claim limitation.

**11(a) at least one compartment containing an element of a beverage.** Boland's "ingredient storage module" anticipates Claim 11(a), which recites "at least one compartment containing an element of a beverage." *Id.* at cl. 1. Boland discloses an embodiment where "the ingredient storage module comprises a plurality of storage compartments." *Id.* at 2:57-58. Boland teaches that such embodiments can contain flavorings, texturing, ingredients, liquids, water, juice, milk, other potable liquids. Boland describes, as shown in Figure 2 to the Boland patent that "the ingredient processing module 14 includes mixing means in containers disposed to receive ingredients from the ingredients storage module 12. *Id.* at 5:65-67. Thus, Boland teaches this claim limitation.

**11(b) at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage.** Boland teaches that the

48

ingredient processing module includes dosing mechanisms associated with the storage compartments. *Id*. at 5:58-64. Although Boland does not expressly use the word "valve," it is well settled that a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it. See, e.g., *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002); *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 51 USPQ2d 1943 (Fed.Cir.1999); *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 227 USPQ 773 (Fed.Cir.1985). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Id.* (citing *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365, 52 USPQ2d 1303, 1305 (Fed.Cir.1999)) (finding anticipation of a method of hair depilation by an article teaching a method of skin treatment but recognizing the disruption of hair follicles, citing *In re King*, 801 F.2d 1324, 1326, 231 USPQ 136, 138 (Fed.Cir.1986)). "Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *Id*. (citing *MEHL/Biophile*, 192 F.3d at 1365; *Atlas Powder*, 190 F.3d at 1347. Boland describes conduits into the ingredient processing module. (Boland, Ex. 21, at 5:60-64). Boland teaches "means to advance ingredients along the conduits typically include gravity, fluid advancing means such

as augers, air or liquid pressure, or vacuum pressure at the ingredient processing end of the conduits." *Id.*

Boland further discloses the use of switches, motors. and pumps to deliver ingredients. *Id*. at 12:13-14 (stating that system "sends the signal to the motors and pump to deliver" ingredients.); *id*. at 12:15 ("At step 16 the ingredients are delivered by liquid pumps . . .;" *Id.* at 8:21-25 (a customer "makes their selection and a controller will then actuate switches governing the dispensing of ingredients leading to the mixing of the ingredients and then dispensing them from the machine."). The disclosure of such motors and pumps, by RCDI's own standard, constitutes disclosure of "at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage." RCDI's infringement contentions describe "passive valves," "small electronically controlled pumps," "solenoid pumps," and "ice gates" as functioning as valves. (SUMF at ¶76, Ex. 43, 2/22/2022 Infringement Contentions at pp. 10-11). Thus, Boland teaches this claim element.

**11(c) a mixing chamber for mixing the beverage.** Boland discloses a mixing chamber for mixing a beverage. It teaches that the "ingredient processing module includes mixing means in containers disposed to receive ingredients from the ingredients storage module." (Boland, Ex. 21, at 5:65-67).

50

As shown in Figure 3 below, Boland further discloses a mixer drive 70 and mixer head 71 that are maneuvered in the direction of the arrow 72 A to a position where head 71 is in cup 78 and agitates the contents. . ." *Id*. at 10:55-59.



**FIGURE 3**

RCDI's expert did not rebut that Boland teaches this claim element.

**11(d) a user interface module configured to receive an[d] identity of a user and an identifier of the beverage.** Boland discloses that the device has a controller in whose memory is stored an inventory of the ingredients available in the device, their compositions and properties and customer profile data." *Id.* at Abstract. Boland teaches that a customer is identified through the customer interface (*id*. at 2:29-30), and selects an input or customized serving through the customer interface (*id*. at 2:3-4, 7:22-23). Boland explains that a customer may ***register on the system*** through the customer interface 20, and registration would normally include ***input of customer profile data***, and customers could ***key in information*** in response to

51

standardized questions about **preferences, health status and allergies.** *Id*. at 7:37-43.

**11(e) a communication module configured to transmit the identity of the user and the identifier of the beverage to a server over a network, receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server and communication the user generated beverage product preferences to controller.** Boland discloses the element, "communication module configured to."   This Court construed "communication module" as "a component of the beverage dispenser that enables communication between the dispenser and the server."  (SUMF at ¶25).  Boland describes that a system in its simplest configuration would be a stand-alone vending machine with all of the memory and programming functions within the controller. Boland, Ex. 21 at 8:4-6.  Boland discloses the controller in one embodiment as, "a microprocessor having a large number of functions. It will operate interactively with the storage module 12, with the ingredient processing module 14 and with the dispensing module 16 to ensure that the ingredients selected, dispensed and processed meet both the customer selection criteria and the health, nutritional and customer profile data requirement." *Id.* at 6:47-53.  Boland further teaches that there is an electronic connection 26 between each dispenser 10 and server. *Id.* at 7:60-61.

Boland discloses the element, "transmit the identity of the user and the identifier of the beverage to a server over a network."  Boland teaches that a controller can be programmed to operate as follows: "when a customer selects a customized serving through the customer interface, the controller [first] looks up the information stored in its memory, formulates a serving which best matches the customized serving selected by the customer within predetermined constraints set by its programming and presents a selected serving to the customer for confirmation or modification;"). *Id*. at 2:3-9.  Boland teaches that the controllers can be linked to one or more servers each having stored on its memory ingredients, nutritional and health data, and the customer profile data. *Id.* at 3:36-44.  In more sophisticated models, Boland teaches "where the customer has ordered a serving from a site remote from the machine (by cell phone or via the internet) the customer will enter input data to allow release of the serving from a dispensing station in the machine itself." *Id.* at 8:29-33.  Table 1 puts it simply: ("User Joins membership enters health information … on internet;" "User health data stored … on network server;" "User ID verified and profile and preference information presented … on interface panel … on remote computer.")

Boland discloses the element, "**receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from**

53

the server." As discussed above, Boland teaches that (a) when a customer selects a customized serving through the customer interface, the controller looks up the information stored in its memory, formulates a serving which best matches the customized serving selected by the customer within predetermined constraints set by its programming and presents a selected serving to the customer for confirmation or modification, and (b) if the customer modifies the selection, repeats step a) on the modified selection, and presents the resulting selected serving to the customer for confirmation or modification"). *Id.* at 2:3-9; *see also* 3:36-44; 4:65-5:4; 7:43-45; 8:29-33; 2:35-40.

Boland discloses the element, "communication the user generated beverage product preferences to controller." As discussed above, Boland teaches that when the ***customer selects a customized serving*** through the customer interface, the ***controller***:

> a) ***looks up the information*** stored in its memory, formulates a serving which best matches the customized serving selected by the customer within predetermined constraints set by its programming and ***presents a selected serving to the customer*** for confirmation or modification;

54

b) if the customer modifies the selection, repeats step a) on the modified selection, and presents the resulting selected serving to the customer for confirmation or modification;

and

c) when the customer has confirmed a serving issues instruct[s] to the ingredient storage and processing modules and the serving dispenser to prepare and dispense the serving."

*Id*. at 2:3-15.

**11(f) the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user generated beverage product preferences.**   Boland discloses the element, "the controller coupled to the communication module and configured to."   As shown in Figure 1, Boland teaches dispensing 16 coupled to controller 18.  *Id*. at Fig. 1.

55



**FIGURE 1**

Boland discloses the element, "<u>actuate the at least one valve to control an amount of the element to be dispensed</u>."  Boland discloses when the customer has confirmed a serving the controller instructs the ingredient storage and processing modules and the serving dispenser to prepare and dispense the serving.  *Id*. at 2:3-15.  Boland further teaches that once the customer makes their selection, the controller will then actuate the switches governing the dispensing of ingredients leading to the mixing of the ingredients and then dispensing them from the machine.  *Id*. at 8:21-26.  The size of the portions will be determined by reference to the customer profile data.  *Id.*  Boland further explains that "[i]n operation after the consumer has agreed to the selected nutritional beverage and the formulation algorithms have determined the quantities of ingredients required, the drive 50 actuates the feeding mechanism 52 to feed powdered ingredients through tube 56."  *Id.* at 10:31-35; *see supra*, Section V.C.4.Claim 11(b).

Boland discloses the element, "<u>and to actuate the mixing chamber based on the user generated beverage product preferences</u>."  Boland discloses that when the customer has confirmed a serving issues the controller instructs the ingredient storage and processing modules and the serving dispenser to prepare and dispense the serving.  *Id*. at 2:3-15.  Boland teaches the customer makes their selection, the controller will then actuate the switches governing the dispensing of ingredients leading to the mixing of the ingredients and then dispensing them from the machine. The size of the portions will be determined by reference to the customer profile data 34." *Id*. at 8:21-26.

### 5.      Boland Anticipates Dependent Claims 12, 13, 17, 21-23.

**Claim 12.** Claim 12 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "configured to receive the product preferences of the user.**"**  For overlapping limitations, claim 12 is invalid for the same reason that Claim 11 of the '377 Patent is invalid. Boland teaches that a customer selects a customized serving through the customer interface and that the user makes changes based on preference and ingredients via an interface panel.  *Id.* at 2:3-4; Table 1. RCDI did not rebut that Boland teaches this claim element.

**Claim 13.** Claim 13 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "further comprising a database for storing product

preferences of a plurality of users; wherein the user interface module is further configured to receive an identity of the user, wherein the product preference for at least one user is retrieved from the database based on the user's identity and transmitted to the controller."  For overlapping limitations, claim 13 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.  RCDI argues that Boland does not teach what information constitutes its "customer profiles," including whether the profiles include product preferences. (SUMF at ¶256, Curley Report, Ex. 56 at ¶161). First, Boland explains "[t]he customer database 34 *contains customer profiles*."  Boland, Ex. 21 at 7:63-64.  Boland further demonstrates multiple user information is maintained on the database, and Boland at 2:3-5 explains "…when a customer selects a customized serving through the customer interface, the controller: a) looks up the information stored in its memory…"  Thus, custom customer product preferences are stored on the database.  Boland further discloses that users "can simply enter their user ID and PIN…and the computer system in the vending machine will access the network and find the data relating to that customer." *Id.* at 14:44-48.

**Claims 17, 21.** Claim 17 of the '377 Patent is identical to claim 13 of the '377 Patent, but adds the limitation of "wherein the user interface module further comprises a display for displaying the product preferences to the user, wherein the

user interface module is further configured to receive confirmation of the product preference from the user."  For overlapping limitations, claim 17 is invalid for the same reason that claim 13 of the '377 Patent is invalid.  Claim 21 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "wherein the user interface module further comprises a display for displaying the product preferences to the user, wherein the user interface module is further configured to receive confirmation of the product preference from the user."  For overlapping limitations, claim 21 is invalid for the same reason that Claim 11 of the '377 Patent is invalid.

As previously discussed, Boland discloses that a customer makes a selection of a customized serving through the customer interface.  *Id.* at 2:3-5.  Boland teaches when customer makes a selection, the controller: "a) looks up the information stored in its memory, formulates a serving which best matches the customized serving selected by the customer within predetermined constraints set by its programming and presents a selected serving to the customer for confirmation or modification…when the customer has confirmed a serving issues instructions…"). *Id*. at 2:5-13.  RCDI did not rebut that Boland teaches this claim element.

**Claim 22.** Claim 22 of the '377 Patent is identical to claim 21 of the '377 Patent, but adds the limitation of "wherein the user interface module is configured

to receive product preferences from the user and the communication module is configured to transmit the product preferences to the server." For overlapping limitations, claim 22 is invalid for the same reason that claim 21 of the '377 Patent is invalid. RCDI argues that Boland does not disclose whether the "controller" is configured to transmit product preferences to a server. SUMF at ¶257, Curley Report, Ex. 56 at ¶163). RCDI is mistaken. Boland demonstrates that the "controller" is configured to transmit product preferences to a server. The specification explains, "[a]t step 6 t*he user adds…immediate preference details*. This can be done *through the user interface* on the machine…At step 7 the program in…the *server then runs the algorithm* with…the updated choices…" (Boland, Ex. 21, at 11:33–40). Boland further discloses in one embodiment that the controller is *operatively linked* to one or more servers each having stored on its memory at least some of the inventory of ingredients in the storage module and possible servings available therefrom, nutritional and health data relating to ingredients in the storage module and possible servings therefrom, and at least some of the customer profile data. *Id*. at 3:36-44. Boland teaches that customer data stored on a remote computer may be accessed when authorized by the customer. *Id*. at 7:43-45.

**Claim 23.** Claim 23 of the '377 Patent is identical to Claim 11 of the '377 Patent, but adds the limitation of "wherein the product preference is a formulation

including a predetermined amount of at least one element." For overlapping limitations, claim 23 is invalid for the same reason that Claim 11 of the '377 Patent is invalid. Boland discloses, "…the ***predetermined*** constraints in the programming of the controller include but are not limited to…limitations or physical properties of ingredients, compatibility of ingredients with one another…" *Id*. at 2:20-24. RCDI did not rebut that Boland teaches this claim element.

### D.   Summary Judgment of Non-Infringement Should Be Granted

Coca-Cola moves for summary judgment of non-infringement, based on two claim elements that RCDI has failed to identify in the accused Freestyle dispensers. RCDI has failed to identify a "communication module" or an "identifier of the beverage." Both claim terms are recited by every asserted claim. Summary judgment of non-infringement should be granted because RCDI cannot prove at trial the presence of either element in the accused Freestyle dispensers.

### 1.   Claim 11 Was Amended in January 2013 to Add the Term "Identifier of the Beverage"

In January 2013, the U.S. Patent Office agreed to allow Claim 11 to issue as a patent, on the condition that it was amended to include four new words: "identifier of the beverage." Prior to that amendment, Claim 11 had been twice rejected by the Patent Office as anticipated by prior art. The term "identifier of the beverage" was

added on January 31, 2013, to distinguish Claim 11 from that prior art.  Prior to that

amendment,  Claim 11 (then identified as Claim 37) recited:

> a communication module configured to transmit the identity of the user
> to a server over a network, **receive user generated beverage product
> preferences based on the identity of the user from the server** and
> communicate the user generated beverage product preferences to a
> controller

(SUMF at ¶15, Ex. 53, Jan. 7, 2013 Amendment at FH158).  On January 31, 2013,

the Patent Examiner made an "Examiner's Amendment" after obtaining

authorization to do so from Applicant Rothschild.  The Patent Examiner notified

Applicant Rothschild that Claim 11 would be allowable over the "present prior art

of record," when amended.  The Patent Examiner also provided a statement of the

reasons Claim 11 was being allowed:

> The following is an examiner's statement of reasons for allowance: A
> beverage or product dispenser **which receives beverage or product
> identifier and a user identity** and transmits these to a server over a
> network **and receives back** controller information related to at least
> one valve, in combination with the remaining claim language is not
> taught or fairly suggested by the present prior art of record.

(SUMF at ¶17, Ex. 53, January 31, 2013 Notice of Allowance at FH175 (emphasis

added).

Prior to the January 2013 Examiner's Amendment, Applicant Rothschild attempted to distinguish Claim 11 from the prior art (the Lahteenmaki Patent) that the Patent Examiner relied upon to reject Claim 11:

> Lahteenmaki merely discloses a user interface for entering personal information. The device in Lahteenmaki uses the personal information to suggest a product, which can be accepted or declined by the user. Lahteenmaki does not disclose or suggest a communication module for **transmitting the identity of the user to a server over a network, receiving user generated beverage product preferences based on the identity of the user from the server and communicating the user generated beverage product preferences to a controller**, which will in turn actuate the valves and the mixing chamber based on the product preferences.

(SUMF at ¶13, Ex. 53, January 7, 2013 Amendment After Final Rejection at FH164) (emphasis in original).  In his effort to persuade the Patent Examiner to grant his patent application, Applicant Rothschild made clear that his beverage dispenser (1) transmitted the identity of a user to a server, and (2) received the user's beverage product preferences **based on the identity of the user** back from the server.  The Patent Examiner was not persuaded, and Claim 11 was again rejected.

Applicant Rothschild's description of that version of Claim 11 was consistent with the corresponding figures in his patent application.  Figure 5 of the '377 Patent's specification was not modified after the January 2013 Examiner's Amendment. Figure 5 is a flowchart depicting how a **user's identity** (only) is sent to a server [510], the server determines **that user's** beverage product preferences [516], and the

server transmits the user's beverage product preferences back to the dispenser [518]

so that the beverage dispenser can mix the user's beverage according to the user's

beverage product preferences [520]:



D.I. 1-1, '377 Patent at Fig. 5.

On January 23, 2013, the Patent Examiner spoke with Applicant Rothschild

to obtain his approval to enter an "Examiner's Amendment" suitable to distinguish

Claim 11 over the prior art.  (SUMF at ¶17, Ex. 53, January 31, 2013 Notice of

Allowance at FH1752.  When the Patent Examiner entered his January 31, 2013

Examiner's Amendment, the communication module of Claim 11 finally took the

form in which it would issue as Claim 11 of the '377 Patent:

> a communication module configured to transmit the identity of the user
> **and the identifier of the beverage** to a server over a network, receive
> user generated beverage product preferences based on the identity of
> the user **and the identifier of the beverage** from the server and

64

communication the user generated beverage product preferences to controller

D.I. 1-1, '377 Patent at Col. 9, ll. 52-58.  Before agreeing to allow Claim 11 to issue as part of the '377 Patent, the Patent Examiner required the communication module of Claim 11 be amended to distinguish it from the prior art.  The Patent Examiner required that Applicant Rothschild claim a communication module that (1) transmits **both** a user's identity **and** an **identifier of the beverage** to the server, and (2) receive from the server "user generated beverage product preferences" **based on both** the identity of the user **and** the **identifier of the beverage**.  Claim 11, as issued, requires that the server sends to the dispenser "user generated beverage product preferences" that are **based on** the identity of a user and the identifier of the beverage that the dispenser transmitted to the server.

RCDI is attempting to erase the prosecution history of the '377 Patent.  The January 2013 addition of the term "identifier of the beverage" to Claim 11 was advantageous for Applicant Rothschild when he was trying to persuade the Patent Office to grant a patent, but it is fatal to his patent infringement case against Coca-Cola.  To paraphrase the Federal Circuit in *CommScope*, RCDI seeks to treat the '377 Patent like a nose of wax, twisting it one way to get the patent issued and another to find infringement."

The accused Freestyle dispensers do not receive from a server "beverage product preferences" **based on both** a user's identity and an identifier of the beverage that the dispenser transmitted to the server.  The Freestyle dispenser can receive a user's preferences (mixes and favorites) from Coca-Cola's Consumer Data Aggregator server ("CDA Server") without transmitting to the server either a user's identity or an identifier of a beverage.  Although the Freestyle dispenser transmits a confirmation that a beverage was poured along with a corresponding user identification number, that can only happen **after** the Freestyle dispenser has dispensed a beverage for the user.  There is no case in which a Freestyle dispenser transmits a user's identity **and** an identifier of a beverage and receives beverage product preferences **based on** the user identity and the identifier of a beverage.

Moreover, the Freestyle dispenser does not transmit an "identifier of the beverage" to the CDA Server under any circumstances.  RCDI's infringement theories identify only one transmission from the Freestyle dispenser to the Coca-Cola server ("CDA Server") as satisfying the Claim 11 element "transmit … **the identifier of the beverage** to a server over a network."  The only transmission RCDI identifies is a transmission of "pour data" that the Freestyle dispenser sends to the CDA Server.   But the Freestyle dispenser sends the "pour data" only **after** a beverage has been dispensed to the user, and only for the purposes of tracking

66

beverage supply inventory.  (SUMF ¶30, Ex. 57, Alexander Report at ¶173.  SUMF at ¶255, Ex. 56 Curley Opening Report at ¶159.   The Freestyle dispenser's transmission of "pour data" to the CDA Server has no connection to determining a user's beverage product preferences.

Accordingly, RCDI cannot prove infringement of Claim 11, because the Freestyle dispenser does not "transmit … the identifier of the beverage to a server over a network."

### 2. The Coca-Cola Freestyle Dispenser Does Not Have the "Communication Module" Required by Claim 11

#### a. The "Communication Module" of Claim 11

Claim 11 requires a "communication module" configured to perform three functions:

> (a) "**transmit** the identity of the user and the identifier of the beverage to a server over a network"
> (b) "**receive** user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server" and
> (c) "**communication** the user generated beverage product preferences to controller"

D.I. 1-1, '377 Patent at Col. 9, ll. 52-58 (emphasis added).   The '377 Patent's specification describes this functionality as follows:

> The user enters this identity information into the dispenser and the dispenser retrieves the user's product preferences from memory. Alternatively, **the dispenser communicates the user's identity information to a server** on the global computer network (e.g., the

67

> Internet). The server then identifies the user of the dispenser and directs the dispenser to mix the beverage for the user exactly the way the user has predetermined that they like to drink the beverage.

D.I. 1-1, '377 Patent at Col. 6, ll. 12-20 (emphasis added).  Once the user enters its identity information, the dispenser of the '377 Patent retrieves the user's "product preferences" either from memory within the dispenser or by sending the user's identity to a server.  *Id*.  When the beverage dispenser of the '377 Patent sends the user's identity information to a server, the server responds by looking up the user's "product preferences" and then sending the "product preferences" back to the dispenser.  *Id*.  After receiving the user's "product preferences" from the server, the dispenser employs the "product preferences" to "mix the beverage for the user exactly the way the user has predetermined that they like to drink the beverage."  *Id*.

### b. The User Generated Beverage Product Preferences of Claim 11 Must Be "Based on" the Identifier of the Beverage

Claim 11 recites the embodiment requiring retrieval of the user's beverage product preferences from a server, via the communications module (i.e., not from local memory).  Claim 11 requires that the communication module "**transmit** the identity of the user **and the identifier of the beverage** to a server over a network."  Claim 11 requires that the communication module "**receive** user generated beverage

product preferences **based on** the identity of the user and **the identifier of the beverage** from the server."

As described above, the specification of the '377 Patent only describes retrieval of a user's beverage product preferences based on the user's identity, but says nothing about beverage product preferences based on the identified of the beverage. The '377 Patent never even mentioned the term "identifier of the beverage," until the term was added to Claim 11 in January 2013.

<blockquote>

**c.    The Freestyle Dispenser Does Not Have User Generated Beverage Product Preferences That Are Based on the Identifier of the Beverage**
</blockquote>

Unlike the beverage dispenser of Claim 11, the Freestyle dispenser does not "receive [from a server] user generated beverage product preferences based on [] the identifier of the beverage." The only communications between the Freestyle dispenser and the CDA Server are two electronic messages: (1) the QR Initiate from the CDA Server to the Freestyle dispenser, and (2) the Pour Complete message from the Freestyle dispenser to the CDA Server. (SUMF at ¶¶28-29, Ex. 57, Alexander Report at 165-166). When the Freestyle dispenser receives a user's preferences (i.e., mixes and favorites) from the CDA server, it comes in a message referred to as the QR Initiate. ((SUMF at ¶¶31-32, Ex. 57, Alexander Report at 87, 88). The preferences are solely "based on" a user identification – i.e., a code associated with

a user's account for which those preferences have been defined.  The preferences are not based on or associated with an "identifier of the beverage," and the QR Initiate

It is undisputed that the user preferences employed in the Freestyle dispenser comprise personalized mixes and favorites. (SUMF at ¶258, Ex. 59, Overby Report at ¶30).  A Freestyle dispenser user may pre-store up to three mixes of soft drinks, such as a mixture of 50% Coca-Cola and 50% Sprite using the Freestyle App.  A Freestyle dispenser user may also pre-store several of its favorites, such as Coca-Cola and Sprite using the Freestyle App.

When a Freestyle App user wishes to dispense a beverage from a Freestyle dispenser, the user can use the Freestyle App to cause the CDA Server to "push" the user's mixes and favorites to the Freestyle dispenser by way of the QR Initiate message. (SUMF at ¶¶31-32, Ex. 57 Alexander Report at 87, 88).  The CDA server will send the user's mixes and favorites information to the Freestyle dispenser without any related transmission from the dispenser to the CDA Server.  That is, the user's preferences are transmitted from the CDA Server to the Freestyle dispenser without any need for the Freestyle dispenser to transmit a message identifying the user or identifying a beverage that the user's preferences should be "based on." Indeed, the CDA Server does not receive any transmission from the Freestyle dispenser prior to transmitting the user's preferences (i.e., mixes and favorites) to

70

the dispenser.  Accordingly, the Freestyle dispenser does not transmit an "identifier of the beverage" to the CDA Server for any purpose – certainly not to be used to dispense a beverage to the user.

The only data transmitted from the Freestyle dispenser to the CDA Server is in the form of the Pour Complete message. (SUMF at ¶29, Ex. 57 Alexander Report at 166).  But the Pour Complete message has **nothing to do** with dispensing a beverage; the Pour Complete message relates only to identifying a beverage **that was already poured**.  (SUMF at ¶33, Ex. 57 Alexander Report at 91).  Indeed, if a Freestyle App user were to use a Freestyle dispenser to dispense one of the user's mixes or favorites, and communications were suddenly disabled between the Freestyle dispenser and the CDA Server – such that the Freestyle dispenser could not transmit the Pour Complete message or any other information back to the CDA Server – it would have no effect on the Freestyle dispenser's ability to dispense one of the Freestyle App user's preferred mixes and favorites.  Accordingly, the Freestyle dispenser cannot infringe Claim 11, because it cannot (1) transmit an "identifier of the beverage" to the CDA server **and** (2) receive a user's "beverage product preferences **based on** … the identifier of a beverage."

Because the Freestyle dispenser does not transmit to the CDA Server an identifier of a beverage – or any other data about a beverage – that is used to

71

determine a user's beverage product preferences, the Freestyle dispenser does not have "user generated beverage product preferences" that are **based on** the identifier of the beverage.   Claim 11 requires that the claimed beverage dispenser has a communication module that can "transmit the identity of the user and the identifier of the beverage to a server over a network" and "receive user generated beverage product preferences **based on** the identity of the user and the identifier of the beverage from the server." D.I. 1-1.  The Freestyle dispenser cannot infringe Claim 11 because the Freestyle dispenser does not have a communications module capable of receiving "user generated beverage product preferences **based on** … the identifier of the beverage from the server."

### E.    Coca-Cola Is Entitled to Summary Judgment That Damages Are Limited to "Handshake-Based" Sales.

RCDI's damages expert, David Kennedy, contends that damages in this case should be based on a reasonable royalty, applied to a royalty base that reflects the value attributable to the infringing features of the product.  (SUMF at ¶ 101-104 , Kennedy Rpt., Ex. 45 at ¶¶21, 62-63, 67-69, 86).[2]  In a reasonable royalty analysis,

---

[2] To the extent Kennedy's opinions fail the reasonable royalty standards set forth by the Federal Circuit, for at least, because they: (1) improperly include the value from Coca-Cola's other business operations, (2) do not apportion the non-patented features of the accused products from the royalty base, and (3) are substantively

damages must be tied "to the claimed invention's footprint in the marketplace." *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010). "Where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the ***value attributable to the infringing features of the product, and no more***." *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1226 (Fed. Cir. 2014) (emphasis added) (citing *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1326 (Fed. Cir. 2014)).

In his report, Kennedy affirms that the best non-infringing alternative is the "Handshake-based User Interaction System." (SUMF at ¶¶104-108, Kennedy Rpt., Ex. 45 at ¶¶63-64, 67-69, 76, 101-103). Kennedy acknowledges that disabling the Handshake-based User Interaction System would render the accused products unable to send and receive handshakes for user identification. *See id.* Kennedy's reliance on handshake-based sales are shown in his damages calculations, which are built on his "weighted average VPD impact of the ***Handshake capability***." (SUMF at ¶111, Kennedy Rpt., Ex. 45 at p. 27; Exs. 3, 4, 8, and 9).

-----------------------

based on data that Kennedy knows is invalid, Coca-Cola reserves its rights to file further exclusionary motions, as necessary, pursuant to the case schedule governing this case.

73

In his deposition, Kennedy affirmed that sales of ingredients that ***do not*** involve a handshake ***should not*** be included in RCDI's damages.

> A. I -- the way that the damages calculations are structured, it's the [] difference in the volume between what Coca-Cola Company expected the volume between the devices, ***based on handshakes*** in the way they were rolling out the technology. . .

SUMF at ¶113, 9/22/2022, D. Kennedy Dep. Tr. 54:22-55:11 (Ex.46)).

> Q. Do you believe that included in your damages numbers, sales of beverages where there was no interactivity with a mobile phone or Freestyle app or a handshake, so just to be clear, it's a person pressing the button on the Freestyle machine to get a beverage just right in front of them, there's no user identity or anything like that, should those be included in your damages number?

> A. No.

(SUMF at ¶114, *Id*. at 161:3-13 (Ex. 46)).

> Q. So if there was infringement by using the touchscreen on the accused dispensers, you would want to -- that would be part of your damages calculation?

> MR. CAREY: Object to form.

> A. It would ***only be part of it*** if that was something that The Coca-Cola Company anticipated ***as part of the handshakes***.

> Q. What do you mean by that?

> A. Well, because I'm basing it on what they anticipated and what they projected their benefits to be over time over the damages period were really -- which is, you know, estimated through the potential or estimated trial date of the first quarter of 2023. So if they were assuming that handshakes could occur without a phone, then that would have been part of what they estimated. But I think the way it's discussed and the best available information at the time was that they were basing

74

their projections *on specific data that they had received from their customers that had used the technology with the QR codes and the handshakes* as they described it.

(SUMF at ¶115, *Id*. at 84:12-85:11 (Ex. 46)).

Accordingly, Kennedy's deposition testimony and his report support Coca-Cola's motion for summary judgment that damages in this case should limited to handshake-based sales.

## VI.   CONCLUSION

For the foregoing reasons, this Court should grant summary judgment of non-infringement, invalidity, and partial summary judgment limiting the applicable damages to allegedly infringing uses that involve a handshake to initiate the pour of a beverage.

Respectfully submitted, October 31, 2022:

/s/ *Shane Nichols*

McDermott Will & Emery LLP

A. Shane Nichols
GA Bar No. 542654
1180 Peachtree Street NE, Suite 3350
Atlanta, Georgia 30309
Tel:  404-260 8553
Fax:  404-420-2754
ShaneNichols@mwe.com

Jodi Benassi, *Admitted Pro Hac Vice*
415 Mission Street, Suite 5600

75

San Francisco, CA 94105
Tel: 628-218-3800
jbenassi@mwe.com

ATTORNEYS FOR DEFENDANT
THE COCA-COLA COMPANY

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1 and 7.1(D), the undersigned counsel certifies that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14-point font.

October 31, 2022

/s/ *Shane Nichols*
MCDERMOTT WILL & EMERY
A. Shane Nichols
Georgia Bar No. 542654


ATTORNEYS FOR DEFENDANT
THE COCA-COLA COMPANY

# CERTIFICATE OF SERVICE

I hereby certify that I have on this day, October 31, 2022, filed electronically via CM/ECF a true copy of the foregoing THE COCA-COLA COMPANY'S CORRECTED MOTION FOR SUMMARY JUDGMENT OF INVALIDITY, NON-INFRINGEMENT, AND PARTIAL SUMMARY JUDGMENT ON DAMAGES using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record for Plaintiff Rothschild Connected Devices Innovations, LLC:

/s/ *Shane Nichols*
MCDERMOTT WILL & EMERY
A. Shane Nichols
Georgia Bar No. 542654

ATTORNEYS FOR DEFENDANT
THE COCA-COLA COMPANY