IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROTHSCHILD CONNECTED
DEVICES INNOVATIONS, LLC,

    Plaintiff,

       v.

THE COCA-COLA COMPANY,

    Defendant.

CIVIL ACTION FILE
NO. 1:16-CV-1241-TWT

## OPINION AND ORDER

This is a patent infringement action. It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 319]. For the reasons set forth below, the Defendant's Motion for Summary Judgment [Doc. 319] is GRANTED in part and DENIED in part.

## I.    Background

This case arises out of the alleged infringement of U.S. Patent No. 8,417,377 (the "'377 Patent"), owned by the Plaintiff Rothschild Connected Devices Innovations, LLC. (Pl.'s Corrected Resp. to Def.'s Corrected Statement of Undisputed Material Facts ¶ 2.) The '377 Patent is titled "System and Method for Creating a Personalized Consumer Product" and was issued on April 9, 2013. (Def.'s Corrected Statement of Undisputed Material Facts ¶¶ 5-6.) The '377 Patent claims priority to U.S. patent application Ser. No. 11/471,323, which was filed on June 20, 2006, and is now embodied in U.S. Patent No. 7,899,713 (the "'713 Patent"). (*Id.* ¶ 8.) The '377 Patent

shares a common specification with the '713 Patent. (*Id.* ¶ 9.) As described in the '377 Patent's abstract, the underlying invention "enables a user, e.g., a consumer, to customize products containing solids and/or fluids by allowing a server communicating over the global computer network, e.g., the Internet, to provide product preferences of a user to a product or a mixing device, e.g., a product or beverage dispenser." ('377 Patent, at 1.)

At issue in this litigation are independent Claim 11 and dependent Claims 12-13, 17, and 21-23 (collectively, the "Asserted Claims") of the '377 Patent. (Pl.'s Infringement Contentions ¶ 1.) Claim 11 discloses a beverage dispenser comprising:

> [1] at least one compartment containing an element of a beverage;
> [2] at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage;
> [3] a mixing chamber for mixing the beverage;
> [4] a user interface module configured to receive and [sic] identity of a user and an identifier of the beverage;
> [5] a communication module configured to transmit the identity of the user and the identifier of the beverage to a server over a network, receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server and communication [sic] the user generated beverage product preferences to controller; and
> [6] the controller coupled to the communication module and configured to actuate the at least one valve to control an amount of the element to be dispensed and to actuate the mixing chamber based on the user genetated [sic] beverage product preferences.

('377 Patent, at 9:43-63.) During the prosecution of the '377 Patent, the U.S. Patent and Trademark Office (the "USPTO") twice found the applied-for claims unpatentable as anticipated by prior art. (Def.'s Corrected Statement of Undisputed Material Facts ¶¶ 10, 12.) After multiple failed claim amendments, on January 31, 2013, the patent

examiner issued a notice of allowance and an examiner's amendment to what is now Claim 11 (then Claim 37). (*Id.* ¶¶ 12-13, 17.) The examiner's amendment added the phrase "identifier of the beverage" for the first time to three limitations of Claim 11 (as shown above). (*Id.* ¶ 17.) According to the examiner, the addition of this phrase, in combination with the remaining claim language, "is not taught or fairly suggested by the present prior art of record." (*Id.*)

Rothschild alleges that the Defendant The Coca-Cola Company has infringed the Asserted Claims of the '377 Patent by using, selling, and offering to sell the "Freestyle" beverage dispenser and its related mobile application (the "Mobile App"). (Am. Compl. ¶ 23; Pl.'s Infringement Contentions ¶¶ 1-2.) First introduced in 2009, the Freestyle machine allows consumers to pick and dispense a beverage among more than 100 Coca-Cola brands, all from a single touchscreen user interface or a smartphone device. (Pl.'s Resp. to Def.'s Corrected Statement of Undisputed Material Facts ¶¶ 140-41.) The Freestyle machine separates the brand flavor concentrate (e.g., Coca-Cola, Sprite, and Orange Fanta) from its sweetener base (e.g., HFCS and artificial sweeteners) and flavoring additive (e.g., cherry, lemon, lime, and vanilla). (Def.'s Corrected Statement of Undisputed Material Facts ¶ 139.) This setup allows consumers to mix and match brands, sweeteners, and flavorings to create dozens of combinations of finished beverages. (*Id.*) Discovery in this case closed on September 28, 2022, and Coca-Cola now moves for summary judgment of invalidity and noninfringement as to the Asserted Claims.

This is not the first time Coca-Cola has moved for summary judgment in this case. On April 23, 2019, the Court issued an order granting summary judgment of noninfringement to Coca-Cola on the grounds that: (1) Rothschild could not assert any dependent claims after failing to adequately disclose them in discovery, and (2) the Freestyle machine does not contain a "user interface module" as required by Claim 11. *See Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 389 F. Supp. 3d 1169, 1193 (N.D. Ga. 2019). In the same order, the Court denied Coca-Cola's request to invalidate the '377 Patent due to anticipation and obviousness. *See id.* at 1197-98. The summary judgment order was vacated on appeal. Addressing the scope of the term "user interface module," the Federal Circuit disagreed with this Court's holding that the module must be physically connected to the dispenser and must enable direct communication between the user and the dispenser. *See Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 562-63 (Fed. Cir. 2020). The constructions of other claim limitations, including the "communication module" and the "mixing chamber," were implicated by the Federal Circuit's reasoning. *See id.* at 562. Based on its new construction of "user interface module," the Federal Circuit vacated summary judgment of noninfringement as to Claim 11 and the dependent claims. *See id.* at 564-65.

## II.   Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),

(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.  Discussion

### A. Whether the Asserted Claims Are Invalid for Lack of Written Description

First, Coca-Cola moves for summary judgment of invalidity on the grounds that Claim 11 contains a new term—"identifier of the beverage"—that was added by examiner's amendment and does not appear in the '377 Patent specification. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 14.) Under 35 U.S.C. § 112(a), the specification must "contain a written description of [1] the invention, and of [2] the manner and process of making and using it, in . . . full, clear, concise, and exact terms[.]" The purpose of the written description requirement "is to prevent an applicant from later asserting that he invented that which he did not; the applicant for a patent is therefore required to recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) (quotation marks and citation omitted). By the same token, an applicant is forbidden to insert new material into claim amendments, particularly during the continuation

5

process. *See Agilent Techns., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009). Whether a patent specification satisfies the written description requirement, and whether new matter has been added to an application, are questions of fact. *See id.*; *Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008).

According to Coca-Cola, neither the abstract nor the specification of the '377 Patent (or its parent) disclose what is meant by the "identifier of the beverage." (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 15.) Rothschild counters, as an initial matter, that this invalidity theory is waived because Coca-Cola failed to raise it before the present motion for summary judgment. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 3-4.) During the yearslong claim construction process, Rothschild emphasizes, Coca-Cola never sought this Court's or the Federal Circuit's interpretation of "identifier of the beverage," despite disputing other nearby claim terms. (*Id.* at 4-5.) Rothschild also argues that the "barebones, unexplained" mention of the written description requirement in Coca-Cola's invalidity contentions is insufficient to avoid waiver. (*Id.* at 5-6 (citing Def.'s Supp. Invalidity Contentions, at 12).) On reply, Coca-Cola turns the tables on Rothschild, arguing that its claim of an inadequate contention should have been pursued during fact discovery and is now itself waived. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 10-11.)

Under the Local Patent Rules for this District, a party seeking a declaratory judgment of patent invalidity must disclose specific information in its invalidity contentions, including "[a]ny grounds of invalidity based on any applicable provision

6

of 35 U.S.C. § 112." N.D. Ga. Patent L.R. 4.3. "[I]nvalidity contentions serve a function far more important than the mere identity and disclosure of potentially relevant evidence: they explain exactly *how* the opposing party will use that evidence to invalidate the patent." *Bayer Healthcare Pharms, Inc. v. River's Edge Pharms., LLC*, 2015 WL 11142427, at *5 (N.D. Ga. May 21, 2015) (quotation marks and citation omitted). An invalidity contention that is not properly disclosed is barred. *See id.*

The Court finds that Coca-Cola gave Rothschild ample notice of its written description argument both in its invalidity contentions and during expert discovery. Not only did Coca-Cola cite the "identifier of the beverage" limitation in its § 112 contentions, but Coca-Cola's invalidity expert, Peter Wolski, also opined that the Asserted Claims are invalid "because they are indefinite, lack sufficient written description, and are not enabled by the specification." (Wolski 2022 Invalidity Report ¶ 19.) Wolski explained:

> [T]he patent specification itself does not specify the scope of "an identifier of the beverage." Rather the '377 Patent specification discloses that once the user's product preferences are determined the server will store those preferences in a standard database and optionally issue to the user an identity code, such as an alphanumeric code, to facilitate retrieval of the user's product preferences in a subsequent purchase.

(*Id.* ¶ 78.) The Court believes that these disclosures provided "sufficient notice for [Rothschild] to engage in meaningful discovery and preparation of its case." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 690161, at *6 (N.D. Cal. Feb. 21, 2014). In fact, Rothschild did just, deposing Wolski about the extent of his

analysis of the written description requirement. (Wolski Dep. at 81:15-82:19.) This record, the Court concludes, does not support a finding of waiver.

The Court shifts now to the merits of Coca-Cola's written description contention. As mentioned, "[w]ritten description is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date." *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1063 (Fed. Cir. 2020) (citation omitted). The written description requirement does not require that the specification, as originally filed, "provide *in haec verba* support for the claimed subject matter at issue." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000). Rather, the standard is whether "one skilled in the art, reading the original disclosure, [would] immediately discern the limitation at issue in the claims." *Id.*

Here, the Court cannot say, as a matter of law, that a person of ordinary skill in the art would not discern the meaning of "identifier of the beverage" in the context of the '377 Patent. First, Rothschild notes that the specification repeatedly discusses an identifier of the "product," although not an identifier of the beverage. (Pl.'s Corrected Br. in Opp'n to Defs.' Mot. for Summ. J., at 13-15.) For example, the abstract recounts steps for "*identifying a product* to a server over the network; identifying a user to the server over the network; [and] retrieving the user's product preferences from a database at the server based on the *product's identity* and user's identity[.]" ('377 Patent, at 1; *see also id.* at 5:3-22 (describing alternative methods for accomplishing the product identification step).) Similarly, figure 3 of the drawing sheets illustrates the invention with a flow chart showing element 304 labeled

8

"IDENTIFY PRODUCT TO SERVER." (*Id.* at Fig. 3.) According to Rothschild, the beverage identifier should be read as a "simple variant" of the product identifier. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 15-16.) In support, Rothschild directs the Court to parts of the specification disclosing the preferred embodiments of the invention. (*Id.*) One embodiment encompasses a broad range of personalized consumer products, including toothpaste, shampoos, conditioners, beverages, and soaps, whereas the other embodiment is designed specifically to mix and dispense beverages. ('377 Patent, at 2:53-58, 4:7-12, 6:5-8, 6:25-29.) All of these disclosures, Rothschild emphasizes, date back to the original parent application filed in 2006. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 15.)

Coca-Cola attempts to poke several holes in Rothschild's reading of the '377 Patent. First, Coca-Cola argues that the specification only describes how to retrieve the user's "beverage product preferences" based on the user's identity. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 4,) "There are no references in the specification," Coca-Cola notes, "to using an 'identification' or any other information about a beverage to retrieve the user's beverage product preferences." (*Id.*) Second, Coca-Cola argues that the specification uses the terms "product" and "beverage" to designate distinct steps in the customization process. (*Id.* at 4-5.) According to Coca-Cola, the "product" is the initial generic product that is input into the system prior to customization, whereas Rothschild's infringement expert, Charles Curley, opined that the beverage identifier refers to the final customized product. (*Id.*) Third, Coca-Cola argues that Rothschild's infringement contentions do not point to a singular

9

identifier of the beverage in the Freestyle machine, confirming the limitation's ambiguous scope. (*Id.* at 6-7.)

None of these arguments are supported by expert testimony. Other than a cursory mention of the written description requirement, Wolski's invalidity report contains no analysis on the subject, and he stated during his deposition that he did not plan to testify about it at trial. (Wolski Dep. at 81:17-82:19.) In fact, the sole expert testimony pertaining to this issue supports Rothschild's position: when asked to locate the "identifier of the beverage" limitation in the specification, Curley picked out the phrase "identifier of the product," among others, during his deposition. (Curley Dep. at 263:18-264:25.) Wolski also testified, without hesitation, that he understood "identifier of the beverage" to mean "something that identifies the beverage associated with the user," including "a method, a symbol, a name . . . . [or] any kind of symbolic representation used in common communications." (Wolski Dep. at 145:10-21.) On this record, the Court determines that Coca-Cola has not presented the "clear and convincing evidence" required to invalidate a patent. *See Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012). There remains a genuine issue of material fact as to whether the '377 Patent specification discloses the "identifier of the beverage" limitation of Claim 11. Accordingly, summary judgment is denied as to Coca-Cola's written description defense.[1]

---

[1] Coca-Cola also moves for summary judgment on the grounds that the "identifier of the beverage" limitation is impermissible "new matter" under 35 U.S.C. § 132(a). (Pl.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 18-19.) But unlike § 112, which is a codified defense to patent infringement, § 132 is an examiner's

**B.  Whether the Asserted Claims Are Invalid as Anticipated by Prior Art**

Coca-Cola next argues that the '377 Patent is invalid because it was anticipated by the Freestyle machine and two prior patents. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 21-23.) Under 35 U.S.C. § 102(a)(1), an applicant cannot receive a patent for an invention that was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention[.]" This rule "embodies the concept of novelty—if a device or process has been previously invented (and disclosed to the public), then it is not new, and therefore the claimed invention is 'anticipated' by the prior invention." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention, either expressly or inherently. An anticipatory prior art reference must also enable one with ordinary skill in the art to practice the invention." *Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.*, 799 F. App'x 838, 842-43 (Fed. Cir. 2020) (quotation marks and citations omitted). Anticipation is a question of fact that must be proven by clear and convincing evidence. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010).

---

instruction with no statutory penalty in the event of a breach. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1348 (Fed. Cir. 2010). "Express statutory invalidity defenses carry more weight than examiner's instructions, and prohibiting adding new matter to the claims has properly been held enforceable under § 112, first paragraph." *Id.* So, Coca-Cola's arguments under § 132 are subject to the same analysis as its arguments under § 112.

### a.  Freestyle Machine

First, Coca-Cola asserts that the Freestyle machine should be treated as prior art to the '377 Patent. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 23.) However, the first model of the Freestyle machine was not brought to market until 2009, three years after the patent's claimed priority date of June 20, 2006. So, echoing its written description argument, Coca-Cola asks that the Court assign an effective filing date of January 31, 2013, to the '377 Patent: that is, the date when the "identifier of the beverage" limitation was added by examiner's amendment. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 19-21.) The Court can easily dispense with this argument. As explained, Coca-Cola has not demonstrated, for purposes of summary judgment, that the "identifier of the beverage" is new matter in the '377 Patent specification. If the jury were to find in favor of Rothschild on the written description issue, then the June 20, 2006 priority date would stand, and Coca-Cola's anticipation defense would fail with respect to the Freestyle machine. Coca-Cola is not entitled to summary judgment on this theory of invalidity.

### b.  Gutwein Patent and Boland Patent

Next, Coca-Cola argues that the '377 Patent is anticipated by two prior art patents: U.S. Patent No. 6,759,072 (the "Gutwein Patent") and U.S. Patent No. 7,762,181 (the "Boland Patent"). (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 25.) The Court addresses each patent in turn.

*Gutwein Patent*

The Gutwein Patent is titled "Methods and Systems for Utilizing Delayed Dilution, Mixing and Filtration for Providing Customized Beverages on Demand." (Gutwein Patent, at 1.) It describes a "[s]ystem for making and delivering a customized beverage product to a consumer having a user interface, a customization director in communication with a customization data store and the user interface . . . and a beverage delivery system[.]" (*Id.*) The patent was issued on July 6, 2004, following an application filed on August 14, 2000 (*id.*); it thus predates both Rothschild's and Coca-Cola's proposed priority dates for the '377 Patent.

Coca-Cola relies on Wolski's invalidity report to make a showing of anticipation. In it, Wolski summarizes the invention covered by the Gutwein Patent and purports to match claim limitations of the '377 Patent with their corresponding disclosures in the Gutwein Patent. (Wolski 2022 Invalidity Report ¶¶ 91-99, 155-62 & Ex. A.) In response, Rothschild argues that summary judgment is inappropriate because its invalidity expert, Curley, disputes Wolski's conclusions as to several limitations. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 28-29.) After reviewing the expert reports, the Court agrees that Coca-Cola has not met the heavy burden for establishing anticipation on summary judgment.

The Federal Circuit has articulated what kind of evidence is required for an alleged infringer to prove anticipation by prior art:

> Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how

each claim element is disclosed in the prior art reference. The testimony
is insufficient if it is merely conclusory.

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004)

(citation omitted). Applying this standard, the district court in *CIF Licensing, LLC v.*

*Agere Systems Inc.*, 727 F. Supp. 2d 337, 360-61 (D. Del. 2010), granted judgment as

a matter of law on the issue of whether the plaintiff's patent ('054) was anticipated

by two prior patents ('495 and '227). The court held that the alleged infringer's

expert's testimony at trial was too conclusory to support a jury finding of anticipation:

> Even when the above-cited testimony is considered in context with the
> demonstrative Dr. Tretter presented to the jury and the references
> submitted into evidence, at most this testimony amounts to a bare
> recitation of excerpts from the '495 and '227 patents which supposedly
> disclose the elements of Claims 1, 12, and 46 of the '054 patent. Dr.
> Tretter provided no explanation of how or why each of the claim
> elements were disclosed in the cited portions of the '495 and '227
> patents.

*CIF Licensing*, 727 F. Supp. 2d at 361. The court's conclusion was also based on a

lack of testimony showing that the prior references were enabling of the claimed

invention. *See id.*

There are similar shortcomings in Wolski's analysis of the Gutwein Patent. In

Exhibit A of his report, Wolski produces a table with each limitation of the Asserted

Claims in one column and verbatim excerpts from the Gutwein Patent in the other

column. To illustrate, the first page of the table is reproduced below:

| Claim Limitation | U.S. Pat. No. 6,759,072 ("Gutwein") |
|---|---|
| 11. A beverage dispenser comprising: | Gutwein at Figs. 1 (beverage delivery system 109), 5 (beverage delivery systems 502), 6 (customizable beverage system 100);<br><br>5:16–19 ("System 100 comprises one or more away from home customizable beverage delivery systems 502…");<br><br>6:22–24 ("The customizable beverage system 100 is contained within housing 608."). |
| at least one compartment containing an element of a beverage; | Gutwein at 8:40–45 ("…a system linking the consumer's choice of product to a beverage delivery system which contains an amount of extract/concentrate and areas in the beverage delivery system(s) to accommodate, if desired, one or more aspects of delayed dilution, mixing and filtration.");<br><br>13:23–24 ("…a holding area which contains an amount of brewed extract;") |
| at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage; | Gutwein at 10:32–36 ("A suitable method for brewing a tea extract useful in the system of the present invention is disclosed in U.S. Pat. No. 4,757,752 to Rob[]ins (assigned to General Foods Corp.), issued Jun. 19, 1988, and is hereby incorporated by reference.");<br><br>4:9–23 ("In operation, when pivoting of lever 23 activates or opens valve 24 permits flow of water through conduit 25 to mixing head or valve 26. In the case of a venturi mixing valve, tea concentrate will be drawn from reservoir 19 through conduit 27 and into mixing valve 26. Water and concentrate are combined in valve 26 at a ratio of about more than 4:1, typically about 5:1. As will be recognized by those skilled in the art, other known systems for metering and mixing water and a liquid concentrate may be employed. Also, as would be the desire for vending machines, the length of the dispensing cycle could be controlled by a timer or flow meter such that each time the dispensing circuit is activated, a constant amount of tea beverage flows from the apparatus."). |
| a mixing chamber for mixing the beverage; | Gutwein at 13:24–27 ("…an area where the dilution of the beverage occurs at a ratio of water to brewed beverage extract that is consistent with the consumer's choice as to brew strength and variety. The system of the present invention may optionally utilize (either or both) the aspects of 'delayed mixing' and 'delayed filtration' to further increase the options of 'brewed' beverage deliverable, on demand, to the individual consumer based upon their preferences.");<br><br>13:47–53 ("The term 'beverage delivery system' as used herein refers to the station, |

(Wolski 2022 Invalidity Report, Ex. A at 1.) As in *CIF Licensing*, these bare citations to portions of the '377 Patent and the Gutwein Patent are not clear and convincing evidence of anticipation—at least not for purposes of summary judgment. Contrary to the Federal Circuit's instructions, Wolski does not "state [his] interpretation of the claim element[s]," nor does he "explain in detail *how* each claim element is disclosed in the prior art reference." *Koito Mfg.*, 381 F.3d at 1152 (citation omitted). The same is true of Wolski's enablement discussion: he asserts, in conclusory fashion, that a person of ordinary skill in the art would understand the Gutwein Patent to teach each of the Asserted Claims. (*Id.* ¶¶ 155-62 & Ex. A.) He does not, however, examine any

15

of the enablement factors laid out in the Federal Circuit's precedent. *See, e.g.*, *Impax Lab'ys, Inc. v. Aventis Pharms, Inc.*, 545 F.3d 1312, 1314-15 (Fed. Cir. 2008).

Wolski's failure to show his work causes substantial confusion in the anticipation inquiry. Consider, for example, the limitation of Claim 11 that requires "at least one valve coupling the at least one compartment to a dispensing section configured to dispense the beverage[.]"[2] ('377 Patent at 9:46-48.) Wolski states that the following language, which was incorporated into the Gutwein Patent from U.S. Patent No. 4,757,752 (the "Robins Patent"), discloses this limitation:

> In operation, when pivoting of lever 23 activates or opens valve 24 permits flow of water through conduct 25 to mixing head or valve 26. In the case of a venturi mixing valve, tea concentrate will be drawn from reservoir 19 through conduit 27 and into mixing valve 26. Water and concentrate are combined in valve 26 at a ratio of about more than 4:1, typically about 5:1. As will be recognized by those skilled in the art, other known systems for metering and mixing water and a liquid concentrate may be employed. Also, as would be the desire for vending machines, the length of the dispensing cycle could be controlled by a timer or flow meter such that each time the dispensing circuit is activated, a constant amount of tea beverage flows from the apparatus.

(Wolski 2022 Invalidity Report, Ex A at 1.) In response, Curley argues that this excerpt does not conclusively teach how valve 24 is coupling the at least one compartment to a dispensing section configured to dispense the beverage. (Curley 2022 Invalidity Report ¶ 56.) The Court agrees. Wolski provides no independent discussion (not even a diagram) to help explain how the technical material in the

---

[2] In another limitation of Claim 11, the "at least one compartment" is described as "containing an element of a beverage[.]" ('377 Patent, at 9:44-45.)

16

Robins Patent relates to the '377 Patent. While valve 24 couples some sort of water source to mixing head or valve 26, it is unclear whether Wolski believes that mixing head or valve 26 is equivalent to the "dispensing section" claimed by Rothschild. If so, that interpretation is not self-evident. In fact, it seems to the Court that other components of the Robins Patent are more analogous to a "dispensing section," including the "dispensing circuit" and the "apparatus" from which "a constant amount of tea beverage flows." But the above excerpt does not disclose any connection between the dispensing circuit, the apparatus, valve 24, and mixing head or valve 26. This Court cannot and will not fill the analytical gaps in Wolski's report. *See Schumer v. Lab'y Comput. Sys., Inc.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002) ("It is not our task, nor is it the task of the district court, to attempt to interpret confusing or general testimony to determine whether a case of invalidity has been made out, particularly at the summary judgment stage."); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001) ("It is not the trial judge's burden to search through lengthy technologic documents for possible evidence.").

### Boland Patent

The Court turns next to Coca-Cola's anticipation arguments arising out of the Boland Patent, which is titled "Customised Nutritional Food and Beverage Dispensing System." (Boland Patent, at 1.) The abstract describes a dispensing system that "is programmed to formulate a serving which best matches the customized serving selected by the customer within constraints set by the programming taking into account the inventory of ingredients and the health profile

17

of the customer." (*Id.*) Coca-Cola contends that the Boland Patent is prior art to the '377 Patent. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 45.) The Court has denied summary judgment to Coca-Cola once before on this exact argument, holding that several elements of Claims 11-12 and 21-23 were not clearly disclosed in the Boland Patent. *See Rothschild*, 389 F. Supp. 3d at 1196-97. The question now is whether Coca-Cola has come forward with sufficient new evidence to overcome this previous ruling.

In particular, the Court found that two limitations of Claim 11 were absent from the Boland Patent: (1) the "valve" and (2) the "identifier of a beverage." *Id.* at 1196. Although the Boland Patent does not contain the word "valve," Coca-Cola emphasizes that it teaches other means to advance ingredients along conduits such as mechanical, gravity, vacuum, air pressure, and liquid pressure. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 49-50; Wolski 2022 Invalidity Report, Ex. C at 1-2.) The Boland Patent specifically mentions the use of motors, switches, and pumps to deliver ingredients of the selected beverage or snack. (Boland Patent, at 8:21-25, 12:13-15.) According to Coca-Cola, the use of a valve is inherent in these distribution methods. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 49.) Indeed, Coca-Cola finds support for its interpretation in Rothschild's own infringement contentions, which describes "electronically-controlled pumps" and "solenoid-operated gates" as examples of valves in the Freestyle machine. (Pl.'s Infringement Contentions, at 10-11.)

Even if Coca-Cola could locate a valve in the Boland Patent, it still has not resolved the Court's concerns about the "identifier of a beverage" limitation. As the Court explained in its previous summary judgment order:

> Claim 11 states that the user interface module of the claimed beverage dispenser is configured to receive both the "identity of a user" as well as "an identifier of the beverage," which the communication module will transmit to a server in order to receive user generated beverage product preferences. Rothschild notes that this distinction is important, because the Boland Patent employs solely user profiles, and not beverage identifiers. The machine described in Boland takes information about a user and constructs a beverage based upon that user's health profile. Thus, it is very likely that a jury would conclude that the Boland Patent does not have an "identifier of the beverage" element.

*Rothschild*, 389 F. Supp. 3d at 1196. The Court sees nothing in Wolski's report or Coca-Cola's briefs to warrant reconsidering this conclusion. Under the Boland Patent, "[a] customer may register on the system through the customer interface . . . . Registration would normally include input of customer profile data [and] customers could key in information in response to standardized questions about preferences, health status and allergies." (Wolski 2022 Invalidity Report, Ex. C at 2 (quoting Boland Patent, at 7:37-43).) When using the nutritional beverage dispenser, the customer enters only his user ID, not a beverage identifier, for the dispenser to recommend a beverage tailored to the customer's health status and preferences. (Boland Patent, at 11:8-44, 14:41-48, 17:55-60.) On this plain reading of the Boland Patent, the point stands that Coca-Cola has not demonstrated, by clear and convincing evidence, the disclosure of an "identifier of the beverage."

19

In sum, there remains a genuine issue of material fact as to whether the Gutwein Patent or the Boland Patent discloses every single limitation of Claim 11. By extension, there is also a genuine issue of material fact as to whether dependent Claims 12-13, 17, and 21-23 are anticipated by the prior patents. *See Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002) ("Because claim 3 is not inherently anticipated, dependent claims 4 and 5 also are not anticipated."). Thus, Coca-Cola is not entitled to summary judgment of invalidity on any of its anticipation theories.

## C. Whether the Freestyle Machine Infringes All Limitations of the Asserted Claims

Finally, Coca-Cola moves for summary judgment of noninfringement, arguing that Rothschild has failed to identify two claim limitations in the Freestyle machine. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 61.) "To prove infringement, the plaintiff bears the burden of proof to show the presence of every element or its equivalent in the accused device." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Infringement is a question of fact, although summary judgment is appropriate when it is apparent a reasonable jury could reach only one conclusion as to infringement. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323-24 (Fed. Cir. 2001).

The first limitation missing from the Freestyle machine, according to Coca-Cola, is an "identifier of the beverage." (Def.'s Corrected Br. in Supp. of Def.'s

Mot. for Summ. J., at 61.) It is undisputed that Coca-Cola products are assigned a unique numerical beverage ID, called a "bevID," in the Freestyle machine and in Coca-Cola's Consumer Data Aggregator server (the "CDA Server"). (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 53-54; Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 32-33.) BevIDs are associated with standard, unmodified products such as Coca-Cola, Sprite, and Fanta; they do not apply to beverages that are mixed according to a user's customized preferences—for example, a combination of 33 percent Coca-Cola, 33 percent Sprite, and 34 percent Fanta. (Cuppari Dep. at 30:2-31:14.) It is also undisputed that the Freestyle machine transmits bevIDs to the CDA Server in the form of "pour data" after a user dispenses his beverage. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 66-67; Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 54-55.) The purpose of the pour data is to track beverage supply inventory in the dispenser. Rothschild reasons that the Freestyle machine's use of bevIDs satisfies the "identifier of the beverage" limitation of Claim 11. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 55.)

Coca-Cola counters that this interpretation of a beverage identifier is inconsistent with Rothschild's own infringement allegations. (Reply Br. in Supp. of Pl.'s Mot. for Summ. J., at 32-33.) As Coca-Cola frames the case, Rothschild alleges that the Freestyle machine infringes the '377 Patent solely by mixing and dispensing customized beverages from user-generated recipes. (*Id.* at 32.) But the Freestyle machine does not assign a single bevID to customized beverages, as it does with standard products; instead, customized beverages are identified by multiple bevIDs

21

and ratios depending on the user's unique inputs. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 54-55.) So, the argument goes, bevIDs serve to identify an "element of a beverage" rather than the final "beverage" in the context of Claim 11. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 33.)

However, nothing in the record or the case law compels that the beverage identifier be expressed as a single name, numerical code, or other symbol. Coca-Cola's argument also fails to account for the doctrine of equivalents in patent law. Under the doctrine of equivalents, there need not be a "one-to-one correspondence between the accused device and that disclosed in the patent" to prove infringement. *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) The Federal Circuit has explained that "infringement . . . may be established even though the accused device requires a number of components to perform functions which the patented invention achieves by use of one component." *Id.* "The determination of equivalency is not subject to a rigid formula. An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component." *Id.* (citation and punctuation omitted). Here, a reasonable jury could find that multiple bevIDs, when used in combination with ratios to designate a single mixed beverage, are the equivalent of an identifier of the beverage.[3]

---

[3] Coca-Cola also argues that the bevID does not fulfill other aspects of the "identifier of the beverage" limitation: namely, (1) the Freestyle machine does not transmit both a user's identity and an identifier of the beverage to a server *before* dispensing a beverage, and (2) the Freestyle machine does not receive from a server

Next, Coca-Cola contends that the Freestyle machine does not fulfill the "communication module" limitation of Claim 11. The communication module must be configured to perform three functions:

> [1] transmit the identity of the user and the identifier of the beverage to a server over a network, [2] receive user generated beverage product preferences based on the identity of the user and the identifier of the beverage from the server and [3] communicat[e] the user generated beverage product preferences to controller[.]

('377 Patent at 9:52-58.) The main dispute between the parties is whether this limitation should be read as a sequential process: that is, must the "transmission" step precede the "receipt" step, and must the "receipt" step precede the "communication" step? (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 71-72; Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., 59-60; Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 37.) Coca-Cola says yes; Rothschild says no. If the steps must be performed in the order written, Coca-Cola argues, there can be no infringement because the Freestyle machine performs steps 2 and 3 of the communication module prior to step 1.

As an initial matter, this Court has construed the term "communication module" to mean "a component of the beverage dispenser that enables communication between the dispenser and the server."[4] *Rothschild Connected Devices Innovations,*

---

beverage product preferences based on both a user's identity and an identifier of the beverage. (Def.'s Corrected Br. in Supp. of Def.'s Mot. for Summ. J., at 66.) In the Court's view, these arguments are better addressed in the context of the next disputed claim limitation: the "communication module."

[4] In its claim construction order, this Court interpreted the communication

*LLC v. Coca-Cola Co.*, 2017 WL 5410867, at *7 (N.D. Ga. Nov. 13, 2017). The accused models of the Freestyle machine each contain a wireless modem that serves to connect and transmit electronic messages between the dispenser and the CDA Server. (Curley 2022 Infringement Report ¶¶ 174-85.) There are two kinds of communications that pass between the Freestyle machine and the CDA Server: (1) the "QR Initiate" message from the CDA Server to the Freestyle machine and (2) the previously mentioned "Pour Complete" message from the Freestyle machine to the CDA Server. (Alexander 2022 Noninfringement Report ¶¶ 84-90.) When a consumer wishes to dispense a beverage from a Freestyle machine, he can use the Mobile App to cause the CDA Server to send his beverage mixes and favorites to the Freestyle machine; this is referred to as the QR Initiate message. (*Id.* ¶¶ 81-85.) After dispensing the beverage, the Freestyle machine sends the Pour Complete message to the CDA Server, which logs the user's beverage selection for inventory management. (*Id.* ¶¶ 88-90.)

Both the QR Initiate and Pour Complete messages contain a user identifier (labeled "fbid") and at least one bevID. (*Id.* ¶¶ 82-83, 85, 88-89.) Thus, Rothschild argues that the first two functions of the communication module are satisfied: (1) the Pour Complete message transmits the user identifier and the beverage identifier (i.e.,

---

module as a "physical component" of the beverage dispenser, but the rationale for this conclusion was rejected on appeal. *Rothschild*, 813 F. App'x at 562-63. The communication module need not be physically part of the dispenser to satisfy Claim 11.

one or more bevIDs) from the Freestyle machine to the CDA Server, and (2) the QR Initiate message transmits user-generated product preferences (i.e., beverage mixes and favorites) based on user and beverage identifiers from the CDA Server to the Freestyle machine. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 54-58.) The trouble with this theory, according to Coca-Cola, is that Claim 11 contemplates that the dispenser will transmit user and beverage data to the server *before* it receives product preferences back from the server. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 40.) The Pour Complete message, by contrast, is sent after the QR Initiate message and after the Freestyle machine has already dispensed the user's chosen beverage. As far as the Court is aware, there is no evidence in the record that the Freestyle machine modem is "configured to," must less actually does, send pre-pour messages to the CDA Server with user and beverage identifiers.

Rothschild pushes back against Coca-Cola's sequencing argument on both procedural and substantive grounds. First, Rothschild draws a firm distinction between method claims and apparatus claims. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 60.) According to Rothschild, Claim 11 and the other Asserted Claims are all apparatus claims, and apparatus claims, unlike method claims, do not consist of steps in a particular order. (*Id.*) Rothschild cites no case law to support this specific proposition. Instead, quoting *Hewlitt-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990), Rothschild merely asserts that "[a]pparatus claims cover what a device *is*, not what a device *does*." (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 60.) But by that vague standard, Claim 11 would not

be an apparatus claim since it unquestionably describes what the patented beverage dispenser *does*. In any event, the Federal Circuit and several district courts have held that "order can be required by a system/apparatus claim." *Avago Techs. Gen. IP (Singapore) PTE Ltd. v. Asustek Comput., Inc.*, 2016 WL 3029674, at *12 (N.D. Cal. May 27, 2016) (collecting cases); *see also Oak Tech., Inc. v. ITC*, 248 F.3d 1316, 1325 (Fed. Cir. 2001) ("These required interactions, based solely on the plain language of the claim, support the Commission's observation that the claim language contemplates and explicitly describes a sequential process."); *Versata Software, Inc. v. SAP Am., Inc.*, 2009 WL 1408520, at *13 (E.D. Tex. May 19, 2009) ("Both the Federal Circuit and this court have, under certain circumstances, imposed a sequential order of method steps in the context of device and system claims."); *Lextron Sys., Inc. v. Microsoft Corp.*, 2005 WL 6220089, at *10 (N.D. Cal. June 1, 2005) ("Although claim 1 is not strictly a method claim, it recites steps, so Federal Circuit precedent on methods is appropriately invoked here[.]"). Accordingly, Claim 11's status as an apparatus claim, even accepted as true, does not preclude the Court from reading its limitations as a sequential process.

Next, Rothschild argues that Coca-Cola has waived any argument as to the order of Claim 11 because it did not raise this issue during claim construction. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 60-61.) Coca-Cola counters, with little explanation, that it is not asking the Court to construe new claim language. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 45.) In each of the parties' cited cases, the question of limitation sequencing was raised and decided during claim

26

construction, not on summary judgment. *See, e.g., Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1367-68, 1370-72 (Fed. Cir. 2003); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1330, 1342-43 (Fed. Cir. 2001); *Avago Techs.*, 2016 WL 3029674, at *1, 11-13; *FotoMedia Techs., LLC v. AOL, LLC*, 2009 WL 2175845, at *1, 12 (E.D. Tex. July 21, 2009). These authorities do not, however, speak to whether it is proper to consider sequencing arguments at the summary judgment stage. Rothschild holds up *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014), for the proposition that courts may not construe additional claim terms following claim construction. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 61-62.) But Rothschild's argument is founded on the mistaken assumption that this Court would have to engage in claim construction anew to resolve the parties' sequencing dispute.

In *Apple*, the district court refused to engage in "hypertechnical refinements" of claim language based on claim construction arguments which were raised for the first time on summary judgment. *See Apple*, 2014 WL 252045, at *4. Still, the court held that it could resolve disputes over the scope of claim terms "as 'part of the infringement analysis, not part of the claim construction.'" *Id.* (quoting *Thorner v. Sony Comput. Ent. Am., LLC*, 669 F.3d 1362, 1369 (Fed. Cir. 2012)). This interpretive process is not altogether dissimilar from claim construction. In the infringement context, the court's task is to determine "whether a reasonable jury, armed with the [c]ourt's claim construction as to certain terms and an instruction that the plain and ordinary meaning controls as to others, could or would necessarily conclude that the

asserted claim reads on an accused device[.]" *Id.* at *5. Although the court is not charged with providing "definitive" definitions in the infringement analysis, it may review the written description and other parts of the specification to "shed contextual light" on a term's plain and ordinary meaning. *Id.* at *5 (citation omitted). What the court will not do, though, is consider "voluminous submissions of intrinsic and extrinsic evidence," "in-depth technology tutorials," and other technical forms of evidence that are associated with the claim construction process. *Id.* at *4.

Armed with this analytical framework, the Court can turn its attention to the merits of Coca-Cola's sequencing argument. According to the Federal Circuit, "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Altiris*, 318 F.3d at 1369 (citation omitted). Here, there is no dispute that Claim 11 does not recite an explicit order for "transmitting," "receiving," and "communicating" data from the communication module. In such cases, the Federal Circuit has endorsed a two-part test for determining whether claim steps must nonetheless be performed in the order written. *See id.* First, courts "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Id.* If not, courts "next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Id.* at 1370 (quotation marks, citation, and emphasis omitted). "If not, the sequence in which such steps are written is not a requirement." *Id.*

Coca-Cola argues that the term "based on" establishes a step-by-step process in the "communication module" limitation. (Reply Br. in Supp. of Def.'s Mot. for

Summ. J., at 39.) As a reminder, Claim 11 requires that the communication module be configured to perform three functions: (1) transmit the identity of the user and the identifier of the beverage to a server over a network; (2) receive user-generated beverage product preferences *based on* the identity of the user and the identifier of the beverage from the server; and (3) communicate the user-generated beverage product preferences to the controller. According to Coca-Cola, "[i]f 'based on' has any meaning, the 'identity of the user' and 'identifier of the beverage' must have been known (i.e., transmitted) before user generated beverage product preferences are received by the communication module and then communicated to the controller." (*Id.* at 39-40.) The Court agrees with this common-sense reading of the limitation. Put simply, each step of the communication module "reference[s] something logically indicating the prior step had been performed." *Altiris*, 318 F.3d at 1370 (citing *Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998)). Step 1 provides the identity of the user and the identifier of the beverage to the server. Step 2 converts the user and beverage identifiers provided in step 1 into user-generated beverage product preferences and sends those product preferences from the server to the communication module. *See Base*, Black's Law Dictionary (11th ed. 2019) (defining "base," in relevant part, as "[t]o use (something) as the thing from which something else is developed"). Step 3 then sends the product preferences received by the communication module in step 2 to the controller.

Viewing these functions in the broader context of Claim 11 confirms their sequential nature. Immediately before the "communication module" limitation, there

is a limitation for "a user interface module configured to receive an[] identity of a user and an identifier of the beverage."[5] ('377 Patent, at 9:50-51.) The use of the indefinite article "a" is telling here (i.e., "*an*[] identity of *a* user and *an* identifier of the beverage"). It signifies that a user is unknown to the beverage dispenser until he enters his personal information into the user interface module. The "communication module" limitation then begins to use the definite article "the" to refer to "*the* identity of *the* user and *the* identity of the beverage." Based on these grammatical clues, "a" user must identify himself to the user interface module before the communication module is able to access and transmit data about "the" user. This sequence makes logical sense: after all, how could the communication module know to transmit information about a particular person unless and until that person identifies himself in some way?

This ordered process continues with the final limitation of Claim 11: the "controller." In relevant part, the controller is "coupled to the communication module and configured . . . to actuate the mixing chamber *based on* the user gene[r]ated beverage product preferences." ('377 Patent, at 9:59-63 (emphasis added).) Like step 2 of the communication module, this limitation uses the phrase "based on" to indicate that a prior step must have occurred before the current one. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Because claim terms are normally used

---

[5] As construed by the Federal Circuit, the term "user interface module" means "a component the user interacts with to communicate with the dispenser." *Rothschild*, 813 F. App'x at 562.

consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."). Namely, the controller cannot actuate the mixing chamber "based on" the user-generated beverage product preferences unless and until it receives those product preferences from some source. That source is the communication module in the preceding limitation: the communication module is configured at step 3 to communicate the user generated beverage product preferences to the controller. In sum, Claim 11 recites a clear sequential process from the user interface module to the communication module to the controller. To effectuate this process, the steps of the communication module limitation must also be performed in the order written.

Coca-Cola's interpretation of Claim 11 is also supported by the patent specification. *See id.* at 1315 ("Usually, [the specification] is the single best guide to the meaning of a disputed term." (citation omitted)). The abstract of the '377 Patent recounts a series of "steps" for creating a personalized consumer product, including "identifying a product to a server over the network; identifying a user to the server over the network; retrieving the user's product preferences from a database at the server based on the product's identity and user's identity; [and] transmitting the user's product preferences to the product over the network[.]" ('377 Patent, at 1.) With respect to the embodiment of a beverage dispenser, the specification describes these steps in greater detail and, critically, in the same order as the "communication module" limitation:

> The user identifies himself to the beverage dispenser, e. g., by typing in a user code on a touch keypad on the dispenser, via a communications device such as a mobile device having Bluetooth, WiFi, RFID, etc. capabilities, via a magnetic card or by voice recognition. The user enters this identity information into the dispenser and the dispenser retrieves the user's product preferences from memory. Alternatively, the dispenser communicates the user's identity information to a server on the global computer network (e.g., the Internet). The server then identifies the user of the dispenser and directs the dispenser to mix the beverage for the user exactly the way the user has predetermined that they like to drink the beverage.

(*Id.* at 6:7-20; *see also id.* at 7:56-8:32 (explaining, in order, that the communication module communicates the user's identity to the server; the server uses standard database lookup software to locate the user's beverage product preferences, if known; and the server transmits the user's beverage product preferences to the communication module).) Likewise, Figures 3 and 5 confirm that a user's identity must be transmitted to the server (elements 306 and 510) before the server can locate the user (elements 308 and 512) and his product preferences (elements 312 and 516) and then transmit his product preferences to the dispenser (elements 314 and 518). (*Id.*, Figs. 3 & 5.)

Faced with so much intrinsic evidence as to the order of the "communication module" limitation, Rothschild argues that limitations should not be imported from the specification into the claims. (Pl.'s Corrected Br. in Opp'n to Def.'s Mot. for Summ. J., at 63.) Indeed, "[t]he claims, not specification embodiments, define the scope of patent protection," and courts must afford a patentee the full scope of his claims rather than limiting him to his preferred embodiment. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). At the same time, it is axiomatic that

"claims may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will limit claim breadth." *Gentry Gallery, inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998). Here, there is nothing in the '377 Patent, including the claims, specification, or prosecution history, to support Rothschild's loose reading of Claim 11. Again, Rothschild posits that the Pour Complete message, transmitted after a beverage is dispensed, satisfies step 1 of the communication module. However, the specification does not disclose any communications between the dispenser and the server *after* a beverage has been mixed and is ready to be dispensed. ('377 Patent, at 5:61-6:4, 8:36-47; *id.*, Figs. 3 & 5 (listing the last step in the patented process as "mix product").) In other words, there are no post-pour communications like the Pour Complete message described anywhere in the '377 Patent. So, even if the order of the "communication module" limitation were ambiguous—and it is not—the Court would not accept Rothschild's interpretation since it would render Claim 11 invalid for lack of written description. *See Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."). In sum, the Court concludes that a reasonable jury would understand the communication module, by its plain and ordinary terms, to require three sequential steps.

Because the Freestyle machine, via its wireless modem, does not transmit the identity of the user and the identifier of the beverage to a server prior to dispensing a beverage, Coca-Cola is entitled to summary judgment of noninfringement as to

33

Claim 11 and, by extension, dependent Claims 12-13, 17, and 21-23. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1325 (Fed. Cir. 2009) ("A conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims." (citation omitted)). Having granted summary judgment of noninfringement, the Court need not consider Coca-Cola's argument that any damages awarded in this case should be limited to "handshake-based" sales.

## IV.   Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Doc. 319] is GRANTED as to noninfringement and DENIED as to invalidity. The Clerk is directed to enter final judgment in favor of the Defendant.

SO ORDERED, this ___11th___ day of August, 2023.


THOMAS W. THRASH, JR.
United States District Judge